IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA     )
                                  )      CRIMINAL NO. 5:19CR50059-001
v.                               )
                                    )
ROBERT MORRIS LEVY         )

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1) of the Federal Rules of Criminal Procedure, the parties hereto acknowledge that they have entered into negotiations which have resulted in this Plea Agreement. The agreement of the parties is as follows:

### PLEA OF GUILTY TO COUNTS THIRTEEN AND TWENTY-NINE OF THE SUPERSEDING INDICTMENT AND DISMISSAL OF REMAINING COUNTS

1.      The Defendant, **ROBERT MORRIS LEVY**, hereby agrees to plead guilty to Counts Thirteen and Twenty-Nine of the Superseding Indictment returned by the grand jury on August 16, 2019.  Count Thirteen charged the Defendant with the commission of Mail Fraud, in violation of Title 18 U.S.C. § 1341.  Count Twenty-Nine charged the Defendant with commission of Involuntary Manslaughter, in violation of Title 18 U.S.C. § 1112.  If the Court accepts this Plea Agreement, once the Court has pronounced sentence, the United States will move to dismiss Counts One through and including Twelve, Fourteen through and including Twenty-Eight, Thirty and Thirty-One of the Superseding Indictment.

### ADMISSION OF FACTUAL BASIS IN SUPPORT OF GUILTY PLEA

2.      The Defendant has fully discussed with defense counsel the facts of this case and the elements of the two crimes to which he is pleading guilty.  The Defendant has committed each of the elements of the two crimes to which he is pleading guilty and admits there is a factual basis

1

that supports his guilty pleas and establishes his guilt for the offenses charged in Counts Thirteen and Twenty-Nine.  The following facts are true and undisputed:

a.      The Defendant, Robert Morris Levy ("Levy"), is a board-certified anatomic and clinical pathologist and board-certified hematopathologist.  He graduated from the University of Chicago School of Medicine in 1992.  He completed a five-year residency in pathology at the University of California San Francisco School of Medicine and a one-year fellowship in hematopathology at Duke University.  Levy's specialization in clinical pathology familiarized him with the science of urinalysis, blood testing and toxicology.

b.      In 2005, Levy was hired by the Veterans Health Care System of the Ozarks ("VHSO") in Fayetteville, Arkansas, for the position of Service Chief of Pathology and Laboratory Medicine Services.  A condition of Levy's employment with the VHSO required him to have and maintain a valid medical license.  Levy's medical license issued by the Mississippi Board of Medical Licensure on November 10, 1997, permitted him to practice medicine at the VHSO.

c.      The VHSO is operated by the Veterans Health Administration of the United States Department of Veterans Affairs.  The VHSO provides inpatient and outpatient medical care for veterans in twenty-three counties in Northwest Arkansas, Southwest Missouri and Eastern Oklahoma.  The VHSO is located within the special maritime and territorial jurisdiction of the United States in the Western District of Arkansas, Fayetteville Division.

d.      Levy's duties at the VHSO included, but were not limited to, rendering diagnoses after examining fluid and tissue samples; entering information in patients' medical records; assisting radiologists, surgeons and other medical professionals during needle biopsies; ensuring that quality standards were maintained for anatomical and clinical laboratory studies; reporting

2

errors that occurred at the VHSO pathology laboratory; and supervising the pathology laboratories at the VHSO clinics in Branson and Mount Vernon, Missouri. At the time of his termination from employment with the VHSO on April 13, 2018, Levy's adjusted annual basic pay was $232,547.00. Levy's salary, contributions to his employee benefits package and pecuniary performance awards were funded by the Department of Veterans Affairs.

e.    On March 22, 2016, Levy appeared impaired while working at the VHSO. He was immediately drug and alcohol tested. The test revealed Levy's blood alcohol content on March 22, 2016, was 396.0 milligrams per deciliter. The VHSO summarily suspended Levy's privileges to practice medicine and notified the Mississippi State Board of Medical Licensure. Levy voluntarily entered an inpatient alcohol treatment program in July 2016. He completed the program on October 8, 2016.

f.    In preparation to return to work at the VHSO, Levy agreed to participate in an impaired physician monitoring program ("monitoring program"). As part of the monitoring program, Levy executed a contract on September 19, 2016, with the Mississippi Physician Health Program and the Mississippi State Board of Medical Licensure that was intended to hold Levy accountable for maintaining sobriety to ensure his ability to practice medicine with reasonable skill and safety to patients. Levy agreed to "abstain completely from the use of . . . alcohol and other mood-altering substances" and submit to random drug and alcohol testing. He was on notice his medical license could be revoked if he breached the contract and failed random drug and alcohol tests. Levy knew he would lose his job and resulting salary and benefits if he lost his medical license.

g.      Levy returned to work at the VHSO on October 13, 2016.  He was randomly drug and alcohol tested.  All test results reported to the medical licensure authorities indicated drugs and alcohol were not in Levy's system.

h.      Beginning at an unknown date but at least in June 2017 when Levy was in the monitoring program subject to random drug and alcohol testing and working at the VHSO as Service Chief of Pathology and Laboratory Medicine Services, Levy purchased a substance to ingest that enabled him to achieve a state of intoxication.  The substance was 2-Methyl-2-butanol (tert-Amyl Alcohol), referred to as 2M2B.  Levy knew 2M2B would not be detected in standard blood, urine and breathalyzer tests.

i.      During an interview conducted by federal law enforcement special agents on July 23, 2018, Levy stated he "first discovered" 2M2B in November 2016 when "I started to get real about it."  Levy stated he knew 2M2B would not be detected on standard tests because it did not "degrade on the glu-chloride pathway."  Levy further admitted to federal law enforcement special agents that the "very first time" he used 2M2B was February 2017.   Levy revealed to a treating physician at Washington Regional Hospital in June 2018 that Levy had used 2M2B "to obtain the effects of alcohol without triggering a positive test" on his monitoring program.

j.      Beginning at a time unknown in or about the end of 2016 or the beginning of 2017, Levy intentionally devised a scheme to defraud the Department of Veterans Affairs to receive salary and benefits that Levy otherwise would not have received had the VHSO known about Levy's use and concealment of his use of the intoxicant 2M2B.

k.      As part of the scheme to defraud, Levy misled the Mississippi State Board of Medical Licensure and the VHSO about his compliance with his sobriety contract and monitoring

4

program.  Levy intentionally manipulated the information reported to the medical licensure authorities and VHSO by consuming 2M2B, a type of alcohol intoxicant he knew would not be detected through routine drug and alcohol testing.  Levy intended to defeat and did conceal that he defeated the monitoring program whose purpose was to monitor his sobriety to ensure his ability to practice medicine with reasonable skill and safety to patients.  Levy caused reports to be submitted to the Mississippi State Board of Medical Licensure that represented Levy was abstaining completely from the use of alcohol and other mood-altering substances when he was ingesting 2M2B to intoxicate himself.  Levy's scheme defrauded the Department of Veterans Affairs of money and benefits Levy would not have received had the VHSO been aware he materially misrepresented his compliance with the monitoring program and concealed the material fact he was using 2M2B to intentionally disguise his ingestion of an intoxicant.

l.      On July 2, 2017, in furtherance of the scheme to defraud, Levy caused a package containing 2M2B to be shipped in interstate commerce from a chemical supply company in Virginia to Levy's residence in Fayetteville, Arkansas.  The package containing 2M2B was sent from Virginia and delivered to Levy's home in the Western District of Arkansas by United Parcel Service, a commercial interstate carrier.

m.      Based on evidence from witnesses who would testify Levy was put on notice in October 2016 that he would lose his job with the VHSO if he did not comply with the monitoring program and lost his medical license; documentary evidence to include the contract Levy signed with Mississippi medical authorities in September 2016 in which Levy acknowledged he would be randomly drug and alcohol tested with the results reported to the board that had the authority to revoke his medical license; Levy's admission he was well aware that 2M2B would not be detected

through routine drug and alcohol testing; Levy's statement to a physician at Washington Regional Medical Center that the reason he used 2M2B was to achieve the effect of alcohol intoxication without triggering positive test results; reports of test results conducted by an independent laboratory on body fluid specimens Levy submitted for mandatory, random drug and alcohol testing that indicated no presence of drugs or alcohol; records obtained by federal investigators that Levy ordered and received packages containing 2M2B during the time in which Levy was well aware he would lose his job with VHSO if he did not maintain sobriety; and a test conducted by the Arkansas State Crime Laboratory of a urine sample Levy provided on a day he was on duty at the VHSO (March 1, 2018) that was positive for 2M2B, the Government could prove beyond a reasonable doubt that the Defendant, Robert Morris Levy, knowingly and willfully devised and intended to devise a scheme to defraud the Department of Veterans Affairs by means of material misrepresentation and concealment of a material fact for the purpose of obtaining resulting salary, monetary contributions to his employee benefits package and pecuniary performance awards that Levy would not have received had the VHSO known the facts involved in his scheme. Based on credit card transactions associated with Levy's Ebay account, internet purchase orders for 2M2B that were sent from Levy's email address of rmlevy@dog****.org, and commercial shipping and package transmittal records obtained from United Parcel Service, the Government could prove beyond a reasonable doubt that the Defendant, Robert Morris Levy, did cause a package containing 2M2B to be sent from Virginia on July 2, 2017, and shipped in interstate commerce by United Parcel Service, an interstate commercial carrier, for delivery to Levy's home in the Western District of Arkansas, Fayetteville Division, to execute the scheme to defraud.

n.      On February 4, 2014, Levy conducted a cursory and rudimentary workup of a biopsy of a tumor in the lymph node of Air Force veteran J.R.G. and rendered a diagnosis of diffuse large B cell lymphoma. The Government's evidence would show this diagnosis was incorrect and that Levy's workup prior to finalizing the incorrect diagnosis was cursory and rudimentary. The Government's evidence would prove that Levy's extensive training and experience as a pathologist included education and training in the proper diagnostic steps to be taken before finalizing a diagnosis of diffuse large B cell lymphoma. Levy knew the proper diagnostic steps to follow in order to diagnose J.R.G.'s case, but Levy chose not to follow those steps. Had Levy followed the proper diagnostic steps in J.R.G.'s case, Levy would have recognized that diffuse large B cell lymphoma was an incorrect diagnosis. Despite Levy's knowledge that his workup in J.R.G.'s case was inadequate, Levy finalized the erroneous diagnosis of diffuse large B cell lymphoma by entering that erroneous diagnosis in J.R.G.'s medical record on February 5, 2014.

o.      Levy also made an entry in J.R.G.'s medical record on February 5, 2014, that stated P.H., a VHSO pathologist, "has reviewed this case and concurs." Levy knew this was a false statement at the time he made it. Levy could reasonably foresee that J.R.G.'s doctors would consider P.H.'s purported concurrence with Levy's diagnosis as an indication of the confidence they could place in Levy's diagnosis in J.R.G.'s case of diffuse large B cell lymphoma.

p.      P.H. did not concur with the diagnosis of diffuse large B cell lymphoma. In fact, P.H. wrote a letter to Levy that expressed concern about J.R.G.'s case and recommended further testing be conducted. P.H. hand delivered the letter to Levy on February 6, 2014. In his letter, P.H. stated in pertinent part:

> "I have now reviewed these slides and I now favor a metastatic carcinoma but the case needs more immunos for classifications of the malignancy . . . My differential

7

at this time is undifferentiated carcinoma (poorly diff adeno, basal cell variant of squamous cell CA vs Neuroendocrine CA) versus large cell Lymphona (but now I feel less likely). I would recommend LCA, Pancytokeratin, CK 5/6, p63, CK 7, CK 20, TTFI, Synaptophysin + Chromogranin. Flow results will need to be reviewed also. I am concerned about this case and these immunos are regarded as important."

q.     Even after receiving P.H.'s letter, Levy did not take proper diagnostic steps to conduct full immunohistochemical studies that a pathologist with Levy's education, training and experience would have known to perform before rendering a diagnosis of diffuse large B cell lymphoma. Levy's decision not to perform a complete workup with further testing prevented an opportunity for a correct diagnosis in J.R.G.'s case that would, in turn, inform the type of treatment J.R.G. received. Levy's false entry in J.R.G.'s medical record on February 5, 2014, that P.H. "has reviewed this case and concurs," reinforced in J.R.G.'s medical record the incorrect diagnosis Levy rendered. The totality of Levy's conduct was grossly and criminally negligent and in wanton and reckless disregard for J.R.G.'s life.

r.     Based on Levy's incorrect diagnosis and without knowledge the diagnosis had been rendered after an incomplete workup and unaware the statement in J.R.G.'s medical record that P.H. concurred with the diagnosis of diffuse large B cell lymphoma was false, J.R.G.'s doctors immediately started J.R.G. on an aggressive treatment plan for diffuse large B cell lymphoma.

s.     Levy learned on or about February 10, 2014, that flow cytometry studies of J.R.G.'s lymph node biopsy conducted by an outside reference laboratory pathologist did not support Levy's diagnosis of diffuse large B cell lymphoma. When Levy learned that J.R.G.'s diagnosis was not supported by flow cytometry studies, Levy conducted a rudimentary and incomplete

workup with one immunohistochemical stain.  In light of Levy's knowledge that his diffuse large B cell lymphoma diagnosis was now in doubt, Levy's decision to forgo a full immunohistochemical study a second time was grossly and criminally negligent and in wanton and reckless disregard for J.R.G.'s life.  On February 10, 2014 - five days after Levy had finalized the erroneous diagnosis of diffuse large B cell lymphoma in J.R.G.'s medical record - Levy changed the diagnosis in J.R.G.'s medical record from diffuse large B cell lymphoma to non-small cell carcinoma characteristic of adenocarcinoma.  Levy's second diagnosis was also incorrect.

      t.     J.R.G.'s doctors relied on Levy's initial and false diagnosis of diffuse large B cell lymphoma to determine J.R.G.'s treatment, which Levy could reasonably foresee that J.R.G.'s doctors would do.  J.R.G. did not respond to treatment for diffuse large B cell lymphoma; a cancer that J.R.G. did not have.  J.R.G. died at the VHSO on July 26, 2014, of small cell carcinoma for which J.R.G. received no treatment to prolong his life.  J.R.G. was not treated for small cell carcinoma due to Levy's grossly and criminally negligent conduct that demonstrated a wanton and reckless disregard for J.R.G.'s life.

      u.     Based on evidence discovered in the look-back of Levy's work undertaken by independent pathologists who all would testify they determined Levy's false diagnosis of diffuse large B cell lymphoma was made with less than a proper workup, medical records, statements of witnesses and the Government's investigation to date, the Government could prove beyond a reasonable doubt that the Defendant, Robert Morris Levy, with gross and criminal negligence and wanton and reckless disregard for J.R.G.'s life, and with actual knowledge of circumstances that allowed Levy to reasonably foresee that his conduct might be a threat to the life of J.R.G., did cause the death of J.R.G. in the commission of a lawful act which might produce death by rendering a diagnosis based upon an incomplete workup that Levy knew through his education, training and

experience was wholly inadequate to render such diagnosis; by falsifying an entry in J.R.G.'s medical record that confirmed the erroneous diagnosis of diffuse large B cell lymphoma; by failing to correct the false entry Levy made in J.R.G.'s medical record upon learning P.H. did not concur with the diagnosis of diffuse large B cell lymphoma; by failing to conduct further testing recommended in P.H.'s letter that was hand delivered to Levy on February 6, 2014; by failing to conduct anything more than rudimentary testing after learning on February 10, 2014, that the results of the flow cytometry tests did not support his diagnosis of diffuse large B cell lymphoma; and by and through his acts and omissions that caused J.R.G. to receive treatment for a cancer J.R.G. did not have and caused J.R.G. to not receive potential life prolonging treatment for the type of cancer J.R.G. actually had.  The Government could prove beyond a reasonable doubt that Levy's conduct occurred at the VHSO, which is within the special maritime and territorial jurisdiction of the United States in the Western District of Arkansas, Fayetteville Division, from on or about February 4, 2014, to and including July 26, 2014.

## ADVICE OF RIGHTS

3.      The Defendant hereby acknowledges that he has been advised of and fully understands the following constitutional and statutory rights:

   a.   to have an attorney and if he cannot afford an attorney, to have one provided to him and paid for at the United States' expense;
   b.   to persist in his plea of not guilty;
   c.   to have a speedy and public trial by jury;
   d.   to be presumed innocent until proven guilty beyond a reasonable doubt;
   e.   to confront and examine witnesses who testify against him;
   f.   to call witnesses on his behalf;
   g.   to choose to testify or not testify and that no one could force him to testify; and
   h.   to have at least 30 days to prepare for trial.

## WAIVER OF RIGHTS

4.      The Defendant hereby acknowledges that he understands with respect to Counts Thirteen and Twenty-Nine of the Superseding Indictment to which he pleads guilty, he thereby WAIVES all of the rights listed in (b) through (h) of the above paragraph.

## WAIVER OF ACCESS TO RECORDS

5.      The Defendant hereby waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

## WAIVER OF "HYDE" CLAIM

6.      The Defendant hereby waives any claim under the Hyde Amendment, 18 U.S.C. § 3006A (Statutory Note), for attorney fees and other litigation expenses arising out of the investigation or prosecution of this matter.

## EFFECTS OF BREACH OF THIS AGREEMENT BY DEFENDANT

7.      The Defendant agrees that if after signing this Plea Agreement he commits any crimes or provides information to the Probation Office or the Court that is intentionally misleading, incomplete, or untruthful, or if the Defendant violates any term of this Plea Agreement, takes a position at sentencing which is contrary to the terms of this Plea Agreement or attempts to withdraw from this Plea Agreement, this shall constitute a breach of this Plea Agreement which shall release the United States from any and all restrictions or obligations placed upon it under the terms of this Plea Agreement and the United States shall be free to reinstate dismissed charges or pursue additional charges against the Defendant.  The Defendant shall, however, remain bound by

the terms of this Plea Agreement, and will not be allowed to withdraw his plea of guilty unless permitted to do so by the Court.

8.    The Defendant further agrees that a breach of any provision of this Plea Agreement shall operate as a WAIVER of Defendant's rights under Rule 11(f) of the Federal Rules of Criminal Procedure and Rule 410 of the Federal Rules of Evidence and the United States shall be allowed to use and to introduce into evidence any one or more of the following:

a. admissions against interest, both oral and written, made by the Defendant to any person;
b. statements made by the Defendant during his change of plea hearing;
c. the factual basis used at the change of plea hearing;
d. any testimony given under oath to a grand jury or petit jury;
e. any and all physical evidence of any kind which the Defendant has provided to the United States; and
f. any and all information provided by the Defendant to the United States' attorneys, or to federal, state, county, and/or local law enforcement officers.

## MAXIMUM PENALTIES

9.    The Defendant hereby acknowledges that he has been advised of the maximum penalties for Count Thirteen that charges the Defendant with the commission of Mail Fraud, a violation of Title 18 U.S.C. § 1341.  By entering a plea of guilty to Count Thirteen of the Superseding Indictment, the Defendant agrees that he faces:

**MAIL FRAUD: COUNT THIRTEEN**

a. a maximum term of imprisonment of twenty (20) years;
b. a maximum fine of $250,000.00;
c. both imprisonment and a fine;
d. a term of supervised release of not more than three years, which begins after release from prison;
e. a possibility of going back to prison if the Defendant violates the conditions of supervised release;
f. a special assessment of $100.00; and
g. restitution as ordered by the Court.

10.    The Defendant hereby acknowledges that he has been advised of the maximum penalties for Count Twenty-Nine that charges the Defendant with the commission of Involuntary Manslaughter, a violation of Title 18 U.S.C. § 1112. By entering a plea of guilty to Count Twenty-Nine of the Superseding Indictment, the Defendant agrees that he faces:

**INVOLUNTARY MANSLAUGHTER: COUNT TWENTY-NINE**

a.   a maximum term of imprisonment of eight (8) years;
b.   a maximum fine of $250,000.00;
c.   both imprisonment and a fine;
d.   a term of supervised release of not more than three years, which begins after release from prison;
e.   a possibility of going back to prison if the Defendant violates the conditions of supervised release;
f.   a special assessment of $100.00; and
g.   restitution as ordered by the Court.

**CONDITIONS OF SUPERVISED RELEASE**

11.    The Defendant acknowledges that if a term of supervised release is imposed as part of the sentence, the Defendant will be subject to the standard conditions of supervised release as recommended by the United States Sentencing Commission and may be subject to other special conditions of supervised release as determined by the Court. The standard conditions of supervised release are as follows:

a.    The Defendant shall report to the Probation Office in the federal judicial district where he is authorized to reside within 72 hours of release from imprisonment, unless the Probation Officer instructs the Defendant to report to a different Probation Office or within a different time frame.
b.    After initially reporting to the Probation Office, the Defendant will receive instructions from the Court or the Probation Officer about how and when to report to the Probation Officer, and the Defendant shall report to the Probation Officer as instructed.
c.    The Defendant shall not knowingly leave the federal judicial district where he is authorized to reside without first getting permission from the Court or the Probation Officer.
d.    The Defendant shall answer truthfully the questions asked by the Probation Officer.
e.    The Defendant shall live at a place approved by the Probation Officer. If the Defendant plans to change where he lives or anything about his living arrangements

13

(such as the people the Defendant lives with), the Defendant shall notify the Probation Officer at least 10 days before the change. If notifying the Probation Officer at least 10 days in advance is not possible due to unanticipated circumstances, the Defendant shall notify the Probation Officer within 72 hours of becoming aware of a change or expected change.

f. The Defendant shall allow the Probation Officer to visit the Defendant at any time at his home or elsewhere, and the Defendant shall permit the Probation Officer to take any items prohibited by the conditions of the Defendant's supervision that he or she observes in plain view.

g. The Defendant shall work full time (at least 30 hours per week) at a lawful type of employment, unless the Probation Officer excuses the Defendant from doing so. If the Defendant does not have full-time employment he shall try to find full-time employment, unless the Probation Officer excuses the Defendant from doing so. If the Defendant plans to change where the Defendant works or anything about his work (such as the position or the job responsibilities), the Defendant shall notify the Probation Officer at least 10 days before the change. If notifying the Probation Officer at least 10 days in advance is not possible due to unanticipated circumstances, the Defendant shall notify the Probation Officer within 72 hours of becoming aware of a change or expected change.

h. The Defendant shall not communicate or interact with someone the Defendant knows is engaged in criminal activity. If the Defendant knows someone has been convicted of a felony, the Defendant shall not knowingly communicate or interact with that person without first getting the permission of the Probation Officer.

i. If the Defendant is arrested or questioned by a law enforcement officer, the Defendant shall notify the Probation Officer within 72 hours.

j. The Defendant shall not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person, such as nunchakus or Tasers).

k. The Defendant shall not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the Court.

l. If the Probation Officer determines that the Defendant poses a risk to another person (including an organization), the Probation Officer may require the Defendant to notify the person about the risk and the Defendant shall comply with that instruction. The Probation Officer may contact the person and confirm that the Defendant has notified the person about the risk.

m. The Defendant shall follow the instructions of the Probation Officer related to the conditions of supervision.

## RESTITUTION

12.    The Defendant agrees to pay full restitution to all victims of the offenses to which the Defendant is pleading guilty, and for all losses caused by the Defendant's criminal conduct even if such losses resulted from crimes not charged in the Superseding Indictment or admitted to by the Defendant in the factual statement. The Defendant acknowledges and agrees that all restitution as agreed to above shall be governed by the provisions of the Mandatory Victims Restitution Act, 18 U.S.C. § 3663A. The Defendant understands full restitution will be ordered regardless of Defendant's financial resources. The Defendant further understands the restitution will be determined by the Court. The Defendant agrees to cooperate in efforts to collect the restitution obligation, by any means the United States deems appropriate and agrees to waive any defense or objections to any action to enforce the collection of the restitution. The Defendant understands imposition or payment of restitution will not restrict or preclude the filing of any civil suit or administrative action. The Defendant acknowledges that any restitution imposed is not dischargeable in any bankruptcy proceeding pursuant to 18 U.S.C. § 3613(e).

## AGREEMENT TO PROVIDE FINANCIAL INFORMATION

13.    The Defendant agrees that no later than thirty (30) days after the change of plea, the Defendant shall complete the financial disclosure statement and the accompanying releases provided by the United States Attorney's Office and deliver them to the United States Probation Office and the United States Attorney's Office. This financial disclosure statement is sworn by the Defendant to be true and correct under penalty of perjury. The Defendant agrees that his failure to truthfully and fully complete the financial disclosure statement and accompanying releases may result in the Government objecting to the Defendant receiving a reduction for acceptance of responsibility.

15

## PAYMENT OF MONETARY PENALTIES

14.     The Defendant agrees that monetary penalties to include special assessments, fine, and/or restitution imposed by the Court will be (i) subject to immediate enforcement as provided in 18 U.S.C. § 3613(c) and (ii) submitted to the Treasury Offset Program so that any federal payment such as an income tax refund or transfer of returned property the Defendant receives may be offset and applied to federal debt without affecting the periodic payment schedule ordered by the Court.

## NO OTHER CHARGES

15.     The United States agrees that no other federal charges, which stem from the activities described in the Superseding Indictment, will be brought against the Defendant in the Western District of Arkansas.

## SENTENCING GUIDELINES ARE ADVISORY BUT NOT MANDATORY

16.     The parties acknowledge that the Court shall consult and take into account the United States Sentencing Commission Guidelines in determining the sentence, but that the Court is not bound by the Guidelines and may sentence the Defendant to any sentence within the statutory range.

## AGREEMENT DOES NOT PROMISE A SPECIFIC SENTENCE

17.     The Defendant acknowledges that discussions have taken place concerning the possible guideline range that might be applicable to this case.  The Defendant agrees that any discussions merely attempt to guess at what appears to be the correct guideline range and do not bind the District Court. Further, the Defendant acknowledges that the actual range may be greater than contemplated by the parties.  In the event that the actual guideline range is greater that the

16

parties expected, the Defendant agrees that this does not give him the right to withdraw his plea of guilty.

## RELEVANT CONDUCT CONSIDERED

18.     At the sentencing hearing, the United States will be permitted to bring to the Court's attention, and the Court will be permitted to consider, all relevant information with respect to Defendant's background, character and conduct, including the conduct that is the subject of this investigation for which he has not been charged up to the date of the Plea Agreement and/or which is the basis for any counts to be dismissed pursuant to this Plea Agreement, as provided by § 1B1.3 of the Sentencing Guidelines.

## PERJURY

19.     In the event that it is determined that the Defendant has not been truthful with the Court as to any statements made while under oath, this Plea Agreement shall not be construed to protect the Defendant from prosecution for perjury or false statement.

## CONCESSIONS BY THE UNITED STATES

20.     The United States agrees not to object to a finding by the Probation Office or a ruling of the Court which awards the Defendant an appropriate-level decrease in the base offense level for acceptance of responsibility.  If the offense level in the Presentence Report is 16 or greater, and the Presentence Report awards two points for acceptance of responsibility, the United States agrees to move for an additional one-point reduction for acceptance of responsibility for a total of three points.  However, the United States will not be obligated to move for an additional one-point reduction or recommend any adjustment for acceptance of responsibility if Defendant engages in conduct inconsistent with acceptance of responsibility including, but not limited to, the following:

a.  falsely denies, or makes a statement materially inconsistent with, the factual basis set forth in this agreement;

b.  falsely denies additional relevant conduct in the offense;
c.  is untruthful with the United States, the Court or Probation Officer; or
d.  materially breaches this Plea Agreement in any way.

## UNITED STATES' RESERVATION OF RIGHTS

21.     Although the United States agrees not to object to certain findings by the Probation

Office or to rulings of the Court, it reserves the right to:

a.  make all facts known to the Probation Office and to the Court;
b.  call witnesses and introduce evidence in support of the Presentence Report;
c.  contest and appeal any finding of fact or application of the Sentencing Guidelines;
d.  contest and appeal any departure from the appropriate Guideline range;
e.  defend the rulings of the District Court on appeal, even those for factors on which the United States has agreed to make no recommendations, not to object, and/or to make recommendations.

## NO RIGHT TO WITHDRAW THE GUILTY PLEA

22.     The United States' concessions on sentencing options are non-binding and made

pursuant to Rule 11(c)(1) of the Federal Rules of Criminal Procedure.  As a result, if the Court

should reject the Defendant's requests or recommendations for certain findings of fact or

applications of the Guidelines, the Defendant acknowledges that there is no right to withdraw the

guilty pleas.

## DISMISSAL OF COUNTS

23.     The United States' agreement to dismiss certain counts of the Superseding

Indictment is made pursuant to Rule 11(c)(1)(A) of the Federal Rules of Criminal Procedure.  As

a result, if the Court should reject the United States' motion to dismiss the agreed counts of the

Superseding Indictment, the Defendant shall be afforded the right to withdraw his plea pursuant to

Rule 11(c)(5)(B) of the Federal Rules of Criminal Procedure.

## AGREEMENT NOT BINDING ON THE COURT

24.     The parties agree that nothing in this agreement binds the District Court to:

a.  make any specific finding of fact;
b.  make any particular application of the Sentencing Guidelines;
c.  hand down any specific sentence;
d.  accept this Plea Agreement.

25.     The United States and the Defendant acknowledge that the Court has an obligation

to review the Presentence Report before it accepts or rejects this Plea Agreement.

## AGREEMENT DOES NOT BIND ANY OTHER ENTITY

26.     The parties agree that this Plea Agreement does not bind any Governmental entity

other than the United States Attorney's Office for the Western District of Arkansas.

## SPECIAL ASSESMENT

27.     The Defendant agrees that he will pay $200.00 as the special assessment in this
case.

## REPRESENTATIONS BY THE DEFENDANT

28.     By signing this Plea Agreement, the Defendant acknowledges that:

a.  The Defendant has read this agreement and carefully reviewed every part of it with
    defense counsel.
b.  The Defendant fully understands this Plea Agreement and is not under the influence of
    anything that could impede the Defendant's ability to fully understand this Plea
    Agreement.
c.  No promises, agreements, understandings, or conditions have been made or entered
    into in connection with the decision to plead guilty except those set forth in this Plea
    Agreement.
d.  The Defendant is satisfied with the legal services provided by defense counsel in
    connection with this Plea Agreement and matters related to it.
e.  The Defendant has entered into this Plea Agreement freely, voluntarily, and without
    reservation and the Defendant's desire to enter a plea of guilty is not the result of threats
    or coercion directed at the Defendant or anyone connected with the Defendant.

## REPRESENTATIONS BY DEFENSE COUNSEL

29.     By signing this Plea Agreement, counsel for the Defendant acknowledges that:

a.  Counsel has carefully reviewed every part of this agreement with the Defendant and this agreement accurately and completely sets forth the entire agreement between the United States and the Defendant.
b.  Counsel has explained the ramifications of the Plea Agreement to the Defendant, and believes that the Defendant understands this Plea Agreement, what rights are being lost by pleading guilty, and what the United States has agreed to do in exchange for the plea of guilty.
c.  The Defendant's decision to enter into this agreement is an informed and voluntary one.

## PLEA AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT

30.     The Defendant and his counsel acknowledge that this Plea Agreement constitutes

the entire agreement of the parties.  Further, all parties agree that there are no oral agreements or

promises which have been made to induce the Defendant to change his plea to guilty.


Dated this _____ day of _____, 2020.


_____
Robert Morris Levy
Defendant

_____
John C. Everett
Attorney for Defendant


_____
Mark F. Hampton
Attorney for Defendant


_____
Michael Darren O'Quinn
Attorney for Defendant


DAVID CLAY FOWLKES
ACTING UNITED STATES ATTORNEY


By:  _____
     Kyra E. Jenner
     Assistant U.S. Attorney

20

## REPRESENTATIONS BY DEFENSE COUNSEL

29.    By signing this Plea Agreement, counsel for the Defendant acknowledges that:

a.   Counsel has carefully reviewed every part of this agreement with the Defendant and this agreement accurately and completely sets forth the entire agreement between the United States and the Defendant.

b.   Counsel has explained the ramifications of the Plea Agreement to the Defendant, and believes that the Defendant understands this Plea Agreement, what rights are being lost by pleading guilty, and what the United States has agreed to do in exchange for the plea of guilty.

c.   The Defendant's decision to enter into this agreement is an informed and voluntary one.

## PLEA AGREEMENT CONSTITUTES THE ENTIRE AGREEMENT

30.    The Defendant and his counsel acknowledge that this Plea Agreement constitutes

the entire agreement of the parties.  Further, all parties agree that there are no oral agreements or

promises which have been made to induce the Defendant to change his plea to guilty.

Dated this ____ day of _____, 2020.

_____
Robert Morris Levy
Defendant

_____
John C. Everett
Attorney for Defendant

_____
Mark R. Hampton
Attorney for Defendant

_____
Michael Darren O'Quinn
Attorney for Defendant

DAVID CLAY FOWLKES
ACTING UNITED STATES ATTORNEY

By:

Kyra E. Jenner
Assistant U.S. Attorney

20