**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL NO. 5:19CR50059-001** |
| | ) | |
| | ) | |
| **ROBERT MORRIS LEVY** | ) | |

# GOVERNMENT'S SENTENCING MEMORANDUM

Comes now the United States of America, by and through, David Clay Fowlkes, First Assistant United States Attorney for the Western District of Arkansas, and the undersigned Assistant United States Attorney, and files its Sentencing Memorandum pursuant to this Court's Order entered October 5, 2020. (Doc. 42).

## PROCEDURAL BACKGROUND

The defendant, Robert Morris Levy (Levy), will be sentenced January 21, 2021, for violating one count of Title 18, United States Code, Section 1341 (mail fraud) (Count Thirteen) and one count of Title 18, United States Code, Section 1112 (involuntary manslaughter) (Count Twenty-nine) that were charged in a 31-count Superseding Indictment returned by the grand jury in the Western District of Arkansas on August 16, 2019. (Doc. 4).

On June 1, 2020, Levy and the Government executed a negotiated written Plea Agreement that was filed during a change of plea hearing held June 11, 2020. (Doc. 39). Levy agreed to plead guilty to Counts Thirteen and Twenty-nine of the Superseding Indictment in exchange for the Government's agreement to recommend Levy receive an adjustment for acceptance of responsibility (Doc. 39, ¶ 20) and move to dismiss the remaining counts of the Superseding Indictment after sentencing. (Doc. 39, ¶ 23).

The parties acknowledged in the written Plea Agreement that the Court was not bound by the advisory sentencing guidelines in determining Levy's sentence and could sentence Levy within the statutory range. (Doc. 39, ¶ 16). The Plea Agreement set forth the maximum statutory term of imprisonment for which the Court could sentence Levy: 20 years for Count Thirteen (Doc. 39, ¶ 9) and eight years for Count Twenty-nine. (Doc. 39, ¶ 10).

The written Plea Agreement expressly recognized that the Court could consider Levy's conduct relating to the investigation for which Levy had not been charged, as well as conduct for any of the dismissed counts. (Doc. 39, ¶ 18). Levy acknowledged no promises were made to him regarding what specific sentence he would receive. (Doc. 39, ¶¶ 17, 30).

An initial presentence investigation report (PSR) was filed October 1, 2020. (Doc. 40). The PSR calculated the advisory guideline range of imprisonment was 87 to 108 months, based upon a total offense level of 29 and a criminal history category of I. The final PSR filed December 4, 2020 (Doc. 57) calculated the same advisory guideline range of imprisonment.

The initial and final PSR described four grounds upon which the sentencing Court could depart upward and impose a sentence outside the advisory sentencing guidelines range of imprisonment. Those grounds were U.S.S.G. § 5H1.9 (Dependence Upon Criminal Activity for a Livelihood), U.S.S.G. § 5K2.1 (Death), U.S.S.G. § 5K2.7 (Disruption of Governmental Function), and U.S.S.G. § 5K2.21 (Dismissed and Uncharged Conduct). The Government believes that a just punishment that reflects the seriousness of the crimes cannot be captured in a sentence of imprisonment of 87 to 108 months. The Government requests a sentence at the statutory maximum imprisonment based upon an upward departure under U.S.S.G. §§ 5K2.1, 5K2.7 and 5K2.21. Accordingly, the Government will file a Motion for Upward Departure pursuant to this Court's text only scheduling order entered October 5, 2020. (Doc. 42). The Government will request an

upward variance to the statutory maximum imprisonment, based upon 18 U.S.C. § 3553(a) factors, should the Court decline to depart upward from the advisory guideline range of imprisonment.

**EVIDENCE TO BE PRESENTED AT THE SENTENCING HEARING ON GUIDELINE-DETERMINATIVE OBJECTIONS**

The Government submitted 52 objections to the initial PSR, most of which were framed as requests that the PSR include additional information for clarification purposes. An Addendum to the final PSR resolved all of the Government's objections to the initial PSR. (Doc. 57-1, pp. 1-22).

Levy filed 15 objections to the PSR. The final PSR resolved seven of them. (Doc. 57-1, pp. 27-30). Eight of Levy's objections remain unresolved. (Doc. 57-1, pp. 22-27). Of the eight objections that remain unresolved, the Government believes three are guideline-determinative and require the Government to present evidence at the sentencing hearing. The three unresolved objections that affect the advisory sentencing guideline calculation are:

**Levy's Objection Number Two:** The PSR includes in its loss calculation under U.S.S.G. § 2B1.1.(b)(1) Levy's earnings, awards and benefits for fiscal year 2017. Levy appears to object to the inclusion of some of Levy's fiscal year 2017 earnings, awards and benefits in the loss calculation. Levy's objection notes that fiscal year 2017 began on October 1, 2016, and ended September 30, 2017. Levy's objection states that, "the mail fraud allegation began in February 2017 to the date of termination." (Doc. 47, p. 11).

The Government believes the PSR correctly includes Levy's entire fiscal year 2017 earnings, awards and benefits. The Government's position is based, in part, upon Levy's admission to Veterans Administration Office of Inspector General (VA-OIG) Special Agent Kris Raper, the investigating case agent, that Levy "first discovered" 2M2B in November 2016 "when he started to get real about it." (PSR, ¶130). Special Agent Raper's testimony will establish that

relevant conduct did in fact occur prior to November 2016. Therefore, the salary, awards and benefits Levy received beginning on or about October 1, 2016, are properly included under U.S.S.G. § 2B1.1(b)(1).

**Levy's Objection Number Ten:** Levy challenges the PSR's inclusion of the lookback costs and tort claims in calculating the total loss amount. The final PSR deleted tort claims from the total loss amount. Levy's remaining unresolved objection is to the inclusion of the lookback cost under U.S.S.G. § 2B1.1(b)(1). The Government contends the PSR correctly included the lookback costs in calculating the total loss amount and will call Special Agent Kris Raper to testify about this.

**Levy's Objection Number Twelve:** Levy challenges the PSR's application of U.S.S.G. § 3C1.1 for obstructing or impeding the administration of justice. The Government believes the PSR correctly applied U.S.S.G. § 3C1.1. The Government will call Special Agent Kris Raper to testify about evidence pertaining to U.S.S.G. § 3C1.1.

## GOVERNMENT WITNESSES ANTICIPATED TO TESTIFY AT THE SENTENCING HEARING

The Government will call Dr. Margie Scott to testify about Levy's diagnoses in relation to causing the untimely deaths of the veterans in Counts Thirty and Thirty-one of the Superseding Indictment. Dr. Scott will also testify about Levy's diagnoses related to the causation of other veterans' untimely deaths for which Levy could not be charged with violating 18 U.S.C. § 1112 because the five-year statute of limitations prohibited prosecution. Those veterans are identified in the PSR. Dr. Scott's testimony will support the Government's request for an upward departure under U.S.S.G. §§ 5K2.1 and 5K2.21.

Dr. Scott is the medical center director for the Central Arkansas Veterans Healthcare System (CAVHS) in Little Rock, Arkansas. She served as Chief of Staff and Chief of Pathology

and Laboratory Medicine Service for CAVHS. Some of Dr. Scott's academic, clinical and administrative appointments include Associate Professor of Pathology at the University of Arkansas for Medical Sciences and Vanderbilt University Medical Center, Medical Director of the Diagnostic Laboratories at Vanderbilt University Hospital and Clinics, and Vice Chair of the Department of Pathology for the University of Arkansas Medical Science.

The Government will call Special Agent Kris Raper to testify about evidence regarding the disruption of Government function, pursuant to U.S.S.G. § 5K2.7.

The testimony elicited from Dr. Scott and Special Agent Raper will also address the sentencing factors in 18 U.S.C. § 3553(a).

**AUTHORITY AND ARGUMENT IN SUPPORT OF OBJECTED-TO SENTENCING GUIDELINE ENHANCEMENTS**

**The Lookback Loss:** The PSR found the loss attributable to Levy's conduct on the mail fraud count totaled $2,600,806.27. (PSR, ¶ 139). The PSR derived that amount from (1) the money Levy fraudulently collected from the VHSO in salary, benefits and performance-based awards during and resulting from his fraudulent scheme, and (2) the costs incurred by the VHSO in conducting the lookback into Levy's medical practice, as described in paragraphs 65 and 66 of the PSR. Paragraph 139 of the PSR identified the amounts as follows:

| **Loss Type** | **Loss Amount** |
|---|---|
| Salary, Benefits, and Awards | $497,745.70 |
| Lookback | $2,103,060.57 |
| **Total:** | **$2,600,806.27** |

Based on a total loss of $2,600,806.27, the PSR increased Levy's base offense level by 16 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(I) because the loss amount exceeded $1,500,000.00 and was less than $3,500,000.00. (PSR, ¶ 148).

Levy objects to the PSR's inclusion of the lookback costs in determining the amount of loss under § 2B1.1(b)(1). Levy's specific objection to including the lookback costs is based on U.S.S.G. § 2B1.1 Application Note 3(D)(ii), which excludes from the loss calculation "[c]osts to the Government of, and costs incurred by victims primarily to aid the Government in, the prosecution and criminal investigation of an offense." Levy argues the cost of the lookback should be excluded from the loss amount included under § 2B1.1(b)(1) because the lookback was conducted in order to "ascertain the extent of the defendant's alleged malpractice in relation to criminal culpability." (Doc. 47, p. 5).

The Government believes an Eighth Circuit case is instructive on Levy's objection to capturing the lookback cost in the loss amount. *United States v. DeRosier,* 501 F.3d 888 (8th Cir. 2017). In *DeRosier*, the Eighth Circuit considered whether the cost of an internal investigation into an employee's criminal offense was properly included in the loss calculations. *Id.* at 895-96.

The defendant in *DeRosier* was a bank employee who "borrow[ed] money under false pretenses from acquaintances she came to be familiar with through her job" at the bank, including acquaintances who were customers of the bank. *Id.* at 891. When the bank "was alerted to [the defendant's] suspicious activity, it initiated an investigation." *Id.* The bank's internal audit team conducted an investigation with the help of a law firm. *Id.* at 895. The bank employee was convicted and sentenced for committing wire fraud affecting a financial institution. In assessing the loss amount for sentencing purposes, the district court included the costs incurred by the bank's own investigation. *Id.* at 894.

Levy's basis for objecting to the inclusion of the lookback costs is unavailing. He cites grounds for exclusion similar to the unsuccessful argument advanced by the defendant on appeal in *DeRosier*, namely, that the costs of an internal investigation should have been excluded under

Application Note 3(D)(ii) because they were costs incurred "by [a] victim[] primarily to aid the Government in the prosecution and criminal investigation of an offense." *Id.* at 894-85. The Eighth Circuit rejected that argument, finding that the bank's investigation "was prompted prior to any criminal charges being brought" and "therefore, these costs were not incurred to primarily aid the Government, rather, the investigation was prompted for the bank's own benefit." *Id.* at 895. The Eighth Circuit determined that even though the bank "had a responsibility as a financial institution to report suspicious activity to law enforcement, and as such provided the results of its own internal investigation to the FBI," those facts did not require exclusion of the bank's costs under Application Note 3(D)(ii), because the bank's investigation "was motivated by its own business interests," and its investigation "commenced well before an indictment was brought." *Id.* at 895 fn. 11.

The Eighth Circuit in *DeRosier* also rejected the defendant's claim that the bank's internal investigation costs were not a "reasonably foreseeable" pecuniary harm. *Id.* at 895. The Eighth Circuit determined that because the defendant was "an employee of the bank and her loans were obtained from those she knew through the bank," it was "reasonable and foreseeable" that the bank would investigate "one of their employees who was involved in acquiring loans from bank customers." *Id.* (citation omitted).

In Levy's case, the Government's evidence will establish that the lookback was undertaken before an investigation into potential criminal activity was begun and prior to criminal charges being filed against Levy. The lookback was prompted by the VHSO's need, resulting from Levy's conduct, to "identify [Levy's] malpractice" and "to provide the proper care" to those patients victimized by his malpractice. (PSR, ¶¶ 56, 65-66). The Government believes Levy's objection Number Ten should be overruled.

**Obstruction of Justice:** The PSR applied a two-level increase for obstruction of justice pursuant to U.S.S.G. § 3C1.1 which provides, "If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels." Application Note 4 provides a non-exhaustive list of examples of conduct to which the adjustment applies including:

"(B) committing, suborning, or attempting to suborn perjury, including during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction" or

"(G) providing a materially false statement to a law enforcement officer that significantly obstructed or impeded the official investigation or prosecution of the instant offense."

In this case, the PSR found that the adjustment under U.S.S.G. § 3C1.1 applied because Levy had engaged in conduct covered by both Application Note 4(B) and 4(G). Specifically, the PSR found that Levy had 1) falsely testified under oath during a hearing at the VHSO that he "had no idea" what "interfering substance" had been detected during a breathalyzer examination on March 1, 2018, and 2) had falsely stated during an interview with a federal agent investigating the offense that he had not used any intoxicating substance. (PSR ¶ 144).

While not objecting to the facts set forth in PSR ¶ 144, Levy did object to the two-level increase under U.S.S.G. § 3C1.1 stating, "There is no evidence that the Defendant was using 2M2B during the time frame of the involuntary manslaughter counts charges in the indictment or the one pled to before the court." (Doc. 47, p. 11). Levy's objection is without merit.

"The district court has broad discretion to apply section 3C1.1 to a wide range of conduct." *United States v. Collins*, 754 F.3d 626, 629 (8th Cir. 2014). U.S.S.G. § 3C1.1 (2) makes clear that the enhancement is applicable not only to the offense conduct but to any relevant conduct or a closely related offense. In *United States v. Jensen*, 834 F.3d 895 (8th Cir. 2016), the Eighth Circuit rejected the argument that U.S.S.G. § 3C1.1 did not apply because the obstruction did not relate to the offense conduct. The Court stated:

"Although Jennifer agreed to a plea bargain with the Government, under which she pled guilty to receipt of child pornography, the investigation into the sexual abuse of J.S. and H.J. encompassed conduct relevant to Jennifer's instant offense of conviction as well as closely related offenses, such as Jennifer's original charges of production and possession of child pornography and Brad's charges of sexual exploitation of a child and production of child pornography. Jennifer's tampering with H.J. qualifies under U.S.S.G. § 3C1.1 as …obstructive conduct related to 'the defendant's offense of conviction and any relevant conduct' or 'a closely related offense.'" *Id.* at 900.

In *Jensen*, the Eighth Circuit cited with approval *United States v. Crousore*, 1 F.3d 382, 385 (6th Cir. 1993) where the Sixth Circuit stated, "The test is not whether the false statement was about the actual crime charged, but whether it was made during the investigation, prosecution, or sentencing of the instant offense." *See also United States v. Kirk*, 70 F.3d 791, 798 (5th Cir. 1995) ("The enhancement for obstruction of justice under section 3C1.1 is proper anytime the defendant has concealed or attempted to conceal information material to the investigation, prosecution, or sentencing of the instant offense. Although this Guideline clearly contemplates a relationship between the information concealed and the offense conduct, it does not require that it be related directly to a particular offense to which the defendant pleads guilty.").

In this case, Levy's false statements related directly to the criminal investigation which encompassed an inquiry into significant misdiagnoses Levy made while working at the VHSO and believed to be impaired while on duty. The PSR sets forth, as relevant conduct, seven veterans who were misdiagnosed during the period Levy was ordering and using 2M2B. Levy's false statements regarding his use of 2M2B were attempts by Levy to obstruct the overall criminal investigation into misdiagnoses believed attributable to his impairment, whatever the intoxicating substance might have been. Since Levy's obstructive conduct related to the overall investigation including relevant conduct and closely related cases, Levy's objection based on the fact that 2M2B was not involved in his count of conviction should be overruled.

**THE COURT CAN AND SHOULD DEPART UPWARD FROM LEVY'S ADVISORY GUIDELINES RANGE**

The PSR identified four provisions from Chapter Five, Part K of the Guidelines as possible grounds for an upward departure from Levy's advisory guideline sentencing range. (PSR, ¶¶ 240-244).[1] The Government believes the Court can and should depart upward from Levy's guidelines sentencing range based on three of the grounds identified in the PSR: U.S.S.G. § 5K2.1 (Death), § 5K2.7 (Disruption of Governmental Function), and § 5K2.21 (Dismissed and Uncharged Conduct).

Section 1B1.4 of the Sentencing Guidelines describes the possible "information" the Court may consider in deciding whether to impose a sentence within the guideline range or whether a departure from the guidelines is warranted: "the court may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise

[1] As the PSR also noted, grounds for departure may also inform the Court's analysis of the sentencing factors under 18 U.S.C. § 3553(a). *See, e.g., United States v. Maurstad*, 454 F.3d 787, 790 (8th Cir. 2006); *United States v. Zeigler*, 463 F.3d 814, 818 (8th Cir. 2006).

prohibited by law." U.S.S.G. § 1B1.1. As noted in the commentary, and referenced in the policy statement itself, § 1B1.4 is grounded in the Congressional directive found in 18 U.S.C. § 3661, which provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

In *United States v. Rogers*, 423 F.3d 823 (8th Cir. 2005), the Eighth Circuit addressed the scope and application of § 1B1.4 in a sentencing court's departure decision. In that case, the defendant pleaded guilty to several child pornography-related counts in violation of 18 U.S.C. § 2252 and three counts of distribution of obscene materials in violation of 18 U.S.C. § 1462. *Id.* at 825. The three counts of distributing obscene materials were based on the defendant's having emailed to others images of him posing with severed male genitals. *Id.* The PSR noted that the defendant had pending charges in state court accusing him of a surgical-type procedure referred to as a 'nullification' procedure." *Id.* at 826. The PSR recommended, and the Government moved, for an upward departure from the defendant's advisory guidelines range based on that conduct. *Id.*

The district court determined the defendant's advisory guidelines sentencing range was 57 to 71 months in prison. The district court also heard testimony at sentencing regarding the defendant's commission of a "nullification procedure," as referenced in the PSR's description of the pending state charges. The district court heard testimony that the defendant had performed the same "procedure" on other individuals. *Id.* Citing three guidelines departure provisions, including two provisions - § 5K2.2 (physical injury) and § 5K2.8 (extreme conduct) – which the district court found relevant to the "nullification procedure," the district court departed upward from the advisory range and sentenced the defendant to 360 months in prison. *Id.* at 825-27.

The defendant argued on appeal that the district court erred by basing its departure decision on two provisions - extreme conduct under § 5K2.8 and physical injury under § 5K2.2 – that the court determined were applicable based on the defendant's conduct in performing "nullification procedures" on adult victims. *Id*. at 828. The defendant argued that his conduct in performing "nullification procedures" on adult victims was "insufficiently related" to any of his offenses of conviction. *Id*.

The Eighth Circuit rejected this argument. In doing so, the Eighth Circuit observed that "[i]n deciding whether to depart from the applicable Guidelines range," a sentencing court "is not limited to considering 'relevant conduct' as defined in U.S.S.G. § 1B1.3." Instead, in deciding whether to depart, a sentencing court follows the broader provision of § 1B1.4, which provides that a court "'may consider, without limitation, any information concerning the background, character and conduct of the defendant, unless otherwise prohibited by law.'" *Id*. (quoting U.S.S.G. § 1B1.4). The Eighth Circuit observed that this "permissible range of information" allowed by § 1B1.4 can include criminal conduct that was dismissed or not charged. *Id.* (citing U.S.S.G. § 5K2.21, p.s.).

After agreeing with another circuit court that "it is doubtless true" that uncharged conduct offered to support a departure must "relate in some way" to the offense of conviction, the Eighth Circuit wrote that "even a remote relationship" between the uncharged conduct and an offense of conviction "will suffice." *Id* (citing *United States v. Flores*, 336 F.3d 760, 765 n. 6 (8th Cir. 2003), for proposition that a remote relationship between the uncharged conduct and offense of conviction will suffice). Under the "liberal standard" of "even a remote relationship," the Eighth Circuit held in *Rogers* that the defendant's conduct in performing the nullification procedure and the testimony regarding other such procedures was "without a doubt sufficiently related at least

to" the obscenity counts of conviction, and thus the district court was permitted to consider that conduct for upward departure purposes. *Id*.

The defendant in *Rogers* also alleged the district court impermissibly applied the departure guidelines because the defendant's nullification procedure – the "extreme conduct causing physical injury" - was "only" related to the three obscene material counts of conviction, which had the lowest statutory maximum (five years) of all his counts of conviction. The Eighth Circuit rejected that allegation as "irrelevant," because the "'total punishment" includes "'a lawful upward departure.'" *Id*. at 828-29 (quoting *United States v. Evans*, 314 F.3d 329, 332 n. 1 (8th Cir. 2002), cert. denied, 539 U.S. 916, 123 S. Ct. 2275, 156 L.Ed.2d 133 (2003)). Thus, "'[o]nce the total punishment is determined," the various provisions of Part 5G of the Guidelines "direct the court to sentence multiple counts of conviction as an interdependent package, and to use consecutive as well as concurrent sentencing to construct a combined sentence equal to the total punishment.'" *Id*. at 829 (quoting *Evans*, 314 F.3d at 334). The Eighth Circuit then held that "[b]ecause all the counts are sentenced as an 'interdependent package,' the permissible ground for departure *on any count* may be applied *in determining the total punishment* for the combined offenses. *Id*. (quotation marks in original) (emphasis added). Thus, the district court in *Rogers* was permitted to sentence the defendant to higher sentences on the child pornography counts in order to reach the appropriate total punishment of 360 months, even though the departure provisions pertaining to the defendant's nullification procedure "only" related to the three counts with a five-year maximum sentence available. *Id*.

In Levy's case, as in *Rogers*, the Government will present testimony and rely upon undisputed facts from the PSR to ask this Court to depart upward based on § 5K2.1 (Death), § 5K2.7 (Disruption of Governmental Function), and § 5K2.21 (Dismissed and Uncharged

Conduct). Some of the testimony and facts will prove by a preponderance of the evidence that Levy's reckless conduct caused the untimely deaths of numerous veterans, just as Levy admitted his reckless conduct caused the death of victim J.R.G. Under the "liberal standard" articulated in *Rogers*, there is no doubt that such conduct by Levy is, at the very least, "remotely related to" to Levy's involuntary manslaughter count of conviction and, therefore, may be considered by the court in deciding whether to depart upward from Levy's advisory guideline sentencing range. Moreover, according to the Eighth Circuit's holding in *Rogers*, if the Court decides to depart upward in Levy's case, the Court may impose a sufficient term of imprisonment on Levy's fraud count of conviction, with its maximum sentence of 20 years' imprisonment, in order to reach the appropriate total sentence.

Levy may object that some of his conduct supporting an upward departure would have been barred by the statute of limitations, had the Government sought to charge him criminally for that conduct. The statute of limitations presents no bar to the court's consideration of information presented at sentencing. *See, e.g.*, *United States v. Ziskind*, 491 F.3d 10, 16-17 (1st Cir. 2007) (affirming a district court's use of "relevant conduct outside the statute of limitations period in fashioning his sentence"); *United States v. Dickerson*, 370 F.3d 1330, 1342 (11th Cir. 2004) ("[A] district court may consider conduct occurring outside of the statute of limitations in sentencing."); *United States v. Williams*, 217 F.3d 751, 753-54 (9th Cir. 2000) (a "district court may consider as relevant conduct for sentencing purposes actions which may be barred from prosecution by the applicable statute of limitations"); *United States v. Stephens*, 198 F.3d 389, 391 (3rd Cir.1999) ("[C]onduct that is not chargeable because the statute of limitations has expired may be considered in determining the appropriate sentence under the Guidelines."); *United States v. Valenti*, 121 F.3d 327, 334 (7th Cir. 1997) ("[T]he statute of limitations does not limit what actions a court may

consider as relevant conduct when sentencing a defendant."); *United States v. Pierce*, 17 F.3d 146, 150 (6th Cir. 1994); ("[C]onduct that cannot be prosecuted under the applicable statute of limitations can be used to determine relevant conduct."); *United States v. Neighbors*, 23 F.3d 306, 311 (10th Cir. 1994) ("Statutes of limitations play no role in the sentencing phase of a criminal proceeding."); *see also*, 18 U.S.C. § 3661 ("[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").

The Government notes that if this Court determines the facts and circumstances of Levy's case justify an upward departure to a total appropriate sentence above the twenty-year maximum sentence presented by the fraud count, the Court has the inherent authority to order consecutive sentences to reach the appropriate total sentence. *See, e.g., United States v. Williamson*, 782 F.3d 397, 399 (8th Cir. 2015) ("we have repeatedly held" that U.S.S.G. § 5G1.2 "does not limit the district court's discretion" to sentence consecutively, based on the § 3553(a) factors, "when the total punishment is less than the statutory maximum.") (internal quotation marks and citations omitted); *and see*, 18 U.S.C. § 3584(a),(b) ("[i]f multiple terms of imprisonment are imposed on a defendant at the same time ... the terms may run concurrently or consecutively [;]" "in determining whether the terms imposed are to be ordered to run concurrently or consecutively, [the district court] shall consider ... the factors set forth in section 3553(a).").

Finally, in anticipation of other possible objections Levy might make to an upward departure, the Government addresses here two additional considerations regarding two of the three departure provisions upon which it will rely. First, the Government points out that § 5K2.1 (Death) can still apply as a departure consideration even though Levy's conviction for involuntary

manslaughter involved one death. *See United States v. Merrival*, 176 F.3d 1079, 1080-81 (8th Cir. 1999) (§ 5K2.1 properly applied as basis for departure when involuntary manslaughter resulted in more than one death); *United States v. Two Crow*, 124 F.3d 208, 1997 WL 572862 (8th Cir. 1997) (per curiam) (unpublished) (consideration of § 5K2.1 proper in involuntary manslaughter case because although the offense conduct guideline for involuntary manslaughter, U.S.S.G. § 2A1.4, "necessarily takes death into account, it makes no adjustment for the number of deaths that resulted from a defendant's conduct, or the degree of recklessness involved in causing those deaths, other than to distinguish between criminally negligent and reckless conduct."). As to the factors in § 5K2.1 supporting the extent of an upward departure, the Government anticipates that testimony and evidence will establish, among other factors warranting an extensive departure, Levy's criminal liability for "multiple deaths," the "extent to which" Levy "knowingly risked" death or serious physical injury by his conduct, and Levy's "state of mind."

Second, while § 5K2.7 (Disruption of Governmental Function) states that the disruption must be "significant," the quantum of proof required to meet the standard of a "significant" disruption is not high. For example, a probationer was arrested inside a probation office and the search of his backpack revealed that he was carrying a loaded firearm, for which he was later convicted of illegally possessing as a felon. *United States v. Perez,* 609 F.3d 609, 610-611 (4th Cir. 2010). At sentencing, the district court determined that an upward departure under § 5K2.7 was appropriate because it found that the disruption caused by bringing the loaded firearm into the probation office was "significant." *Id*. at 612. The Fourth Circuit upheld the district court's finding based on evidence that the defendant's probation officer began wearing a bullet proof vest after the incident and requested a job transfer, that the probation office had to "post[] a new sign stating its policy against bringing weapons into the office," that the defendant's conduct required

the probation office to take "additional precautions," and that the defendant's conduct "caused the probation office to come to the realization that they can no longer assume that those who are on probation are going to be reasonably well-behaved when [they are] in [the probation] office." *Id.* at 615 (brackets in original).

In applying § 5K2.7, courts have also recognized that "unlawful conduct necessitating an unusually burdensome or prolonged investigation of a Government office may suffice as a 'significant disruption' under that departure provision." *United States v. Saani*, 650 F.3d 761, 766 (D.C. Cir. 2011) ("As a result of [the defendant's] conduct the Government was forced to review contracts involving millions of dollars. This task was so complex that the investigative team required the assistance of two senior officials at the Kuwaiti contracting office, who had to be diverted from their ordinary duties) (citing *United States v. Howard,* No. 95–1443, 1996 WL 30781, at *1 (2nd Cir. 1996) as a case that "affirm[ed" increase in a defendant's sentence per § 5K2.7 where defendant's theft of evidence caused several federal agencies to undertake a sprawling investigation.").

**<u>18 U.S.C. § 3553(a) FACTORS –MAIL FRAUD</u>**

The Government believes that the nature and circumstance of Levy's commission of mail fraud exemplify greed, arrogance, deceitfulness and utter disregard for human life and warrant an upward variance.

Levy wanted to keep his job at the VHSO with its guaranteed salary and benefits. He resented the restraint placed upon him by random testing for drugs and alcohol. Levy demonstrated that he believed the sobriety monitoring tests were nuisances to be defeated, not heeded. He concocted a way to defeat the sobriety test results and conceal his ongoing use of an intoxicant from the VHSO and the physician sobriety monitoring program. He accomplished this through a

scheme that enabled him to purchase and ingest 2M2B, an intoxicant Levy knew would not be detected on standard tests for drugs and alcohol. Levy bought and used 2M2B, believing he could keep his medical license and his income with its attendant lifestyle, and continue using an intoxicant, unabated and undetected.

Levy's success in carrying out his scheme was evident on 42 occasions when he submitted a urine or drug sample that ultimately tested negative for intoxicants, even though Levy's colleagues and others around him noticed Levy exhibited signs of impairment.

When Special Agent Raper questioned Levy about Levy drinking on the job, Levy's arrogance about his deception of the VHSO was apparent in his dismissive answer. Levy, well knowing he was using a substance that could not be detected in standard drug and alcohol testing, told Special Agent Raper that there was "not a single positive" test to prove the accusation. Levy emphasized to Special Agent Raper there was "no chemical test" to corroborate allegations Levy was intoxicated at work. Levy's portrayal of himself as having suffered false accusations of intoxication show how confident and arrogant Levy was about the success of his scheme to defraud the VHSO.

Levy depicted himself as a grievously wronged employee terminated by the VHSO. During an employment termination grievance hearing Levy requested after he lost his job, Levy displayed arrogance when he proclaimed – under oath – that he had no knowledge of any substance that could have interfered with the breathalyzer test results from his arrest for driving while impaired on March 1, 2018. At the time of Levy's grievance hearing in June 2018, Levy confidently and arrogantly feigned unawareness of the "interfering substance," later discovered as 2M2B. Levy in fact had been using 2M2B for a year or more when he testified under oath at the grievance hearing in June 2018.

Levy's scheme to deceive the VHSO was not an aberration. He had been deceiving the VHSO about being intoxicated on the job since at least 2015, when Levy responded to a VHSO inquiry about an odor of alcohol that VHSO employees reported they detected on him. Levy professed to the VHSO that the odor of alcohol was because he drank, on a daily basis, large quantities of home-pressed juice. In 2016, Levy was intoxicated while on duty at the VHSO. Levy was tested and had a .39 percent blood alcohol content (BAC). Levy, through his attorney, told the VHSO that Levy's elevated BAC was due to Levy's ketogenic diet. Levy himself denied that his .39 percent BAC was due to alcohol consumption. (PSR, ¶ 40). In October 2017, Levy appeared intoxicated during a Tumor Board meeting at the VHSO. He was tested and no drugs or alcohol could be detected. This, however, was during the period of time that Levy was ordering and ingesting 2M2B.

The seriousness of Levy's mail fraud scheme demands an upward variance. Levy's scheme to defraud enriched himself at taxpayer's expense. But worse than that, his mail fraud scheme enabled him to obtain and ingest a substance that made him a danger to himself and others, particularly, the VHSO patients Levy misdiagnosed during the period he was ordering 2M2B in 2017. They are: R.C. (PSR, ¶ 106); K.W. (PSR, ¶ 107); N.C. (PSR, ¶ 109); W.G. (PSR, ¶ 110); L.C. (PSR, ¶ 111); D.C. (PSR, ¶ 112); and L.Y. (PSR, ¶ 113).

Levy's mail fraud conviction is not just a financial crime confined to defrauding the VHSO. His commission of fraud had wide ranging consequences for the lives and wellbeing of veterans he misdiagnosed when he was using 2M2B, and the families of those veterans. Levy's advisory guideline sentence is wholly inadequate to reflect the harm Levy caused vulnerable veterans who were seeking medical treatment. The devastating impact that Levy's fraud had, and continues to have, on the veterans he misdiagnosed during the execution of his fraud scheme cannot be

measured by a calculus driven by a dollar loss. The advisory sentence guideline range fails to capture the unimaginable loss to the lives and dignity of the veterans who were misdiagnosed by Levy. A sentence at the statutory maximum will reflect the enormity and seriousness of Levy's crime.

**<u>18 U.S.C. § 3553(a) FACTORS – INVOLUNTARY MANSLAUGHTER</u>**

The nature and circumstances of Levy's commission of involuntary manslaughter demand an upward variance to reflect the seriousness of the offense and provide just punishment. The nature and circumstances of the crime were exceptionally reckless and reveal Levy had no regard for the fragility of the life of a cancer patient.

Levy had been practicing medicine for nearly 20 years as a board-certified hematopathologist when he examined J.R.G.'s lymph node tissue samples. It is undisputed that Levy possessed the knowledge, training and skill of a highly qualified pathologist who was extremely capable of correctly diagnosing J.R.G.'s cancer when he failed to do so. Levy conducted rudimentary diagnostic steps in J.R.G.'s case that were simply inadequate to lead to an informed diagnosis. As a result, Levy diagnosed J.R.G. with a cancer J.R.G. did not have.

Levy ignored a warning from another VHSO pathologist who told Levy *in writing* of the need to conduct immunohistochemical staining on J.R.G.'s tissue samples in order to make a diagnosis. Levy disregarded his colleague's concern. Levy did not conduct further immunohistochemical staining before entering the wrong diagnosis, lymphoma, in J.R.G.'s medical record.

In an act of arrogance that underscores Levy's callous disregard for a vulnerable cancer patient, Levy double-downed on his erroneous diagnosis. He falsified in J.R.G.'s medical record that a second pathologist concurred with Levy's incorrect diagnosis. Levy entered a fabrication in

J.R.G.'s medical record, fully aware of its significance and the consequences to J.R.G.'s life. Levy knew J.R.G.'s physicians would rely upon the diagnosis Levy made to inform the course of treatment for J.R.G. Levy also knew that by representing another pathologist had affirmed Levy's diagnosis, the diagnosis would not questioned. Levy's decision not to conduct staining tests on J.R.G.'s tissue samples, to ignore a colleague's recommendation that was intended to assure the integrity and accuracy of J.R.G.'s diagnosis, and to falsify in J.R.G.'s medical record that a second pathologist had agreed with Levy's erroneous diagnosis are all circumstances of the offense that demonstrate that Levy had a wanton disregard for a veteran with cancer.

Levy later learned that an outside reference laboratory had conducted cell surface studies of J.R.G.'s lymph node biopsy. The outside laboratory reported findings that conflicted with Levy's diagnosis of lymphoma. The report from the outside laboratory gave Levy an opportunity to reexamine J.R.G.'s tissue and conduct the panoply of diagnostic staining tests. When presented with a chance to correct his prior erroneous diagnosis, Levy performed only one study and changed J.R.G.'s diagnosis to yet another incorrect diagnosis, that being metastatic lung adenocarcinoma. Levy's disregard for the consequences his actions had on J.R.G.'s life are clear from any one of the decisions Levy made.

Levy took an oath as a physician "to do no harm." Levy was entrusted with making diagnostic decisions to prolong life, not curtail it. Levy intentionally falsified information in J.R.G.'s medical records. Based upon the nature and circumstances of Levy's exceptionally reckless conduct, an upward variance to the statutory maximum sentence of imprisonment for involuntary manslaughter is warranted.

## CONCLUSION

The Government requests the Court impose a sentence at the statutory maximum. A statutory maximum sentence accounts for the magnitude of harm Levy inflicted on veterans, their families, and society in general. Levy's criminal conduct failed veterans who sought the health care they were entitled to receive in return for their service to this country. Levy's extremely reckless practice of pathology led to the death of veteran J.R.G. and others. The magnitude of Levy's reckless conduct is evident by the diagnoses he rendered to veterans who did in fact have cancer, but Levy said they did not have cancer. Levy rendered cancer diagnoses to veterans who in fact did not have cancer, but Levy said they did. Based upon the evidence in this case, the statutory maximum sentence is warranted.

Respectfully submitted,

David Clay Fowlkes
First Assistant United States Attorney

By: /s/ Kyra E. Jenner
Kyra E. Jenner
Assistant U.S. Attorney
Arkansas Bar No. 2000041
414 Parker Avenue
Fort Smith, AR 72901
(479) 783-5125
Kyra.Jenner@usdoj.gov

**CERTIFICATE OF SERVICE**

I, Kyra E. Jenner, Assistant U. S. Attorney for the Western District of Arkansas, hereby certify that on December 14, 2020, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing and that a copy of the foregoing was also sent via email to the following:

John C. Everett, attorney for Defendant, John@Everettfirm.com
Mark F. Hampton, attorney for Defendant, MarkFHampton@aol.com
Michael Darren O'Quinn, attorney for Defendant, Darren@Darrenoquinn.com
Rachel R. Roisen-Avant, Probation Officer, Rachel_Roisen@arwp.uscourts.gov

/s/ Kyra E. Jenner
Kyra E. Jenner
Assistant U.S. Attorney