**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISON**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | § | |
| | § | |
| **Plaintiff(s)** | § | |
| | § | **Case No. 5:19CR50059-001 TLB** |
| | § | |
| **vs.** | § | |
| | § | |
| **ROBERT MORRIS LEVY,** | § | |
| | § | |
| **Defendant(s)** | § | |

**DEFENDANT'S REPLY TO THE GOVERNMENT'S SENTENCING MEMORANDUM**

The Defendant, Robert Morris Levy, through his attorneys, John C. Everett, Mark F. Hampton, and Michael Darren O'Quinn, states as follows:

1. At the outset, the Defense is dumbfounded at the request of the government for this Court to, not only sentence the Defendant to the statutory maximum sentence of 20 years under wire fraud (18 U.S.C. § 1341), but also to sentence the defendant to the statutory maximum sentence of 8 years for involuntary manslaughter (18 U.S.C. § 1112). Further, ultimately the Government requests that the Court sentence the Defendant to the statutory maximum on both counts AND to run these sentences "consecutively". This request puts the Defendant at a sentence of 336 months or 28 years.

2. Based upon our calculations, had the Defendant opted to go to trial and ultimately had he been convicted of all counts, his base level offense through grouping would have been at a level 31 showing a sentencing range of 108 to 135 months. Engaging in what was thought as very meaningful and sincere plea negotiations, the

Government saw fit to allow the Defendant to plead to the 2 counts which are the counts of conviction before this Court. An additional 2 points have been given to the Defendant in the PSR for his acceptance of responsibility putting him at a base level of 29 and a sentencing range of between 87 to 108 months.

3. What good if anything arose from the Defendant saving the Government, the Court, and all veterans' families associated with this case a 2½ to 3 week trial? What benefit does the Defendant receive from accepting responsibility which the guidelines require that he be given credit for his voluntary admission of guilt? The Defendant is currently 54 years of age, if the Court takes the recommendation of the Government and sentences Dr. Levy to 28 years that is an <u>eleven (11) level increase on the sentencing grid</u>- a 211% increase from the HIGH end of the guideline range. At 54 years of age, and based upon the current goodtime credit earned while serving a sentence in the Bureau of Prisons, Levy will be given 4 years off if he maintains his good behavior. That leaves him with a balance of 24 years' imprisonment. With that in mind, Levy would be 78 years old when released. In essence, the Government is asking for a life sentence to be applied to the Defendant.

## I. DEFENDANT'S OBJECTION TO AN UPWARD DEPARTURE OR UPWARD VARIANCE

4. The Defendant objects to the government's request for an upward departure and upward variance and will examine each in turn. The Defendant submits that a sentence within the advisory guideline range is appropriate in this case.

### A. GOVERNMENT REQUEST FOR UPWARD DEPARTURE

5. With respect to upward departures from the advisory guideline range, U.S.S.G. § 5K2.0(a)(1)(A), allows the sentencing court to depart upward if "there exists

an aggravating or mitigating circumstance of a kind, or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described." Furthermore, the sentencing court must distinguish whether the case falls under the category of a "heartland case" or an "unusual case." *See Koon v. United States*, 518 U.S. 81, 93 (1996).

6. The Defendant contends that the government's grounds for departure are presently and adequately taken into account in the current advisory guidelines calculation. Moreover, the Defendant submits that this case does not fall outside the heartland and thus, an upward departure is not justified. The government, however, argues that an upward departure is warranted pursuant to U.S.S.G. § 5K2.1. Death, U.S.S.G. § 5K2.7 Disruption of Governmental Function, and U.S.S.G. § 5K2.21. Dismissed and Uncharged Conduct.

### 1. OBJECTION TO THE GOVERNMENT'S REQUEST FOR AN UPWARD DEPARTURE PURSUANT TO U.S.S.G. § 5K2.7. DISRUPTION OF GOVERNMENTAL FUNCTION

7. The Defendant submits that the government request for an upward departure pursuant to U.S.S.G. § 5K2.7 for disruption of governmental functions is improper because the presentence report currently considers that conduct in enhancements applied in offense level calculations for both the mail fraud and involuntary manslaughter convictions. The sentencing guidelines provide for an upward departure under U.S.S.G. § 5K2.7:

> If the defendant's conduct resulted in a significant disruption of governmental function, the court may increase the sentence above the authorized guideline range to reflect the nature and extent of the disruption and the importance of the governmental function affected. Departure from

> the guidelines ordinarily would not be justified when the offense of conviction is an offense such as bribery or obstruction of justice; in such cases interference with a governmental function is inherent in the offense and unless the circumstances are unusual the guidelines will reflect the appropriate punishment for such interference.

8. The Defendant, however, submits that the advisory guideline range already accounts for obstruction of justice by adding two levels to the offense level calculations for both the mail fraud conviction and involuntary manslaughter conviction pursuant to U.S.S.G. § 3C1.1.[1] Because of these applied enhancements, the conduct sought as grounds for an upward departure is already adequately considered and should not result in a sentence higher than that described. *See* U.S.S.G. § 5K2.0(a)(1)(A).

9. A similar situation arose in *United States v. Cole*, 357 F.3d 780 (8th Cir. 2004). There, the district court decided to depart upward when sentencing a defendant for transmitting a threat in interstate commerce by making a bogus threat of an Anthrax attack at a school. The defendant appealed the upward departure on such grounds and the Eighth Circuit reversed because the sentencing guidelines, specifically U.S.S.G. § 2A6.1, already provided for an increase in the base offense level if governmental functions were substantially disrupted.

10.Likewise, here, Levy the presentence report currently calculates a two level enhancement to the offense level calculations for both the mail fraud and involuntary manslaughter convictions pursuant to U.S.S.G. § 3C1.1. This enhancement results in a higher advisory guideline calculation and adequately accounts for obstructive conduct. Thus, the government's request for an upward departure on this ground should be denied.

---

[1] The Defendant withdraws his objection to the obstruction enhancements.

## 2. OBJECTION TO THE GOVERNMENT'S REQUEST FOR AN UPWARD DEPARTURE PURSUANT TO U.S.S.G. § 5K2.1 DEATH

**3.**

11. The government also cites U.S.S.G. § 5K2.1. Death as grounds for requesting an upward departure. Much like the Eighth Circuit's analysis in *Cole*, the Defendant argues that the guidelines have already adequately accounted for his conduct.

12. Pursuant to U.S.S.G. § 2A1.4, the Involuntary Manslaughter guideline, a conviction for Involuntary Manslaughter under U.S.C. § 1112, begins with a base offense level of 12 if the offense involved criminally negligent conduct. That offense level, however, is increased to 18 if the offense involved reckless conduct. In the instant case, the Defendant's base offense, as calculated in the presentence report, begins at 18. That offense level is increased with the following enhancements:

> 157. **Victim Related Adjustment:** If the defendant knew or should have known that a victim of the offense was a vulnerable victim, increase by 2 levels. U.S.S.G. § 3B1.3(b)(1)
>
> 158. **Adjustment for Role in the Offense.:** The defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission of concealment of the offense; therefore, increase by 2 levels. U.S.S.G. § 3B1.3

13. The Defendant's base offense has, effectively, been substantially increased by application of specific offense characteristics which adequately reflect the Defendant's conduct and therefore, no upward departure is warranted. *See Cole infra*.

. 14. The government submits that the Court "can and should" depart upward from Levy's guideline sentencing range based on 3 grounds identified in the presentence report. The government, however, does not specifically address the enhancements enumerated in U.S.S.G. § 5K2.1, but instead addresses the factors enumerated in 18 U.S.C. § 3553 factors, requesting an upward variance.

15. At present, the Defendant has received an 8 level increase from the initial base level offense of 12, for involuntary manslaughter. The government argues that Levy "ignored a warning from another pathologist," "that he disregarded the fact that a vulnerable cancer patient was involved," "[h]e violated his oath as a physician to do no harm," "[h]e failed to reexam his prior erroneous diagnosis" to support its contention that an upward departure and/or variance is warranted. *See* Government's Sentencing Memorandum, pgs. 20-21. However, the Defendant asserts that those issues have been contemplated in the presentence report and are adequately represented in the multi-level enhancements. Therefore, an additional upward variance under § 5K2.1 or 18 U.S.C. § 3553 is unwarranted. See *United States v. Cole*, 357 F.3d 780 (8th 2004).

16. Again, United States Sentencing Guidelines, § 5K2.0(a)(1)(A), provides for upward departure if "there exists an aggravating or mitigating circumstance of a kind, or to a degree not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that, in order to advance the objectives set forth in 18 U.S.C. § 3553(a)(2), should result in a sentence different from that described." The Defendant contends that the Government's grounds for departure are presently and adequately taken into account in the current advisory guidelines calculation.

**3. OBJECTION TO THE GOVERNMENT'S REQUEST FOR AN UPWARD DEPARTURE PURSUANT TO U.S.S.G. § 5K2.21 DISMISSED AND UNCHARGED CONDUCT.**

17. Next, government argues that this Court should vary or depart upward because of the number of patients whose quality of care was negatively impacted because of Levy's alleged misdiagnoses effectively relying on relevant conduct as is permissible under the guidelines. As the defense has previously argued, this requires the Court to

engage in considerable speculation as to whether (a) the misdiagnosis occurring on that particular day was because Levy was under the influence of an intoxicant or (b) whether it was simply attributable to human error. The Government will not be able to offer any proof in any of the 39 cases of intoxication. Thus, any upward variance would be based on complete speculation. The Defense asks the Court when considering the 39 patients to be mindful of even the Governments own admission in the presentence report that several of these cases should not be attributable to misconduct on Dr. Levy's part.

### 4. OBJECTION TO UPWARD DEPARTURE PURSUANT TO U.S.S.G. § 5H1.9 DEPENDENCE UPON CRIMINAL ACTIVITY FOR A LIVELIHOOD

18. Finally, while not cited in the government's motion, the presentence report indicates that an upward departure may be warranted pursuant to U.S.S.G. § 5H1.9. Dependence on Criminal Livelihood. The Defendant objects. U.S.S.G. § 5H1.9 directs the party to refer to Chapter 4, Part B- Career Offenders and Criminal Livelihood. As the Defendant has no criminal history and §4B1.1 applies to Offenders, § 4B1.4 applies to Armed Career Criminals, and § 4B1.5 applies to Repeat and Dangerous Sex Offender Against Minors, the Defendant submits that the only remaining applicable portion of that chapter is § 4B1.3 which addresses criminal livelihood.

19. §54B1.3 provides the following "if the defendant committed an offense as part of a pattern of criminal conduct or engaged in as a livelihood, his offense level shall be not less than 13, unless § 3E1.1 (Acceptance of Responsibility) applies, in which event his offense level shall be not less than 11." This provision of the guidelines, in the application notes, further defines *"pattern of criminal conduct"* as "planned criminal acts occurring over a substantial period of time. Such acts may involve a single court of

conduct or independent offenses." U.S.S.G. § 4B1.3, App.N. 1. Application Note 2 of U.S.S.G. § 4B1.3 provides that "*Engaged in as a livelihood*"

> Means that (A) the defendant derived income from the pattern of criminal conduct that in any twelve-month period exceeded 2,000 times the then existing hourly minimum wage under federal law; *and* (B) the totality of circumstances shows that such criminal conduct was the defendant's primary occupation in that twelve-month period (*e.g.*, the defendant engaged in criminal conduct rather than regular, legitimate employment; or the defendant's legitimate employment was merely a front for the defendant's criminal conduct.

*Id*. (emphasis added).

20. In the instant case, a departure for Criminal Livelihood pursuant to U.S.S.G. § 5H1.9 with reference to U.S.S.G. § 4B1.3 is not warranted, nor is it applicable to the underlying facts. Here, there is no evidence that the criminal conduct was Levy's primary occupation in any twelve-month period. Levy's primary occupation was that of a pathologist. And, while he engaged in unlawful behavior by using 2M2B while engaged in that employment, in violation of his contractual agreement not to do so, and continued to receive a salary and benefits during that time, ingesting 2M2B was not his primary occupation. This departure ground is applicable in cases where individuals might appear to be running a lawful business, but such business is front for some type of criminal activity such as drug trafficking, money laundering, or prostitution.

21. By analogy, in *DeRosier* case, defendant DeRosier, while employed for a bank, defrauded customers of the bank she encountered during the course of her employment. *See infra*. Absent from *DeRosier*, however, is the application of an upward departure Nowhere in that opinion is it ever even mention that an upward departure should be given to DeRosier for defrauding customers of the bank while fully employed. The VHSO "lookback" reviewed approximately 39,902 cases as far back as 2006. Of the

39,902 cases, according to the math that would place an estimated 3,325 cases per year which Levy had performed pathology duties. The Government points to 2017 where the only proof that Levy was using 2M2B was that year and a few months in 2018. The number of misdiagnoses claimed by the Government that affected patient care was 6 in 2017 and none in 2018. Thus, Levy had properly performed his function as a pathologist in at least 3,319 of cases in 2017. Nowhere in the guidelines is it contemplated giving an upward variance similar to Levy's case. No factors bear out such an incredulous upward variance based upon §5H1.9.

**B. GOVERNMENT REQUEST FOR AN UPWARD VARIANCE**

22. Next, turning to the portion of the government's motion requesting an upward variance, the Defendant objects to the imposition of a sentence above the advisory guideline range and submits that a sentence within that guideline range comports the sentencing factors enumerated in 18 U.S.C. § 3535(a). The Defendant submits that a guideline sentence is the appropriate sentence and urges the Court to consider the factors enumerated in 18 U.S.C. § 3553(a) with particular attention to the nature and circumstances of the offense and to provide *just* punishment- sufficient punishment, but not punishment that is greater than necessary.

23. There is an unspoken danger that imposing a sentence above the advisory guideline range will have negative consequences on physicians who will fear criminal prosecution in making mistakes which in turn may result in doctors acting overly cautious and unlikely or unwilling to perhaps suggest more radical, but life-saving treatments, therapies, or alternatives.

24. Upward departures and variances should be reserved for medical professionals whose behavior is intentional and malicious as opposed to reckless.

## II. THE LOOKBACK COST AS CALCULATED IN THE LOSS AMOUNT PURSUANT TO U.S.S.G.§ 2B1.1

25. The Defendant maintains his objection to the inclusion of the cost of the lookback in the loss amount calculation, pursuant to U.S.S.G. § 2B1.1.

26. The government's position is that the cost of the third Lookback, initiated at the behest of Dr. Paul Hendrycy in a letter dated March 1, 2018, should be calculated in the loss amount in part because "the lookback was undertaken before an investigation into potential criminal activity and was begun and prior to criminal charges being filed. The lookback was prompted by the VHSO's need, resulting from Levy's conduct to 'identify [Levy's] malpractice' and 'to provide the proper care' to those patients victimized by his malpractice."

27. Here, the government relies on *United States v. DeRosier* to support its contention that the costs of the lookback should be calculated in the loss amount. 501 F.3d 888 (8th Cir. 2007). However, *DeRosier* is very different from the instant case and while the government believes it "is instructive on Levy's objection to capturing the lookback cost in the loss amount," the government's sentencing memorandum omits important information which distinguishes *DeRosier* from the case at hand.

28. Specifically, Lynn Tran DeRosier was a gambling addict who worked for TierOne Bank in Red Oak, Iowa. While working at the bank, DeRosier solicited personal loans from individuals she encountered through her employment. Importantly,

> DeRosier did not solicit the loans on the premises of the bank, imply that the bank approved the loans, or take any money from the bank unlawfully. Instead, DeRosier contacted these acquaintances at home, explaining to

> them that she needed to borrow money to help her family. In return for the loan, DeRosier agreed to pay back the loans with interest within short periods of time, and she formalized the agreements by handwriting loan contracts.
>
> DeRosier did not use the borrowed money for the purposes she claimed to her creditors. Rather, DeRosier gambled the money away, intending to win at the casino and use the proceeds toward paying back her loans. In sum, DeRosier borrowed money from acquaintances so she could support her gambling habit. While Appellant may have intended to abide by her promise to repay her victims, she planned to fund these payments with winnings from the casino, a plan which, true to odds, never came to fruition.
>
> When TierOne was alerted to DeRosier's suspicious activity, it initiated an investigation. TierOne decided to voluntarily give back some money to a few of its customers who made loans to DeRosier. TierOne then pursued a civil judgment against DeRosier in California to recoup the amounts refunded to her creditors. DeRosier agreed to settle the claim in the amount of $25,123.88.

29. Notably, DeRosier resigned from the bank on March 12, 2002 and TierOne, along with the assistance of its in-house attorneys, initiated its investigation, into her activities shortly thereafter. *Id*. at 895. Over three years later, on August 23, 2005, DeRosier was criminally charged for conduct arising from her fraudulent borrowing practices. *Id*. at 892.

30. DeRosier proceeded to trial and was subsequently convicted of three counts of wire fraud affecting a financial institution, in violation of 18 U.S.C. § 1343. DeRosier appealed, pertinent here, the calculation of the loss amount—particularly, the inclusion of the "amount for TierOne's attorney fees, legal fees, and other employee costs related to the investigation" in the loss amount. *Id*. at 894. DeRosier argued "that she should not be accountable for the bank's legal and employee fees associated with the investigation of her conduct because they are consequential and U.S.S.G. § 2B1.1

specifically prohibits their inclusion of the calculation of loss." *Id.* The Eighth Circuit, however, disagreed, finding that

> [T]he costs incurred by the bank for investigating DeRosier are not consequential because the investigation was in immediate response to DeRosier's fraudulent conduct. DeRosier was an employee of the bank and her loans were obtained from those she knew through the bank—it was reasonable and foreseeable that TierOne's internal audit team would investigate one of their employees who was involved in acquiring loans from bank customers. . .
> TierOne's investigation was prompted prior to any criminal charges being brought against DeRosier, and therefore, these costs were not incurred primarily to aid the government, rather the investigation was prompted for the bank's own benefit.

*Id*. at 895.

31. The Eighth Circuit further opined in a footnote that "we realize that TierOne had a responsibility as a financial institution to report suspicious activity to law enforcement, and as such provide the results of its own internal investigation to the FBI. However, to reiterate, TierOne's investigation was *motivated by its own business interests*, and its investigation commenced *well before* an indictment was brought against DeRosier. *Id*. (fn. 11) (emphasis added).

32. The differences between *DeRosier* and Levy, while perhaps seemingly finite, are integral to the analysis of loss amount calculation and whether the lookback is included in such calculation.

33. First, TierOne is a bank, not a government agency, that investigated the fraudulent activities of its employee who engaged in unlawful conduct in a *personal* capacity. Here, VHSO and VA-OIG are both part of a government agency (Veterans Administration) that investigated the fraudulent activities resulting in malpractice of its employee who engaged in unlawful conduct in his *professional* capacity- acting in his role as an employee of and on behalf of that government agency.

34. Second, the time between the investigations conducted by TierOne into DeRosier and the time between the VHSO's investigation into Levy is critical. TierOne began investigating DeRosier shortly after she resigned from TierOne on March 12, 2002. DeRosier was not criminally charged until three years later and, in the interim, TierOne was able obtain a civil judgment against her for loss arising from her criminal conduct. The Eighth Circuit noted, in a footnote, that TierOne's "investigation commenced well before an indictment was brought against DeRosier. Whereas, here, the lookback and criminal investigation into Levy commenced almost in tandem and undoubtedly commingled information for the benefit of both.

35. On March 1, 2018, Dr. Paul Hendrycy wrote a letter to VA-OIG exposing Levy's malpractice and concealment of the malpractice while requesting that the VA-OIG conduct a thorough investigation into those allegations. (PSR ¶ 56).. Levy was terminated from his employment with VHSO on April 13, 2018. (PSR ¶ 62). In conjunction with Levy's termination, the VHSO conducted a lookback. (PSR ¶ 65). VA-OIG investigators conducted interviews with employees who worked with Levy and Levy himself beginning in July of 2018 (PSR ¶ ¶ 116-130). Levy was indicted and arrested in August of 2019.

36. As to this point, *DeRosier* and the case at hand are distinguished because of the time- the time between the discovery of the potentially unlawful conduct attendant internal investigation and the commencement of the criminal investigation. In *DeRosier*, there were years. Here, there were weeks. Additionally, in *DeRosier*, the internal investigation was completed before the criminal investigation even commenced. Here, the investigations began and occurred simultaneously.

37. The government's contention that the cost of the lookback should be calculated in the loss amount because it commenced before the investigation into criminal activity is misplaced. If the lookback commenced the same day or after the criminal investigation commenced or even after criminal charges had been filed, would the government still maintain the position that the cost of the lookback should be calculated in the loss amount? Moreover, if criminal charges had not been filed against Levy, would he be required to reimburse the VA for the cost of the lookback?

38. Furthermore, two other reviews of Levy's professional work were conducted, and yet the government is not requesting that the cost of such be included in the loss amount calculation despite the fact that both occurred prior to the initiation of the criminal investigation and filing of criminal charges. The first retrospective was initiated in September of 2016 in order to review Levy's "high risk cases. This review covered the period of March 2015 to March 2016. No patient care issues were noted. (PSR ¶ 41). The second was initiated on October 13, 2017 covering the period of October 1, 2016 through September 30, 2017 and "revealed 16 cases in which Levy did not follow quality and patient safety policies and procedures." (PSR ¶¶ 47-48).

39. The government is quick to assert that the cost of the lookback should be included in the loss amount calculation because it began before and was separate and apart from the criminal investigation; however, the government simultaneously contends that the results of the lookback must be included in the presentence report, considered relevant conduct, and urges that the contested findings of the lookback serve as a basis to request an upward departure. Clearly, the lookback, conducted by a government agency is part and parcel with the criminal investigation.

40. Next, calculating the cost of the lookback in the loss amount runs afoul of other cases from districts within the Eighth Circuit, faced with similar circumstances that have not calculated the cost of an internal or private investigation in the loss amount, such as *United States v. Cornelsen*, 893 F.3d 1086 (8th Cir. 2018).[2] This fact, of course, presents a problem insofar as how different districts within the same circuit treat guideline applications and calculations resulting in potentially adverse effects on a defendant. While *Cornelsen* did not address whether private investigation costs may or may not be calculated in the loss amount calculation under U.S.S.G. § 2B1.1, the opinion is determinative that in that case, they were not.

41. Beginning in 2007, the defendant, Cornelsen worked for MV Transportation (MVT), a company based in Dallas, Texas, but with an office in Elk Horn, Iowa, where he worked. By 2010, he was promoted to Chief Financial Officer, but terminated four years later in April of 2014. Then MVT began an internal review of Cornelsen's corporate activities- an internal review which cost the company $763,746.74. Subsequently, the matter was referred to the United States Attorney. Thereafter, in January 2016 Cornelsen was indicted with five counts of wire fraud alleging five unauthorized wire transfers and defrauding MVT of $297,985.13. Cornelsen proceeded to trial. *Id*. at 1088.

> At trial, David Oswald, a forensic accounting expert, testified regarding an Ernst & Young (E & Y) audit of Cornelsen's corporate activities. The E & Y audit estimated Cornelsen defrauded MVT of a total of $1,453,025.42. Accordingly, the government presented evidence of uncharged, yet related conduct, including unauthorized, non-business expenditures made using manual checks and a company credit card. In November 2016, a jury found Cornelsen guilty on all five counts of wire fraud.

[2] Notably, both *DeRosier* and *Cornelson* arise from the Southern District of Iowa.

> The Presentence Investigative Report recommended the court find an actual loss amount of $1,150,320.09 for purposes of determining the base offense level under United States Sentencing Guidelines § 2B1.1. At sentencing, Special Agent Kevin Kohler, a certified public accountant, testified to the calculations. Kohler used the E & Y audit's $1,453,025.42 calculation as a baseline and recommended the court (1) remove a $206,250.00 personal loan that did not appear to be fraudulent, (2) remove $321,846.75 in potentially ambiguous vehicle expenditures, and (3) include a $225,391.42 unauthorized cash bonus from November 2012. After making certain credibility findings and determining the E & Y audit to be a "very conservative" estimate of the actual losses, the district court adopted the recommended loss calculation of $1,150,320.09. The court then turned to restitution, awarding $1,150,320.09 in losses, as well as $250,000.00 in attorney and accountant fees, for a total restitution award of $1,400,320.09.

*Id*. at 1088-1089.

42. Important here, Cornelsen appealed the court's calculation of the loss and restitution amounts- specifically arguing that any amount of loss over what was stated in the indictment or loss pertaining to conduct which occurred outside of the indictment could not be included in either amount. *Id*. What is notably absent from the loss amount calculation is the $763,746.74. cost of the internal review conducted by MVT.

43. The differences between *DeRosier* and *Cornelsen* are instructive as to how the court should calculate the loss amount in the instant case and whether the lookback cost should be included- and perhaps why internal investigation costs were attributable in one case but not the other. In *DeRosier*, the defendant acted in a personal capacity, not as an agent of the bank where she worked and which conducted the internal investigation into her fraudulent activity. DeRosier was criminally charged over three years later for her fraudulent activity. Cornelsen, however, conducted his fraudulent activity while acting in his professional capacity with MVT- conduct for which he was criminally charged no more than 18 months after the private investigation commenced.

44. The lack of consistency by which loss amount calculations include the cost of an internal investigation within this Circuit and from the same district court within that Circuit, bolster the Defendant's contention that the finite differences which distinguish *Cornelsen* from *DeRosier* also distinguish his case from *DeRosier*, and liken it to *Cornelsen*. The Defendant was acting in his professional capacity as a physician and employee of VHSO while undertaking the admittedly illegal conduct. The lookback, while commencing before the criminal investigation, did not commence years, but mere weeks before the criminal investigation, occurred simultaneously with the investigation, undoubtedly commingled findings with that investigation, and concluded at time likely in tandem with the criminal investigation if not after. Thus, the cost of the lookback, much like the cost of the internal investigation in *Cornelsen*, should not be included.

45. Therefore, the Defendant reiterates his objection that the cost of the look back should not be included in the loss amount calculation pursuant to U.S.S.G. § 2B1.1.

. **WHEREFORE PREMISES CONSIDERED**, The Defendant moves this Court for all reasonable relief to which he is entitled.

Respectfully submitted,

Mark F. Hampton
Arkansas Bar No. 85066
Attorney for Defendant
1122 West Capitol Avenue
Little Rock, Arkansas 72201
(501) 376-6277
(501) 376-6279 fax
Mark@MarkHamptonLaw.com

And

M. Darren O'Quinn
Arkansas Bar No. 87-125
Attorney for Defendant
LAW OFFICES OF DARREN O'QUINN PLLC

B. Ram Suri Professional Building
36 Rahling Circle, Suite 4
Little Rock, AR 72223
Phone: (501) 817-3124
Fax: (501) 817-3128
Darren@DarrenOQuinn.com

And

John C. Everett
Arkansas Bar No. 70022
Attorney for Defendant
P. O. Box 1460
Farmington, Arkansas 72730
Phone: (479) 267-0292
Fax: (479) 267-0564
john@everettfirm.com

CERTIFICATE OF SERVICE

I hereby certify that on December 24, 2020, I electronically filed the foregoing with the Clerk of Court using CM/ECF system, which shall send notification of such filing to the following:

Kyra E. Jenner
Assistant U. S. Attorney
P. O. Box 1524
Fort Smith, Arkansas 72902

Mark F. Hampton
Arkansas Bar No. 85066
Attorney for Defendant
1122 West Capitol Avenue
Little Rock, Arkansas 72201
(501) 376-6277
Mark@MarkHamptonLaw.com