UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

UNITED STATES OF AMERICA PLAINTIFF

v. CASE NO. 5:19-CR-50059

ROBERT MORRIS LEVY DEFENDANT

---

SENTENCING HEARING, DAY TWO

VOLUME 2 of 2

JANUARY 22, 2021

BEFORE THE HONORABLE TIMOTHY L. BROOKS

FAYETTEVILLE, ARKANSAS

---

A P P E A R A N C E S

FOR THE PLAINTIFF:

MS. KYRA E. JENNER
Assistant United States Attorney
414 Parker Avenue
Fort Smith, Arkansas 72901
(479)783-5125
kyra.jenner@usdoj.gov

MR. BRYAN A. ACHORN
Assistant United States Attorney
100 Reserve Street, Suite 343
Hot Springs, Arkansas 71901
(479)719-8380
bryan.achorn@usdoj.gov

Also Present: Special Agent Kris Raper
Department of Veterans Affairs
Office of Inspector General

Officer Rachel Roisen
United States Probation

FOR THE DEFENDANT:

MR. JOHN C. EVERETT
Attorney at Law
P.O. Box 1460
Farmington, Arkansas 72730
(479)267-0292
john@everettfirm.com

MR. MICHAEL DARREN O'QUINN
Attorney at Law
36 Ralhing Circle, Suite 4
Little Rock, Arkansas 72223
(501)817-3124
darren@darrenoquinn.com

MR. MARK F. HAMPTON
Attorney at Law
1122 West Capitol Avenue
Little Rock, Arkansas 72201
(501)376-6277
markfhampton@aol.com

# I N D E X


| | Page |
|---|---|
| Objections 2 and 10 | 278 |
| Argument by Ms. Jenner | 278 |
| Argument by Mr. Everett | 280 |
| Court's Ruling | 283 |
| Objections 5, 8 and 13 | 294 |
| Court's Ruling | 295 |
| Government's Departure Motions Considered | 309 |
| Argument by Ms. Jenner | 309 |
| Argument by Mr. Everett | 317 |
| Court's Ruling on Government's Departure Motions | 322 |
| Victim Impact Statement of James McGuire | 333 |
| Victim Impact Statement of Kelvin Parks | 335 |
| Victim Impact Statement of Tammy Phillips | 339 |
| Victim Impact Statement of Catherine Hill | 341 |
| Victim Impact Statement of Shawna Lynch | 343 |
| Victim Impact Statement of Judy Velosky | 347 |
| Victim Impact Statement of Doug Kolpek | 357 |
| Closing Argument by Ms. Jenner | 362 |
| Closing Argument by Mr. Everett | 362 |
| Defendant's Allocution | 367 |
| Court's Ruling on Sentencing | 368 |
| Reporter's Certificate | 397 |

377

# E X H I B I T S

| | | Admitted |
|---|---|---|
| **Court's Exhibits** | | |
| Exhibit 1 | Photograph of David Phillips | 347 |
| Exhibit 2 | Video Regarding John Ray Gibbs | 347 |
| Exhibit 3 | Photo Collection Regarding John Ray Gibbs | 348 |

THE COURT: All right. Where we left off yesterday, we had concluded the evidentiary hearing that we were having for all purposes. And at this time, I would like to receive any argument that the parties wish to make as it relates to the guideline determinative objections. This would be objections 2 and 10 relating to loss amounts properly included under 2B1.1.

I'll invite Ms. Jenner to make her argument first.

MS. JENNER: Thank you, Your Honor.

Your Honor, there is simply no merit in the objection that the defendant has filed as to objection number 2 where they are asking the Court to exclude the first quarter of fiscal year 2017.

I would actually first note, Your Honor, by any calculation or any mathematical formula, to back out the first quarter of Dr. Levy's salary, performance award and benefits for calendar year 2017, I do not see would have any effect on the loss amount under any calculation in a prorata division and splitting of numbers. I do not see how it benefits the defendant to advance this objection because they will not get below the $550,000 limit, and they certainly can't get below the 1.5 million if the Court does include the lookback amount.

But that observation aside, Your Honor, there is

ample evidence that the Court can use in making a finding that Dr. Levy was a member of the Tissue Board, that he used that position as Chairman of the Tissue Board to begin concealing the number of errors and major mistakes being made in his laboratory starting in October of 2016, which is the very first month of fiscal year 2017. And his concealment of those mistakes is repetitive, repeating and misleading to the upper echelon of the Veterans Administration that there were absolutely "0" mistakes being made in his lab for the first part of fiscal year 2017, I think would allow the Court to conclude that the probation officer properly and correctly included all of fiscal year 2017 in the loss amount.

Now, Your Honor, directing my attention to the lookback. The testimony yesterday made it abundantly clear that the lookback was not initiated for the primary purpose of assisting the government in the investigation or prosecution of a criminal matter. The commentary and the notes that describe what should be excluded from loss talk about what the primary purpose of the investigation is. And I think the Court heard on several different occasions from two different witnesses, Special Agent Raper and Dr. Scott, that the criminal investigative division of the Veterans Administration was not instrumental in initiating that lookback. The criminal investigation was not

affiliated with that lookback. And although we have today had that benefit of appreciating the results of that lookback for purposes of considering the overall picture of Dr. Levy's conduct, that is a proper inclusion. And it was foreseeable, Your Honor, which is another thing that I believe the Court has to recognize is that Dr. Levy, in continuing his pattern of errors and concealing those errors, it's reasonable for us to draw the inference that a lookback was a possibility or foreseeable event based upon his criminality and his conduct in deceiving the Veterans Administration.

The government believes that the *United States v. DeRosier* is a case that is helpful to the Court in making its findings. And the case cited by the defense, *United States v. Cornelson* is really not instructive because *Cornelson* doesn't even talk about why it did or did not include investigative costs in the loss calculation.

I'm prepared to answer any questions the Court may have of the government, but I believe our position is clear.

THE COURT: Thank you, Ms. Jenner.

Mr. Everett?

MR. EVERETT: May it please the Court.

Your Honor, the defendant agrees that the resolution of objection number 2 would not have an impact

on the guideline range, as Ms. Jenner stated. However, her comments about the Tumor Board deserve some response.

You will note from the minutes of the Tumor Board meeting that many physicians attended every meeting, including particularly Dr. Hendrycy. He wasn't there all the time. He was there about half the time. So if it's true, as Ms. Jenner says it's true, that Dr. Levy was intentionally concealing the number of missed diagnoses in the PATH lab, then certainly Dr. Hendrycy would have known that and did not speak. So that information was available institutionally to the Veterans Administration no matter what Dr. Levy did. But we acknowledge that there's no guideline impact on however the Court decides that. We do, however, offer and stand on our pleadings on that issue.

Objection number 10 on the lookback period deserves more comment. To start with, Your Honor, while the government says, well, the divisions of the VA are separate, there's a criminal division and there's an administrative division that handles the lookback period is a little disingenuous. After all, they are both divisions of the Veterans Administration. They are not separately created entities. They are both one person. They are both, according to some things before the Court, a victim of Dr. Levy.

And in addition to that, it's clear, as a matter

of fact it's painfully apparent, that that lookback investigation provided a great deal of support for the manslaughter charges, for without it, there would have been no manslaughter charges. There would have been no indication that Dr. Levy should be or properly could have been charged with those offenses. So while it might have been started, initiated, by the Veterans Administration prior to the criminal investigation started, it was the same entity. And as it played out, it was critically important to the criminal investigation and the criminal charges.

Dr. Staggs (sic) -- sometimes I forget peoples' name -- interesting said that, the purpose of that was to figure out how to recompense the victims of this alleged misconduct, but as you can see in the PSR, that effort to recompense to this date has resulted in four federal tort claims being paid, with five or six pending. Also interestingly to me, though not directly on point, is that Dr. Staggs (sic) explains to us that, with respect to the defendant's exhibits offered yesterday, those medical reports were designed to defend against federal tort claims and were not, for whatever reason, she says, are not particularly probative on the issue of the charges against Dr. Levy. That's probably a dishonorable comment about the Veterans Administration, that they would have an entirely

different administrative body charged with trying to defend federal tort claims. And then come to this Court yesterday and suggest that, notwithstanding that, there's the same evidence that they used to deny federal tort claims is offered in support of the prosecution. We also offer our written pleadings on objection number 10 and stand on them.

I'm not bold enough to say I'm fully prepared to answer questions, but I would take a stab at it, Your Honor, if you have any.

THE COURT: Thank you, Mr. Everett.

MR. EVERETT: Thank you, Your Honor.

THE COURT: So the Court is going to overrule the objections number 2 and number 10 as to the loss calculation required under 2B1.1.

With regard to objection number 2, this has to do with the inclusion of Dr. Levy's salary and benefits during fiscal year 2017 and that portion of 2018 through his date of termination as discussed in paragraphs 135 and 139 of the presentence report. The total amount at issue here is -- well, the total amount of salary and benefits is $497,745.70.

There is no dispute about fiscal year '18, to the Court's knowledge. The portion attributed to that year is $191,780. As best as the Court can ascertain, the only part of the dispute concerns the first, say first quarter

of fiscal year 2017, which would be October of '16 through let's say into January of 2017. Ball-parking it, there's about $100,000 or so that is being contested.

Before the Court gets into its findings here, I would note that all of the Court's findings today are based on the unobjected to facts in the presentence report. It's based on the admitted facts in the plea agreement and it's based on the evidence adduced at our evidentiary hearing yesterday. And in that regard, the Court feels compelled to note for the record that it finds the testimony of Special Agent Raper and Dr. Scott -- well, it finds their testimony to be extremely credible. The Court listened intently to their testimony and had the ability to observe their demeanor while testifying. And I was struck by the manner in which they provided their testimony.

This will not be reflected in the written record, but this is an extremely complex investigation that was undertaken, the likes of which is rarely seen in terms of the scope of information and the depth that they searched. And yet the testimony of Special Agent Raper, including the dates and amounts, were from his immediate recall without, for the most part, even resorting to his notes. And all of this information was highly consistent with the unobjected to facts in other portions of the record. And the Court just places a high degree of credibility on the manner in

which he testified and the Court believes that this really bolsters its belief as to the thoroughness of his analysis and his investigation.

The Court would make the same findings with regard to Dr. Scott. She's obviously an extremely well-credentialed physician. Her academic and professional experience, credentials in medicine and in pathology in particular the Court finds to be impeccable. She had both factual knowledge of the case because of her involvement with the lookback, but then as part and parcel of that, she also offered expert opinions. And the Court finds that all of the opinions that she offered were sound, well-reasoned, and certainly meets all of the criteria under 702 and that all of her opinions were within her areas of expertise.

The Court was also struck by Dr. Scott who had immediate recall of the details of all of the patients that she testified about, about the data. She was referencing some of the exhibits and was guided through some of the exhibits through her testimony, but for large portions of her testimony, Dr. Scott had immediate recall of the matters, and the Court was well impressed and finds her testimony to be very credible.

Now, findings with regard to the appropriateness of inclusion of the full amount of the salary and benefits for these two fiscal years. The investigation, as Agent

Raper explained, documented the paper trail pertaining to the purchase of 2M2B beginning in, I believe it was June of 2017. And it's true that Mr. Levy's confession aided that, but I'm not sure why we're discounting leads and confessions. That typically happens frequently in law enforcement. So the paper trail was documented to begin in June of 2017. The Court has no doubt whatsoever that Dr. Levy's use of 2M2B was an effort to conceal his ability to work while impaired by the effects of intoxicants.

Secondly, the Court finds that, although the paper trail begins as of June 2017, that doesn't necessarily mean that Mr. Levy was not using 2M2B or other means of concealing his use of intoxicants prior to June of 2017. In fact, the undisputed facts in the plea agreement, paragraph 2(i), by his own admission, translation "by his own confession," Dr. Levy used 2M2B as early as February 2017.

Now, just because that's the first time that Dr. Levy in his confession states that he used 2M2B does not mean that that is the first time that he engaged in concealing his use of intoxicants. In fact, again uncontested, again as part of his confession, paragraph 2(i) of the plea agreement, this really dates -- I mean, the earliest admission and the earliest connection to 2M2B is November 2016 when Dr. Levy -- then Dr. Levy -- says

that he first discovered the ability to use 2M2B to conceal the use of intoxicants and that was when he, quote, "Started getting real about it."

While there is no direct evidence that he was actually physically using 2M2B, the Court finds that all of these datapoints and all of the context here lead the Court to the reasonable inference that he was using 2M2B as early as November 2016. But set that aside. Even if he wasn't actually using 2M2B in November, even if he hadn't sourced it as of November 2016, it is readily apparent and the Court easily finds this beyond a preponderance of the evidence, Mr. Levy was preparing and investigating and researching ways to conceal his use of intoxicants while working.

And the Court finds the timeline here to be disturbing considering that he just came back to work fresh off of drug rehab in October, midway through October, as a matter of fact. And by sometime in October and November, he's already planning how to violate the terms of his addiction contracts. I'll get to that when we get to 3553(a). But suffice it to say that the reason Dr. Levy -- then Dr. Levy, Mr. Levy now -- the reason he was doing this is because he well knew that if his use of intoxicants while working was discovered again, he would be fired and he would lose the salary and benefits. So he was planning

a way to be able to be intoxicated and to at the same time be able to provide clean urine or blood samples, which were also part of his contract. And this is all an intent to defraud, and it was for purposes of continuing his salary and receipt of benefits. And on those facts alone, it is properly included as loss under 2B1.1.

This whole part about the bonus and that based on an error rate of less than 5 percent and what the Tumor Board found, all of this is very interesting, but the Court doesn't really have to even get there to make these findings. The Court finds the whole Tumor Board thing to be interesting on a lot of fronts. But at a minimum, Mr. Levy knew or should have known that these errors were being committed. We need look no further. I mean, the earliest one in this time period after he returns to work that's documented is R.C., the level 3 error that he made on November 7th. So this and other errors are being committed, and throughout the course of that year, no errors at all were being reported. And the Court does find that apparently there's this financial gain that if he had accurately reported, he could have been in jeopardy of losing that performance bonus. So the government has established that, in the Court's mind, by a preponderance of the evidence. I get that theory. But the Court doesn't even really even need to reach that and doesn't really use

that as the basis for its findings here, even though it believes it to be true.

With regard to objection number 10, this is the inclusion of the lookback. As we know from paragraph 139, that amount that has been included for loss purposes is $2,103,060.57. The defense rightfully notes Application Note 3(D) to 2B1.1 which says that the Court cannot include for loss purposes investigative costs which were incurred by either the government, which is to say the government in its prosecution, or the victim, if those costs and expenses were primarily for purposes of aiding the government's prosecution.

Here, the Court finds that the lookback expenses, the $2.1 million of expenses, while it did aid the government's investigation, while it did aid in the prosecution, it was not incurred primarily for that purpose. The Court was well persuaded by the testimony, the credible testimony yesterday that these expenses would have been incurred regardless of then Dr. Levy's, confession. Even if the government never discovered what Mr. Levy was using to conceal his intoxication, even if they never recovered that, the errors that were brought to the VA's attention by Dr. Hendrycy in his letter that we discussed during the hearing yesterday, or that was discussed during the hearing yesterday, was a call to arms

to the VA that there is a major problem at the VA in Fayetteville with regard to the medical care that is being rendered due to some really bad diagnoses, bad procedure, understaffing, et cetera, in the pathology department. And one component, one central component of Dr. Hendrycy's complaint to the VA-OIG was this pathologist who was falsifying records and who was making these critically wrong violations of procedure. And that is obviously referring to Mr. Levy.

What would we have the VA health-side to do upon receipt of this information? Were they to do nothing? Were they only to initiate a criminal investigation which has nothing to do with the potential for hundreds or thousands of people who had been incorrectly diagnosed? Do we just ignore that as if it never happened and we only pursue a criminal investigation? No. The Court is well persuaded that the first order of business was to audit what was going on in the pathology department and to make recompense to the patients who had been adversely affected by what was going on in that pathology department.

The testimony that the Court finds to be credible -- and this is unobjected to in the presentence report -- the OIG's office has at least two divisions, but the two that are pertinent here are the criminal investigation division. That's the portion that would aid

ultimately in the prosecution. That's who Special Agent Raper, that's the channel, that's the side he reports up through. But there's another side, OHI, Office of Health Care Inspections, and they work side and side with the Veterans Health Care Services part of the overall Veterans Administration, which as we all know is a cabinet-level agency of the United States government. But it was the OHI and the health care side of this equation that had to make the decision about whether they would conduct a lookback and then the scope that the lookback would take. And that was done for patient health care purposes. They had to do that. They had no choice. And these expenses would have been incurred regardless. And this was initiated before the criminal referral was even made.

Further proof of this is the fact that after the lookback had been completed, or perhaps while it was being completed, they had to send letters to every affected veteran and their family to let them know what had happened and what was going on. And I'm sure those weren't easy letters to write, but they had an ethical, moral responsibility as health care providers to do that. And they did. Not only that, but as Dr. Scott testified, out of the 589 level 3 errors, these are major diagnostic errors that adversely impacted the timely receipt of proper diagnosis and treatment, they had to go into these

patients' medical records and amend them to include accurate findings. That's not part of a criminal investigation. The criminal investigation wasn't needed. No part of a criminal investigation, to this Court's knowledge, requires it to go back and amend patient records. That's not a remedy that the government could receive in a criminal prosecution. That was required because of the findings. And the findings, the lookback findings were required in order to make recompense with these victims such that they were armed with true and accurate information. And all of that, the genesis of all of that, at least from the Central Office in Washington, was Dr. Hendrycy's complaint about what was going on at the Fayetteville VA.

And so the Court finds that the primary purpose of the $2.1 million was not to aid the government in its prosecution. This is consistent with *United States v. DeRosier*. The Court finds that the facts here are certainly analogous to the facts in *DeRosier*. In *DeRosier*, that involved loss being held properly accountable for the bank's internal audit. And what we have here, the lookback is essentially an audit of the procedures, processes, and medical errors that were committed and making the books right, so to speak. And in that respect, the analysis here is very similar to *DeRosier* and the Court believes that --

well, the Court finds that the Eighth Circuit's analysis in *DeRosier* is very instructive and consistent and guides the Court's findings here.

So the Court will include the $2.1 million figure for the lookback expense. I would further observe -- and we'll get to this later today -- but the $2.1 million we learned yesterday was really not the full impact of the cost to the VA because that does not include the cost of all of the VA doctors and staff and resources that they were just absorbing. These are other monies paid out of pocket, so to speak. So that will be included, along with the full amount of the salary and benefits. That's the $497,000 figure. And as the parties have conceded, now that we're up in the overall 2.5, or actually it's $2.6 million range, even if the Court is wrong about including the salary from the first quarter of fiscal year 2017, that would have no impact on the guideline calculation. Even if the Court backs that out, we're still at 16 levels of enhancement. So, again, even if the Court is in error, that would have no impact on the guideline range whatsoever.

So that is the Court's ruling on the guideline determinative objections. That leaves us with three non-guideline determinative objections. This is objection number 5 with regard to the pap smear cases in paragraphs

72, 79 and 88. It involves objection number 8. That's the inclusion of paragraphs 67 through 113 of these specific patient cases that are not part of the patient that was involved in the count of conviction, which is Count 29. And then objection number 13, that pertains to a sentence in paragraph 143 of the presentence report wherein it states regarding Count 29 and related conduct, the number of victims exceed 500. And they object to suggesting that there are 500 victims that should be inferenced here as being part of the relevant conduct.

So, Ms. Jenner, would you like to address or argue these objections?

MS. JENNER: Thank you for the opportunity to allow me to address the Court, Your Honor. But if I had anything to say -- and I do -- it would simply regurgitate the extensive testimony that the Court heard yesterday and for which the Court credits. I believe that the evidence that was presented on these particular issues came across loud and clear through the testimony of Special Agent Raper and Dr. Margie Scott, and I don't wish to reiterate that because I recognize the Court took careful notes and listened intently. Therefore, I believe the evidence has been proven by a preponderance.

THE COURT: Thank you. Mr. Everett?

MR. EVERETT: Your Honor, frankly, we have said

everything we're smart enough to say in our objections and it's on paper before the Court. I would simply adopt those as the argument with respect to these three objections.

THE COURT: All right. Thank you, Mr. Everett.

The Court will overrule those objections. First of all, the Court would observe that these are non-guideline determinative objections and therefore the Court need not even rule on them. But in cases where the Court might take information in the presentence report into consideration under 3553(a), then it is appropriate for the Court to rule. I will say that I don't know that there's just a whole lot having to do with objections 5, 8 and 13 that the Court plans on -- that's going to affect the Court's analysis under 3553(a). But I do believe and I do find that it is appropriate to be contained within the presentence report.

I am going to ask Officer Roisen to prepare a revised final presentence report to correct or clarify the record consistent with Dr. Scott's testimony. Yesterday, when she was adding basically a sentence for timeline purposes to some of the patients' paragraphs, for example paragraph 83 with regard to J.K., she interlineated a sentence where she's talking about the second pathological review. I would ask, Officer Roisen, if you would just get the transcript, the real-time transcript, and make that

correction.

The same would be true at paragraph 103 with regard to D.C. where she interlineated the clarification about on May 8th, the second pathology review, et cetera. The same with regard to paragraph 110 in patient W.G. where she interlineated the correction that Hendrycy disagreed as opposed to Dr. Hendrycy not being provided the opportunity to review it, or it falsely saying that he agreed.

And also the interlineated comment that she made with regard to paragraph 112 and patient D.C. Again, this is after the second sentence where she begins her interlineation with a second pathological review, et cetera. And you can refer to the real-time transcript to get the exact quote. So I would ask that those revisions be made, just in fairness, because she did -- she was asked if there was anything that was incorrect about these paragraphs and she made those corrections, and so the Court believes that it should be as accurate as it can, so we'll do that.

Let me first take up objection number 8. And this has to do with the inclusion of all of these patient data in cases where significant errors were found by the lookback. And in including those, Dr. Levy's, Mr. Levy's position is that the only need here is to discuss the patient involved with the count of conviction on Count 29,

and that's at paragraphs 94 and 95. And they say all these other patient references between paragraph 67 and 113 are not necessary and they should not be included. And the Court simply disagrees. It's part of the case. It's part of the investigation. The extent to which it has a bearing on any particular finding is hard to tease out, but it's part of what happened. It's part of the investigation. We can't simply just not include it and pretend that it never happened. It did. It was part of the findings of the lookback investigation. And it does go to show, many of the paragraphs go to the time period after Mr. Levy's return to work in October of 2016. Other paragraphs go to between 2014 and this period in 2016 and '17 where he's admitted to all of the predicate for the involuntary manslaughter and practicing so far beneath the standard of care as to have reckless disregard for the harm and injury to his patients.

Something is going on here. The Court is persuaded that 589 level 3 errors, as those have been characterized, over a 15-year period, or a 12-year period, is very abnormal; very, very abnormal. Do we attribute that to, well, then Dr. Levy was just not a very good doctor and sometimes doctors make errors and just chalk it up to that? That's one possibility. Is he an alcoholic since he started at the VA? Did he become an alcoholic

after he went to work at the VA at some point in time? That's certainly a possibility. Is he a doctor who, although well trained, doesn't care, is just making diagnoses without looking at the slides? I suppose that's possible.

According to Dr. Scott, some of the errors that were made were so obvious that it's consistent with someone not even having looked at the slides. So while there are certainly no direct evidence, for example, that he wasn't even looking at the slides, something very abnormal is occurring here; very abnormal. And of course the defense theory is that, well, actually it's not as -- these errors aren't that bad. If you manipulate the numbers and you divide it by this and you only look at it this way, it's really not too far off the norm. Well, I don't believe that argument.

Based on the testimony that the Court does believe, these 589 level 3 errors are extraordinarily abnormal, and they have to be explained by something. And if we were to eliminate references to all of these other datapoints, then we're robbing the record of datapoints that would allow the Court to make reasonable inferences as to what the explanation really is. And so here, at this point for the purposes that the objections have been made, the Court finds that it is relevant information to be

included within the presentence report.

What the Court does with it from there and how it uses it is going to depend on what the other issues are that we will get to in a bit. Certainly the defense makes some very good points about what impact or what effect any of these errors actually had on the eventual patient outcome. Many of the defense arguments are obviously true. Mr. Levy, for all that he is and is not, one thing he didn't do, and that was to cause these patients' cancer. We certainly can't blame that on Mr. Levy. And so then we're on this slippery slope of trying to pinpoint how these errors exacerbated the patients' eventual outcome, and that can be debated ad nauseum, but that's not what these proceedings are about.

What these proceedings are about are whether or not these major diagnostic errors resulted in some identifiable harm to these other patients during the same time frame, during the use of the same modus operandi, during the same course of this scheme, during the course of this same or similar course of conduct. And the Court finds that to be true. The harm is not determined by quantifying the extent to which his errors exacerbated the patients' outcome. The harm is that his errors, caused in the context of this, of whatever it was that was going on here, altered the provision of timely and proper medical

diagnosis, which then altered the treatment path that was taken.

In some cases, that might not have had any meaningful damage, but it did harm them in the sense that they were robbed of having accurate information to allow the clinicians to provide timely and appropriate treatment. And in that sense, these people included in paragraphs 67 through 113 are part of the relevant conduct in this case. Not for all purposes, but to that extent. So that's why the Court overrules objection number 8.

Now, objection number 5 I think is a subset, and this involves this dispute over the pap smears. Again, the Court is not going to make any particular findings and is not going to consider these differences of opinion about the interpretation of pap smears under 3553(a) specifically. These are just three among many patients whom the testimony before the Court that the Court does believe were inaccurate. And it's just three among many whose inaccurate diagnoses in this context of something very abnormal taking place. So these three are included for the same reasons that all of them are being properly included.

And then we get to objection number 13. And this just objects to the presentence report including this sentence that references more than 500 victims. "Victims"

is a loaded word. But here, the Court, A), it's not guideline determinative. But the Court believes that the 589, which is more than 500, simply reference these people who the testimony yesterday explains were part of the group that had a level 3, a major diagnostic error, and that all of these are datapoints from which the Court can make references. The sheer magnitude and the extent to which that is not normal is relevant in the sense that it allows the Court to draw inferences that this either is or is not something that can be explained by the defense theory, which is that doctors make errors, and just because they make errors doesn't mean that they have done anything criminally wrong. And that's true. But again, there's a finite number of possibilities to explain the abnormality. And understanding that the number of overall cases in which major diagnostic errors occurred is relevant to the Court's drawing of conclusions and making inferences from the facts that are not otherwise disputed. So the Court will not alter the language used in paragraph 143.

With that, Mr. Everett, I believe -- and Mr. Levy's objections and exceptions to the Court's rulings are noted. But my question is, has the Court now addressed and ruled on every live remaining objection to the presentence report?

MR. EVERETT: I think you have, Your Honor.

THE COURT: All right. Thank you. Except for the revisions that I have noted that I would ask Officer Roisen to make, the final presentence report is in all other respects adopted and approved.

Mr. Levy, let me turn my focus more specifically to you at this point. I would now like to give full and final approval to the plea agreement, which you and your attorneys negotiated with the government. I do so based on a finding that the offenses of conviction here on the two counts, those adequately capture and reflect the underlying criminal conduct and behavior, and therefore, it is appropriate to approve your plea agreement, and I will do so. And what that means for you, Mr. Levy, is that whatever sentence the Court imposes at the end of this hearing, it will be consistent with the terms of the plea agreement.

Next, Mr. Levy, I would like to explain to you the factors that the Court has considered in determining what would be an appropriate sentence in your case. The Court begins with a calculation of what we call the guideline range of punishment. The guideline range is calculated by applying the United States Sentencing Guidelines to the facts of your case and to your history and background. And it results in what we call the offense level and what we call the criminal history category. And

once we have those two inputs, then the Court looks to what I call the sentencing grid, and we find the intersection of those two inputs on the sentencing grid and that reveals the guideline range of punishment.

The guideline range is merely advisory. The Court is not bound to sentence within the guideline range. The Court has the authority and the discretion to sentence outside the guideline range in appropriate cases. To determine whether your case is one where the Court should sentence within the guideline range or perhaps below the guideline range or perhaps above the guideline range requires the Court to apply an additional set of factors in what I call step two of the process. And I'll explain what those factors are when we get to step two. But let's begin our analysis with step one, which is a calculation of the guideline range.

Now, I will tell you that there are two parts of the guideline calculation. Part one is what I will call the initial calculation. Part two of the guideline calculation involves a consideration of any of what I call traditional departures. These are departures from the initial calculation that are specifically set forth in the sentencing guidelines and contained within the policy statements and rationalizations within the guidelines.

So the first part of the guideline calculation

has actually been calculated for us already by Officer Roisen within her presentence report, and none of the objections that we have been discussing in our hearing have changed her calculation.

I know, based on our discussion yesterday, that you've reviewed the presentence report with your attorneys, so you know and have seen this guideline calculation. It's a little bit complex, so technically I'm just going to adopt and incorporate Officer Roisen's calculation by reference to the final presentence report, but I would like to summarize it for you.

So beginning with the offense level, and this is complex because there are two offenses of conviction here. But the offense level with regard to Count 13, this is the mail fraud conviction, this begins at a level seven. And that's basically true in all fraud or financial loss type cases. The Court then looks to what we call specific offense characteristics that surround the way in which the offense was committed and enhancements apply to this base level of a seven.

One of the specific offense characteristics used is to associate the dollar amount of the loss that's associated with the fraudulent conduct. Here, for the reasons explained in the presentence report, and this was the basis of two objections that the Court has ruled on,

and I won't repeat the Court's explanation, but the Court has found that the loss is accurately stated in the presentence report in the sum of $2,600,806.27. And that corresponds to an increase of 16 offense levels.

There's another specific offense characteristic that comes into play because you used a sophisticated means to commit this fraud, and that's a two-level enhancement. And then the conduct here involved, what the guidelines call, the conscious or reckless risk of death or serious bodily injury in connection with the offense. And that is obviously true here, and that's another two-level increase. So these are all looking at characteristics of how the offense was committed.

Now we go to a different chapter of the guidelines, and there has been a two-level enhancement or upward adjustment to the offense level pursuant to Section 3B1.3, and this was because you abused a public or private trust and/or you used a special skill, namely your skills as a physician, in a manner that facilitated the commission or concealment of your offense conduct. And that is certainly appropriate. That's a two-level upward adjustment.

And then there is another two-level upward adjustment for obstruction of justice. And this applies where a defendant has willfully obstructed or impeded or

attempted to obstruct or impede the due administration of justice. There initially was an objection to this, but that objection was withdrawn, so this two-level upward adjustment is properly included. Doing the math, that gets us up to an adjusted offense level of 31 with respect to Count 13.

Now let's shift gears and calculate the adjusted offense level for Count 29, and this is the involuntary manslaughter count. The base offense level for this count begins at a level 18. One of the specific offense characteristics here is that you knew or should have known that a victim was what the guidelines call a vulnerable victim. And that is true here. Two levels have been applied. This is actually a Chapter 3 victim-related adjustment. And then what we talked about earlier, the abuse of a position of public or private trust or use of a special skill to commit or conceal the offense conduct. That applies on this count as well, again, two levels of upward adjustment. And then the same obstruction of justice upward adjustment of two levels applies on this count as well. Doing the math, that makes the offense level at this point a 24.

So now the guidelines have this somewhat complex way of bringing the two separate offenses together. And for the reasons explained in the presentence report, we

associate units, and the units here total 1.5. One unit is attributed to Count 13; .5 units is attributed to Count 29, for a total of 1.5 units. Then the Court looks at this table and it tells us to increase the offense level of the highest adjusted offense level between the two counts by one level. So the 31 that we had on Count 13 becomes a level 32. And so the blended adjusted offense level, taking into account both offenses of conviction, makes our new adjusted offense level a 32.

Now, the probation officer is recommending that you receive a two-level downward adjustment for your acceptance of responsibility. And it is certainly true that you are well deserving of that adjustment. Actually, the probation officer is recommending an additional third level for your acceptance of responsibility, but the Court can only award a third level on motion of the government.

MS. JENNER: The government so moves because the government will adhere to the plea agreement terms and the government did promise to move for the third level, Your Honor.

THE COURT: All right. So consistent with the terms of your plea agreement, you will receive the full three levels of acceptance of responsibility. And it is undeniable that your acceptance in this case avoided a very expensive and long and drawn-out trial and you should be

fully rewarded for that. And in the guideline calculation, that's three levels. So that brings the offense level down to a 29.

The second input that we need to determine is your criminal history category. And fortunately, this is a very simple calculation because you have no prior criminal history, you score zero criminal history points. That's what makes it easy. That places you in the lowest criminal history category, which is a Category I.

So now the Court looks to the sentencing grid, and I find the intersection point between an offense level 29 and a criminal history Category I. And I can tell you that the guideline range for incarceration purposes would be to a period of 87 and 108 months, to be followed by a period of supervised release of between one and three years; a fine in the range of somewhere between $30,000 and $300,000; restitution in the total sum of the actual loss, which for the reasons explained in the presentence report is this salary and benefits figure. That's $497,745.70. And then there's a special assessment of $100 for each of the two counts of conviction. So this is part A, Mr. Levy, of the guideline calculation.

The Court must next turn to a consideration of whether there is any traditional basis or policy statement within the guidelines that would tell the Court that it

must adjust the guideline calculation that I've just made based on the specific recognized provisions within the guidelines. Here, the government has made a formal motion that the Court increase the guideline range and they move pursuant to Section 5K2.1, 5K2.7 and 5K2.21.

The Court will consider the unobjected to portions -- well, the unobjected to portions of the presentence report, the evidence that was presented yesterday and the information from the admissions in the plea agreement. And in addition, the Court will receive argument as to the appropriateness of departing. And I'll start with the government.

MS. JENNER: Thank you, Your Honor.

As the Court has observed, this is a case with very unique circumstances. And the government's position is that those kinds of circumstances that are present in this case are not adequately taken into consideration in determination of the defendant's guideline range, and therefore, we advance three grounds upon which we ask the Court to consider an upward departure.

Ground 5K2.1 is the death where, if death resulted, the Court may increase the sentence above the guideline range. And some of the factors that I'd ask the Court to consider in whether multiple deaths should adjust this upward is that the multiple deaths here demand a

significantly increased sentence above the guideline range. These additional deaths, Your Honor, as the Court well knows, were not captured in the calculation of the guideline range. The deaths that the government believes that represent the reason for an upward departure is the recent death of the Veteran J.K., who was misdiagnosed and never offered reasonable opportunity for treatment of prostate cancer. He passed away December 31st, 2020.

Mr. Woodward, the Court recalls, he's a gentleman that -- and I'll put it bluntly -- he bled to death because the defendant misdiagnosed him. The Veteran J.D.Q., it's interesting to the government and the government would ask the Court to note that some of the conduct of the underlying offense of conviction with the Veteran J.R.G. was a misdiagnosis in February 2014 with a falsification in the record that Dr. Hendrycy agreed.

Let's fast forward to August, September, same year, 2014. The defendant misdiagnosed this veteran with lung cancer, does not give Veteran J.R.Q. an opportunity for any meaningful treatment, such as resection of that tumor. And, again, the defendant misrepresents in the medical record of J.R.Q. that Dr. Hendrycy agreed with the false or wrong diagnosis.

The government also asks the Court to consider in the number of deaths that should be attributed to the

defendant for purposes of supporting an upward departure for the death consideration is the misdiagnosis of the veteran -- well, the gentleman with the last initial N. And he died of the undiscovered budding yeasts that were present, but because of the misdiagnosis, there was no opportunity for him to be treated, and he died a very, very difficult death.

The dangerousness of the defendant's conduct is also a factor to be considered. The extent to which the defendant knowingly risked death or serious injury to others. I actually think, Your Honor, it almost goes without saying that a physician who misdiagnoses, makes misdiagnoses, but worse, the physician who fails to correct what he knows is a misdiagnosis, is knowingly encountering the risks for which this upward departure should consider for the serious injury and the harm resulting in death to the veterans that I have asked the Court to consider.

I'm now going to turn my attention, Your Honor, to the upward departure that I believe is supported by the facts heard yesterday for the disruption of governmental function. The degree of disruption to the government because of the defendant's conduct is staggering. Because of the defendant's conduct, it deflected Veterans Administration's doctors who were involved in the lookback from being able to perform their regularly routine duties.

It placed a tremendous burden on the overall VA health care system in order to serve the current patients that were coming in the door as well as looking back to give remedial treatment and attention to the patients that Dr. Levy had harmed. The lookback dramatically disrupted the continuing function of the Veterans Administration Health Care, at least in this region, which Dr. Scott said encompassed at least eight separate facilities.

The cost alone, the amount of disruption to the VHSO simply here in Fayetteville was so striking, Your Honor, when Dr. Scott said, "This put the VHSO in Fayetteville in crisis mode." I recall her saying she likened what this lookback did as a result of having to look at Dr. Levy's conduct as being likened to responding to a national disaster or a natural disaster. And for those facts, Your Honor, I believe the upward departure is warranted for the 5K2.7, which would be the disruption to government conduct, or excuse me, government function.

And then finally, the upward departure for the dismissed or uncharged counts. The Court is well aware that the government was not in a position to present to the Grand Jury the case of Veteran J.K. Had the timing of the indictment being presented to the Grand Jury been different after the death of Mr. J.K., that is certainly a case that would have been presented and would have been considered as

an applicable charge of involuntary manslaughter.

The statute of limitations is not a bar for the Court to consider what other cases could have been charged, and in that regard, the statute of limitations precluded the government from presenting the case of R.W. He is the gentleman who bled to death. And what's so significant about the recklessness and the egregiousness of the defendant's conduct in that misdiagnosis, Your Honor, a lab tech made the diagnosis and made the call for the correct diagnosis of Veteran R.W., and that's in the presentence report and that's a fact that was referenced by Dr. Scott.

There are many, many examples, and I will not go over all of them. But as to the deaths, Your Honor, the uncharged veterans' deaths that are listed in the presentence report and which were addressed by Dr. Scott would certainly be a consideration for the Court to increase the defendant's sentence for a traditional upward departure under the concept of dismissed or uncharged conduct.

I would like to call to the Court's attention that the government in the plea agreement did dismiss Count 28. That was the Veteran W.G. He did sustain harm, but he also sustained harm in that the risk that Dr. Levy placed that veteran in by the misdiagnosis, and yet another representation in the medical record of W.G. in which the

defendant wants the rest of his practitioners or clinicians to believe that the defendant's diagnosis is unassailable. Because in that case, Your Honor, which was Count 28, the defendant misrepresented in the medical record that Dr. Hendrycy had also agreed with, again, the wrong diagnosis.

All of these dismissed counts and uncharged counts are not too remote. There is a continuing pattern and trend of falsification with the count of conviction of our Veteran J.R.G. and these other cases I have cited to you, and the government would ask that the Court consider an upward departure for any one or all three of these grounds.

THE COURT: So with regard to J.R.G. who was the patient victim in the count of conviction, Count 29, involuntary manslaughter, this was from errors made in 2014, and in particular for about a week period between February 4 and February 10.

What is the government's theory based on the evidence as to why those errors were made? Would you have the Court surmise that it is general incompetence? That it is lack of concern for patients, just didn't care to make a right decision? Is it that he didn't look at the slides? Or is it that this was a period of time in which he was going to work drunk?

MS. JENNER: There is no evidence, Your Honor, that the defendant was reporting to work intoxicated during that period. And for that reason, the government's theory is that Dr. Levy practiced medicine with such an utter disregard for human life that his recklessness in caring for the propriety and correctness of his diagnoses leads to no other conclusion than he willingly risked the lives of patients in order to -- and I can't explain it -- if he was in a hurry, if he just didn't want to be at work so he just wanted to get the slides out of the way so he could sign out and go home.

I am not suggesting to the Court that the error, diagnostic error that he made not once, Your Honor, not twice, but three times with the offense of conviction, J.R.G. Recall it was February 4th, then he wrote on February 5th, and then he made a third incorrect diagnosis on July 10th. I am not trying to suggest to the Court that he came to work intoxicated on February 4th, February 5th, February 10th, or July 10th. It's the government's theory of the case that he came to work with a reckless disregard for the patients and he did not care. He did not care. And that is the most concerning picture that is painted in the government's mind, that he didn't have the excuse of intoxication. He didn't have an excuse that he was having a bad day. His only justification is, he didn't care. And

he performed his job with just utter disregard for human life.

THE COURT: And so with regard to the upward departure for multiple deaths, would that be your same theory as it relates to the treatment of other veterans in this same early 2014, in the same 2014 time frame, M.E., paragraph 96; J.D.Q., paragraph 97 and identified in Count 30 as well; and now J.K. and R.W.?

MS. JENNER: Yes, Your Honor.

THE COURT: Okay.

MS. JENNER: It paints a very, very disturbing picture of this defendant's conduct.

THE COURT: Are there any of the deaths that occurred, say in the 2016 time period either immediately before or immediately -- either immediately before he went to rehab or immediately upon coming back from rehab through his termination that the government would attribute to working impaired?

MS. JENNER: There is one, Your Honor. And it's the veteran who is identified as R.C. His misdiagnosis did occur during the period that the government would ascribe a period of impairment or intoxication to the defendant. But Your Honor, in complete transparency, Dr. Scott identified that particular victim, or, excuse me, that veteran as also having severe comorbidities. So the government did not

advance that particular veteran's situation for the Court's consideration as to determination of a potential involuntary manslaughter count. But it doesn't change the fact that the incorrect diagnosis was made in 2016 of that veteran's disease.

THE COURT: All right. Thank you, Ms. Jenner.

Mr. Everett?

Oh, were you going to argue -- there was one more, I thought; 21?

MS. JENNER: Yes, Your Honor. That's the uncharged or dismissed conduct.

THE COURT: Right. Okay. Got it. Thank you.

Mr. Everett?

MR. EVERETT: May it please the Court.

Your Honor, frankly, recognizing your prior findings on other issues presented to you, I recognize that we might be fighting with a short stick here. However, these matters deserve to be addressed and I'll make a fair attempt to do so.

You have properly concluded that the principal thrust of the defense on these other deaths is that doctors, pathologists, all doctors, all lawyers, sometimes even judges, make mistakes. And when that happens, that does not necessarily lead to criminal conduct. I want to point out a couple of facts on this issue about the alleged

egregiousness of this mistake and the frequency with which these kinds of mistakes can be made.

The first that comes to mind is, as you will recall, there was a one-year lookback by the VA hospital in Fayetteville, Arkansas, that covered a period from sometime in 2015 up until 2016, March to March, as I remember. It is in paragraph 41 of the presentence report. And it discloses that there were no errors found in that period of time which impacted patient care or the health or the survivability of patients.

Now, that's important, I think, for the proposition that at least whoever those pathologists were presumably examined these slides and information and concluded that there were no errors. But it's even more important when you look at that time frame against the background of the lookback done by Dr. Staggs (sic), for that lookback in the same one-year period of time found four errors. And I think they were all level 3 errors, but I wouldn't bet my life on that. I haven't memorized this. But it says to me that those pathologists at the VA were wrong and they were discovered to be wrong by the lookback.

Now, I recognize that's just four cases. The other testimony that addresses that, and this struck me when Dr. Staggs (sic) said it at the very end of her testimony. When she was being cross-examined, she said,

well, there were 539 level 3 errors and however many deaths there were. And she said she predicted that as we go forward in the future, there would be others discovered. Really. Well, if that's true, then that means her lookback people didn't do a very good job either, for they, if others are discovered, they by definition would have missed those others that she believed will be discovered in the future. And I think it just points up the idea that, as she said, pathology is an art, not a science, and that's the problem.

But with respect to these deaths, it is true, and I know the Court is struggling with it, about how to get a grip on what's caused this number of errors and these number of deaths. And there are a variety of explanations for that, some of which the Court has listed, one of which Ms. Jenner listed.

But Dr. Staggs (sic) opines in part that he might have been sleep-deprived. There are a half dozen or more explanations, one of which is his impairment. Sleep depravation, being tired, being preoccupied, being stupid, being incompetent, for whatever reason. But that does not necessarily mean there's an impact on the criminal sentencing because of this.

And frankly, Your Honor, I'm kind of compelled to say that I am a veteran. And I have every sympathy for

this. I have every understanding of these good people that are here in court and obviously want you to do the maximum that you can do. They are held warmly in all of our sympathetic thoughts, as they properly should be. But you are governed by evidence and rules that govern such things, one of which is not sympathy. And if you look at the evidence in this case, you will see that Dr. Staggs (sic) from the start when she reported to the PSR officer addressed each of these claimed deaths as being, here's the misdiagnosis -- I talk better than that most of the time -- here's the misdiagnosis and it may have contributed to, or it delayed treatment. But in none of those cases, at least in the PSR before her testimony yesterday, did she say that that was the cause of death. In none of those cases did she say that on paper. So we do object to the guideline range being augmented by these prior deaths.

I want to address now the business of disruption of government function. I think that in any investigation, particularly when the government is involved, some function is going to be disrupted. Ms. Jenner suggests and facially it makes some sense to say, well, they spent $2 million over this investigation. Well, fortunately, the money that the government spends in doing anything is not normally a benchmark for what is right or fair or proper. But even in this case, Dr. Staggs (sic) -- and I don't mean to minimize

that figure -- but Dr. Staggs (sic) says her budget at the VA hospital in Little Rock is like $300 million. This is a lot of money, gross money, but it's not alike comparatively. But more importantly, there is no evidence that the governmental function of the Veterans Administration Hospital were actually disrupted. It is clear and the testimony is clear that they had to work harder. They had to work overtime. They were short-staffed to start with and included being short-staffed, but they got the job done to their great credit. And we further assert, as we have on paper, that the increase for obstruction of justice covers this objection anyway.

I don't really know how to substantively respond to the claim that there was a death that was not presented to the Grand Jury because the statute of limitations precluded that. It really is speculation about whether, A), it would have been presented to the Grand Jury, or B), would the Grand Jury have included it in the indictment. And it just doesn't make any sense to me to depart upward because of that claim.

I'll entertain questions if you have any, Your Honor.

THE COURT: That's fine, Mr. Everett. Thank you.

MR. EVERETT: Thank you, Judge.

THE COURT: So in ruling a short while ago on the non-guideline determinative objections, and including the patient data from paragraphs 67 to 113, the Court was ruling that it was proper to include this data because it's, A), relevant, and because based on the testimony, the Court found that these level 3 errors caused some type of harm, as I've described, to these patients. And the Court therefore believes that that makes them victims in that sense.

Now the Court is being asked with regard to the 5K2.1 death motion to depart upward from the guideline range because the relevant conduct establishes that, not only did Mr. Levy cause the death of the patient identified in Count 29, but he caused the death of these other patients. And in particular, J.D.Q. and the others that we have mentioned that Ms. Jenner identified, M.E. And those were both in 2014, M.E. and J.D.Q. And then also she points to, but different time periods, I think, J.K., R.W. and R.C.

It's one thing to include references to these other patients for context to the overall situation that was going on. It's another to ask this Court to opine that these errors, as significant as they were, were the cause of death. The cause of death was the cancers or other ailments that they had, at least that is the immediate

proximate cause of their death. And the Court is not prepared to find that Dr. Levy caused their cancer. I mean, I don't think anyone is suggesting that. So this puts us on this slippery slope of trying to determine where and to what extent their respective conditions were exacerbated by the significance in context of these medical errors. And the Court is not going to grant an upward departure for multiple deaths on that sort of basis.

The Court fully agrees that the errors in some of these particular situations that Dr. Scott testified about are very egregious and significantly affected the course of medical treatment. But I just do not feel that that is appropriate to increase the offense level here pursuant to 5K2.1. That's just a bridge too far. There's another reason for not granting this upward departure request, and I'll address that in a second.

With regard to the disruption of governmental function pursuant to 5K2.7, the Court is going to grant the government's motion. 5K2.7 provides that, if the defendant's conduct resulted in a significant disruption of a governmental function, the Court may increase the sentence above the authorized guideline range to reflect the nature and extent of the disruption and the importance of the governmental function affected. Departure from the guidelines ordinarily would not be justified when the

offense of conviction is an offense such as bribery or obstruction of justice because in such cases, interference with a governmental function is inherent in the offense. Unless there are circumstances that are unusual, the guidelines will ordinarily in those types of cases reflect the appropriate punishment as it is.

The Court, coming into our evidentiary hearing yesterday, was of a mind not to grant this particular motion for upward departure because it was of the opinion that the nature and extent of the disruption was already captured by the significant level of increase in the loss amount that was attributed to the lookback study. However, having listened to the testimony yesterday, which the Court finds to be true and credible, the extent of the disruption is not adequately captured by the loss amount.

We learned yesterday in our hearing that the $2.1 million does not take into account the cost of that portion of the lookback work and study and analysis that was performed by pathologists who were already employed by the VA at other institutions in this region. And there were seven or eight or nine of them that were identified in the record. And the Court was very struck and impressed by the extent of the involvement of these other facilities and the use of their resources and how that had not been taken into account in the loss amount.

As I understand it, about half of the lookback study, maybe a little bit more, was conducted by these outside academic research institutions or pathologists. But there was this significant portion that was conducted by these VA-employed physicians. Here's why I think all this is important and it's important to address through an upward departure:

If Dr. Hendrycy's comments in his letter reflect what goes on in the VA, at least in Fayetteville, these institutions aren't just armed with lots of additional doctors sitting around twiddling their thumbs that have the luxury of just drinking coffee waiting for patients to come in. These are very busy institutions. And if a pathologist has to go to Fayetteville to work on this lookback study, it's stressing the resources that they have at the facilities where they are coming from. And that's not captured anywhere else in the guideline calculation. And it's not like it was just one other doctor. It's not like it was for a month or a few weeks. This lookback study went on for over a year. It involved multiple other pathologists. It involved and adversely affected multiple other institutions because their full staff that would normally be in their pathology department was taking time out to work on the lookback study.

It also involved having to complete this

exhaustive study, the largest of any kind that's ever been undertaken in the VA system. And the Court was struck by the magnitude. I didn't really have a full appreciation for that coming into the hearing. The Court was struck by the magnitude of what was required. The Court was also struck by the fact that, not only did they have to identify patients where these errors were committed, but they had to notify these families. They had to deal with these families. And they had to go and amend the records in all of these cases where there was a level 3 error. And it's not like you just snap your fingers and you make that happen. Institutionally, that's kind of a big deal. And nowhere else in the guideline calculation is the magnitude of the nature and the extent and the scope of this sort of disruption captured.

It's certainly not part of Dr. Levy's conduct that's addressed by the base offense level or any of the other specific offense characteristics. And the Court believes, consistent with the quote from 5K2.7 that I just read, that it meets all of the appropriate situations where it should be used. There's not a whole lot of case law out there on it, but the Court has looked to *United States v. Saani*, S-A-A-N-I, 650 F.3d 761. The pinpoint is 766, case out of the D.C. Circuit, 2011. Another case which I think the D.C. Circuit cites, *United States v. Howard*, 1996 WL

30781. And these having to do with investigations.

Like I said, before hearing the testimony that I heard yesterday, I probably would have thought that the loss amount, the 2.1 million, and the increase having to do with that would suffice. Today I'm persuaded, having heard that, that it's not captured by that and that the scope of it was much more extensive than what I had previously understood.

There's another reason why I believe that granting a departure as opposed to a variance is appropriate. And this is the other point that I said I would come back to as it related to these deaths. And for this matter, I'll also go ahead and say that the Court is going to deny the motion for upward departure pursuant to 5K2.21 for the reason that I'm about to explain.

The Court very, very rarely grants government motions to depart upward because this Court believes that the granting of those motions inherently skew the 3553(a) analysis. In other words, it rachets up the guideline range. And then when the Court gets to the 3553(a) analysis, it's working against whether the 3553(a) analysis gets it right or wrong. And under the 3553(a) analysis, the Court is required to take into account the nature and the circumstances that surround the offense of conviction. So if the Court grants motions for upward departure, it

runs the risk of taking that into account twice in an unfair manner. And the Court has the ability under 3553(a) to consider the same policy rationale that underlies the departure basis. So why would the Court grant the departure if it can address the same points and arguments and issues by variance under the 3553(a) factors.

And the Court finds that with regard to the government's position and arguments with regard to these multiple deaths, the Court believes that the circumstances are better addressed as an argument for an upward variance than it is for the granting of the 5K2.1 motion. The same would be true for the 5K2.21 motion with regard to the uncharged or dismissed conduct. We do that all the time under the 3553(a) factors.

But this disruption of a governmental function is not something that is going to adversely impact the Court's ability to conduct a 3553(a) analysis without doing some double counting, so to speak, double consideration, whereas deaths and uncharged conduct or dismissed conduct is very difficult to tease apart from the overall facts and circumstances surrounding the offense of conviction.

The disruption of governmental function is easily teased apart from that. It's easily identified. It's easy for this Court in its analysis to say, we're going to give consideration and depart, but having departed, I'm not

going to take those same considerations into effect again in the 3553(a) analysis.

And so that is the conclusion that I have made. I am going to depart upward. Understanding that the Court has already departed for loss, I don't think that the Court should just go wild and do the same extent of increase as suggested by the loss amount. But I do think that another two levels, which is consistent with the amount of several of the other specific offense characteristics, is an appropriate number of levels to capture the nature, the extent and the scope of the disruption of governmental function as is in evidence from yesterday's testimony. And I will not re-include that as part of any of the variance considerations under 3553(a), having made this departure.

So that addresses the traditional bases for departure, and now the Court needs to recalculate the initial guideline range. The adjusted guideline range will be based on a total offense level of a 31. Still a criminal history Category I. And I'd ask Officer Roisen to double-check my on-the-fly calculation.

With regard to incarceration, the guideline range would now suggest a period of incarceration of between 108 and 135 months, to be followed by a period of supervised release of one to three years, a fine in the range of -- it appears unchanged. The fine range would remain between

$30,000 and $300,000. The restitution would remain $497,745.70. And the special assessment would remain of $100 per count of conviction.

OFFICER ROISEN: Yes, Your Honor.

THE COURT: All right. So that is the Court's final guideline range calculation.

Mr. Levy, the Court now moves to the second part of its analysis. And this is a consideration of the so-called 3553(a) factors; so-called simply because that's the place in our law book where all of these factors are set out. So, for example, the Court is required to consider as part of determining whether that guideline range that I've now calculated gets it right and is appropriate in your case or not, these 3553(a) factors give the Court the ability to custom-tailor and to fine-tune what is an appropriate sentence in your particular case.

So, for example, the Court is required to take into account the totality of the facts and circumstances that surround your offenses of conviction here. The Court is required to take into account your personal history, background, and characteristics. The Court is required, in the words of the factor, to avoid any unwarranted disparities when sentencing defendants who are similar in terms of their prior criminal history, if any, and in terms of their offenses of conviction. The Court is ultimately

required and tasked to pinpoint that sentence which is said to be sufficient, but not greater than necessary, to achieve the purposes of federal sentencing.

And in this regard, Mr. Levy, the Court is instructed that in determining that sentence and in pinpointing where it should be, it should impose that sentence which will be a reflection of the relative seriousness of the offenses. It should be a sentence that will promote respect for the law. It should be a sentence that will be viewed as one that is just, which is to say a punishment that fits the crime. The Court is obligated to determine that sentence which will deter future criminal conduct. And the Court must impose a sentence that will serve to protect the public from you and any future criminal conduct that the Court may have cause or reason to believe you are predisposed to committing in the future.

So in summary, and the Court should also take into account its ability to craft a sentence in a way that will provide treatment for medical illnesses or rehabilitative needs, those sorts of things. But in summary, those are the other factors that the Court must consider in this step two of the sentencing analysis. And, again, all of this is to determine whether the guideline range as I've now calculated gets it right or wrong.

So that's the framework. And before the Court is

prepared to impose its sentence, we have a few things left to do. First, the Court will entertain oral victim impact statements. Of course, the Court has already read the victim impact statements that are part of the record. I understand that there's been one more victim impact statement that has been submitted.

MS. JENNER: Yes, Your Honor.

THE COURT: I have not had a chance to read this one yet. I will at the break. I've also already considered the letters that were submitted yesterday as mitigation letters and letters of support. And I'll have more comments for those in a little bit. And then I'll entertain argument and recommendations from counsel. And then we'll let Mr. Levy make a statement if he chooses.

We've been going for a while and we have a while to go, so we're going to take a 20-minute recess at this time and allow, kind of reset the table here.

Do you have an order and could you notify the victims of the order and kind of marshal the victims?

MS. JENNER: Yes, Your Honor. We have notified the individuals in which order they will be called. And we'll start with Mr. James McGuire, who wishes to give his statement by Zoom.

THE COURT: Okay. So we'll start with the one on Zoom, and then we'll do the others. So we'll be in recess

until five minutes before the hour.

(recess from 10:39 a.m. to 11:04 a.m.)

THE COURT: We will proceed with the oral victim impact statements. And we will begin with James McGuire.

MS. JENNER: That's correct, Your Honor. Mr. James McGuire is the son of Donald McGuire. Mr. James McGuire will be speaking to the Court via Zoom.

THE COURT: All right. Mr. McGuire, can you hear me?

MR. MCGUIRE: Yes, I can.

THE COURT: All right. Thank you for your time and thank you for being with us at our hearing today. You may proceed.

MR. MCGUIRE: I'd like to say just off the bat, thank you for letting me speak over Zoom. I live in New York now, so it's challenging with COVID to actually get to Fayetteville at this point.

But that being said, what I wanted to say was, the outcome of this is that I lost my father. And he was an amazing person both in his time as a veteran. He was a captain. He flew Chinooks. He saved the lives of, I cannot even imagine how many people, in the line of duty. And beyond that, he meant everything to me. And I'm also not the only one that lost him. I'm speaking for the community that he was a part of. He was a huge portion of

the community in Eureka Springs. He was a huge portion of my family. And losing him isn't something that we can just get back. He is gone. And the things that he did, the music that he brought to the area, the love that he gave to people does not -- there is no fixing that.

And beyond that, watching the pain and the suffering that he went through after the misdiagnosis and watching him just slowly fade away from the person that he was and just suffer for years needlessly, there's no good way of expressing that.

I'm not really sure what else to say, but he was an amazing person. And having him taken from me, my family, his friends, the community, the world, it was unthinkable. And the worst part for me is just knowing that it wasn't a mistake. It wasn't like a careless act. It wasn't -- it was calculated. It was done with the intention to hide and deceive and value somebody's life over the lives of hundreds to thousands of other peoples' because they valued their ability to be intoxicated over someone else. And, again, not just once. To have done it, to have been caught, to have chosen to do it again and again and again. It's unthinkable. Thank you.

THE COURT: Thank you very much, Mr. McGuire. I appreciate your time.

MS. JENNER: Mr. Kelvin Parks.

THE COURT: Mr. Parks. Sir, if you would please come forward and have a seat in our witness box.

Mr. Parks, my understanding would be that you're the Medical Director at the Veterans Hospital of the Ozarks?

MR. PARKS: Yes, sir.

THE COURT: All right. Pleased to have you here today, sir.

MR. PARKS: Thank you, sir.

Good morning, Your Honor. I want to thank you for allowing me to address the Court today to present a victim's impact statement on behalf of the Veterans Health Care System of the Ozarks.

On June 18th, 2018, I, along with senior leaders from the Veterans Health Care System of the Ozarks, the Veterans Health Administration, Congressional representatives from the Arkansas Federal Deligation, and commanders from the local veterans service organizations stood before our beloved veterans, family members, and caregivers to announce to the public the details involving veterans whose care was affected by the defendant while he was employed at the VHSO.

On March the 22nd, 2016, the defendant, a former VHSO pathologist, was found to be impaired while on duty. At that time, the defendant was immediately removed from

clinical care and was directed to successfully complete an impaired physician program. Upon his completion, the defendant was authorized to resume clinical care effective October the 12th, 2016, along with required state licensing monitoring programs to ensure continued compliance.

One year later, on October the 13th, 2017, VHSO leadership received reports of the defendant's possible impairment. As a result, based upon employee health assessments, the VA immediately removed him from clinical care and he was terminated on April the 13th, 2018.

Internal reviews of cases completed by the former employee resulted in the Department of Veterans Affairs' decision to conduct thorough reviews of all cases read by him since the beginning of his employment. The external reviews impacted 19,794 veterans and over 33,000 cases. The financial toll of the external review is over $2.1 million to date. However, we may never know the total impact, for there is no way to gauge the real costs of the harm the defendant has caused our veterans, the staff, and my entire health care system.

As a result of the defendant's actions, my health care system has a permanent scar that serves as a constant reminder of the damage that he has caused. To this date, my staff is still shaken by the events and the effects that he has caused our beloved veterans.

During his second inauguration address, President Lincoln stated, "To care for him who shall have borne the battle and for his widow and for his orphan." In his address, President Lincoln was affirming the government's obligation to care for those injured during the war, to provide for their families, and for those who perished on the battlefield.

Your Honor, this is not only the VA's motto, but what we consider to be our sacred and noble mission. Unfortunately, the defendant's actions has compromised the public trust in my health care system. The VHSO has worked hard over the last two and a half years to regain the public trust, and we will continue to diligently earn the trust and respect of veterans, their family members, our partners in the community, and our staff. This defendant, who took the Hippocratic Oath to "do no harm" has caused irreparable harm to those who were entrusted to our care. He has caused harms to those family members who believe that their loved ones were receiving the best possible diagnosis of care. He has caused harm to our staff whom he led. He has caused harm to the Veterans Health Care System of the Ozarks.

Your Honor, I'm not only the CEO of the Veterans Health Care System. I'm also retired Navy Chief Petty Officer, and I too get my entire care from the Veterans

Health Care System of the Ozarks. And to see the effect that he has had on my staff, my fellow veterans, their family members, our community, he has truly heart broke -- all of us are truly heartbroken. We can never undo the damage that he has caused, but we will do our best to continue our noble mission here in Fayetteville, Arkansas.

With the support of the veterans, our community, our veterans service organizations, we have begun to heal, but the trauma, the heartbreak, and the scars caused by this defendant will always remain. We will never forget this tragedy. We will never forget the families of the veterans whom he has impacted. We will never forget.

Your Honor, on behalf of the Department of Veterans Affairs and my over 1,800 employees at the Veterans Health Care System of the Ozarks, I humbly thank you for this time to address the Court today.

THE COURT: Thank you very much, Mr. Parks. I really appreciate your time and your remarks. Thank you.

MR. PARKS: Yes, sir.

MS. JENNER: Tammy Phillips.

THE COURT: Ms. Phillips, if you would please come forward.

Ms. Jenner, for some reason, I did not have Ms. Phillips in my notes. Can you remind me of her connection?

MS. JENNER: Yes, Your Honor. Her father-in-law was David Phillips. And Ms. Phillips' husband, Jason Phillips, wrote a victim impact statement that's included in the PSR to the Court. I'd also like to tell Your Honor that Ms. Phillips gave us a photograph of Mr. David Phillips that I'd like for the Court to be aware of through her victim impact statement, and we've given a copy of Mr. David Phillips' photograph to defense counsel.

THE COURT: All right. Thank you. Yes, the Court has received the photograph and I'm now reminded of that. We will preserve this as part of the record since the Court has viewed it. And I'm just going to ask that it be included, along with the other victim impact statement materials.

Thank you for being here, Ms. Phillips.

MS. PHILLIPS: Thank you for letting me. I'm going to read the letter that we prepared. I'm sorry. I'm sorry.

THE COURT: Take your time.

MS. PHILLIPS: David Phillips was a wonderful, compassionate man. He served his country in the Army from 1966 to 1969 during the Vietnam War with an honorable discharge. He received the National Defense Service Medal, Parachute Badge, Vietnam Service Medal with two Bronze Stars, and the Vietnam Campaign Medal with 60 devices.

He was a beloved father, husband, son, brother and grandfather. He, along with his late wife, Joan, raised three sons and one daughter. He was a grandfather and great-grandfather. He was hard-working and devoted to his family. He is missed on every day that passes.

David Phillips died December 5th, 2014, a mere shell of the man he had been. He was thin, gaunt, and in pain. It was heartbreaking to see him in such a condition. We grieved his passing and continued on, as he would have wished. Four years after his death, we learned that there was a discrepancy on dad's pathology test results. We learned that the pathology slides read by Mr. Levy during his tenure had been reviewed and that errors had been found. We learned that in 2013, Mr. Levy had determined the results of dad's pathology slide incorrectly, and notified that it was found that dad did, in fact, have cancer.

Upon learning of this, it was like losing him all over again for the entire family. Our grieving process began again, but this time with the questions of, would he have had a better quality of life? What treatment options did he have? Could his life have been prolonged? What about the children, could this have been inherited? And so many more questions that, due to the negligence of Mr. Levy, we will never have the answers.

And because of this negligence, dad was never offered an option to make any treatment choices. The unanswered questions and the unknowns are grappled with every day. Every day we wake up and wonder "what if." Mr. Levy's selfish misconduct has affected us and so many other people. He was supposed to be an educated professional in which veterans, their health care providers, and their families were able to trust. His blatant disregard for human life is disheartening. We can only hope that Mr. Levy's punishment will be as harsh as the turmoil he has inflicted on veterans and their families, including ours.

Thank you, Your Honor.

THE COURT: Thank you very much, ma,am.

MS. JENNER: Catherine Hill.

THE COURT: All right. Thank you for being here.

MS. HILL: Thank you, Your Honor.

Your Honor, I have a brief statement. I'm not sure I can read it given the emotional nature of what we just witnessed, which is so sad and so understandable.

I'm here today on behalf -- my sister and I are here today on behalf of our family simply to take one last tribute to our dad. You already have in your possession letters from Melody and I describing our loss. We don't need to go over that again. I hope you will take it to

heart.

Despite whatever, how it was that Exhibit 1 and 2 said, I believe that Dr. Levy significantly contributed to our dad's early demise. I do not care what the statistical analysis of some algorithm said about his 83 years. My dad was a fighter, and I believe he would have lived a longer life. I don't know how much longer. I believe that proper treatment would have avoided the pain and agony of improper treatment that he did endure for a year.

We understand the necessity in our society for a plea bargaining system. I cannot imagine the resources, as somebody has previously stated, the resources that would have been required to try all of these charges. It's unimaginable, so I understand the nature of that. And to some degree, I understand the nature of sentencing guidelines. I pray that there will not be -- in the formulaic approach that we're taking, that there will be still be a level of humanness in consideration of these charges. It is not -- my dad cannot go -- John Quick cannot go away as simply as, "paragraph 41 on page 14 of the superseding indictment. "

Thank you, Your Honor. We appreciate your Court's efforts.

THE COURT: Thank you very, very much.

MS. JENNER: Ms. Shawna Lynch.

THE COURT: Thank you for being here, Ms. Lynch.

MS. LYNCH: Thank you, Your Honor, for this opportunity to speak on behalf of my beloved brother, J.R. Gibbs.

How can any family member reconcile a loved one's life in mere minutes? At the time of his death, J.R. was a son to his father and mother, a brother to his sister, two brothers -- to a sister and two brothers, an uncle to my son, father of two, and grandfather to one. But beyond his immediate family, J.R.'s family included his community. Gravette lost one of its own sons when J.R. passed.

After his service in the United States Air Force, he served his local community in Gravette, Arkansas, as a police officer, a school board member, and a friend to all those in need. Your Honor, I would ask that you would revisit the video that was provided to you in evidence where my brother, as a school board member and a member of his community and a father, was identified by the local Gravette High School as a veteran of honor and service, and so that video was dedicated to him and his service to the United States.

J.R. cared about his family and his community. The world lost more than a son, brother, uncle, father and grandfather. We lost a community hero who would sacrifice his own comforts for anyone in need.

I cannot say the same for the defendant, Mr. Levy. He neglected not only his responsibilities as a physician, but his Hippocratic Oath to do no harm. Written in 5th Century B.C., the Hippocratic Oath is one of the oldest documents in history. While the creators intended it to be a binding covenant, modern doctors see the oath as a promise to uphold the art of medicine and to act in patients' self interests. Mr. Levy did not act in the patients' self interest. He acted to preserve his own selfish interests by continuously ignoring his professional duty, ethics, and satisfying his own lascivious desires and needs.

My brother, J.R., held true to the core values of the United States Air Force; integrity first, service before self, excellence in all that we do.

Mr. Levy's actions and behavior exhibited in his service at the VA hospital in Fayetteville, Arkansas, lacked honor, duty, and ethical reasoning. Mr. Levy's education and training afforded him opportunities my brother lacked. Where Mr. Levy offers excuses and justification for his actions, my brother never offered such excuses and persevered in the face of every obstacle, from Desert Shield to Desert Storm, to raising two children as a single father.

Mr. Levy can attempt to justify his actions, but

that does not make his actions justified. Your Honor, I ask that you give Mr. Levy the same regard that he gave his patients in his care at the VA hospital for over 14 years.

As my brother lay waste in the palliative care unit, I attempted to ease his suffering by taking ice cream that was provided by the local staff, putting it in a blender and making a shake. And while he lie there in bed with that BiPAP mask forcing the air in and out of his mouth, I meticulously took surgical tubing to put into the corner of his mouth and hold the shake so he could have some type of sustenance as he laid waste.

It's difficult to shut down someone's life in a mere matter of weeks, and that's what I was tasked to do at my brother's request when we discovered that he would not be leaving the VA hospital because of misdiagnosis by Mr. Levy. Mr. Levy's actions were intentionally neglectful and careless, which led to so many deaths of our U.S. veterans. The idea that Mr. Levy would put forth a defense to the extent that he caused no harm to these veterans is wrong. He did not only affect my brother's life expectancy, but he affected countless other families who may never find the peace in the loss of their loved one.

I've provided the Court with a victim impact statement that outlines the loss of our family at the suffering -- and how we have suffered at my brother's

death. But what I find more shocking is the impact that Mr. Levy's reckless choices have made on so many other U.S. veterans. My grandfather served in World War I.; my uncle in World War II; my father in the Korean War; my other uncle in Vietnam; and finally my brother in Desert Shield/Desert Storm. Each of these men proudly served our country. And I ask that you honor our family by serving my brother today.

Our family was devastated by my brother's unexpected death in 2014, and I hope these words I provided the Court today weigh on the conscience of your decision and you consider the full ramifications of Mr. Levy's purposeful incompetence. I implore you, Your Honor, to apply the strictest punishment presented in this case and give hope to the families who were not represented here today.

I would like to thank the Department of Justice and Mrs. Jenner and others for the roles that they played criminally prosecuting Mr. Levy. Thank you for your time.

THE COURT: Thank you very much.

I do want to, just as a housekeeping matter, I think it's going to be better, these victim impact exhibits, I'm just going to go ahead and mark those as Court's exhibits. So the picture of David Phillips I'm going to mark as Court's Exhibit Number 1. And then I have

marked as Court's Exhibit Number 2 the video that Ms. Lynch just referenced when speaking about John Ray Gibbs. And for the record, John Ray Gibbs is the victim described in the count of conviction in Count 29.

(Court's Exhibit Numbers 1-2 received)

THE COURT: The Court found the video very interesting. I didn't understand the context of it until Ms. Lynch just explained it. This is a living biography. And it's so kind of rare that we would have an opportunity, but it's a professionally produced living biography talking about his service and talking about, really about life and life principles. And I now understand the context and when it was made, so I appreciate that. I really appreciate the opportunity to hear from, directly from Mr. Gibbs. That's Court's Exhibit 2.

MS. JENNER: Your Honor, I believe there are another set of pictures that will be pertinent to our next victim impact presenter, which would be Judy Velosky. Judy is the niece of Ms. Lynch and she is the daughter of J.R. Gibbs.

THE COURT: So the Court has received some -- you may have a seat, ma,am -- some pictures of John Ray Gibbs in a hospital bed. And for the record what's remarkable about the photographs, it would appear as though Ms. Velosky was married, or she was at least in the

hospital room in her wedding gown, is that right?

MS. VELOSKY: Oh, I was married.

THE COURT: You were married. I'm sorry. And so I'm going to mark this collection of photographs as Court's Exhibit No. 3. And thank you for providing those.

(Court's Exhibit Number 3 received)

MS. JENNER: Your Honor, may I address the Court?

THE COURT: Yes.

MS. JENNER: Just for clarification, on Court's Exhibit 3, I think Ms. Velosky, in her statement, will put the pictures into context for the Court.

THE COURT: All right. Thank you.

MS. VELOSKY: Thank you for letting me share my story of my dad and how his loss has affected me and my family continually.

So when I was originally asked to write the statement, I was asked to write about the ways that this has affected me and my family. And I'm not sure that there's enough words to accurately express the unyielding sadness and emptiness and loss that I still feel on a regular basis regarding the untimely death of my father.

He raised me and my brother as a single parent for the majority of my life. He sacrificed his own well-being so that my brother and I could have a better childhood than he did. He came to every extracurricular

activity and practice. He pushed us to be decent and hard-working. He was a perfect example of a supportive father, stand-up community member, and the epitome of what it means to be a patriotic American.

I like to think that I am who I am today because of him. I know everyone thinks that their dad is the best, but I truly did have the best. When my father was first diagnosed with his cancer in February of 2014, he told me and my then fiance on a weekend visit to his home. He was upbeat. He was hopeful that he would beat it. Just like all the other hardships he had experienced in his life, he was sure that he could fight it and overcome. He was a survivor. He had overcome a difficult upbringing, war, being shot, divorced, living in poverty and single-parenthood to two hardheaded teenagers. He acted as those beating cancer would just be another notch in his belt that he had to overcome, and I thought the same. My dad was invincible.

So we fast-forward to July of 2014 after doing months of treatment and chemo and radiation. He became very lethargic. He lost interests that he was very interested in. Like he was a wonderful grandfather and he would stay active with my son at the time, who was four. And they would go to movies and they would go bowling. He was a private investigator and he was always working on

cases. Specifically his favorite was to work with children, child custody cases, and do supervised visitations. And so he was always out and about doing all of those things, not to mention all of the American Legion and community services that he was involved in.

But he had become very lethargic. He wasn't eating. He wasn't leaving the house. He was sleeping most of the day. And I had become worried. And we took him to the doctor's office where we found out he needed to go to the ER and he was diagnosed with pneumonia. They had him in the ICU for a few days for observation, but everyone seemed confident that it was just a bump in the road and that he would recover soon and he could resume his treatments. Hope was still there. I visited with him daily while in the ICU. He was beginning to bounce back. He was talking, he was eating, he was making jokes and becoming more like himself. Things were looking up.

We had planned already a large family vacation with my fiance's family to go to Florida. We were supposed to leave soon. I debated about going at all. My dad and my aunt, who was there to support us, convinced me to go because my dad was on the mend and he was going to be okay. He was going to be transferred to a regular room soon and he wanted me to go with them. My aunt would stay with him. And the doctors were upbeat about everything that was going

on. He was to stay in the hospital for two weeks to treat his pneumonia.

So I left for vacation with my family, and I wish that I had never left. I was only at Gulf Shores for 12 hours before my aunt called me and she told me that I needed to come back ASAP. She didn't want to give me all the details over the phone, but she told me that things had changed and my dad was not going to leave the hospital alive. On instinct, I knew in that moment that I was going to lose my dad. My fiance -- I left my fiance and my son there. He drove me to the airport for a 3:00 a.m. flight. I don't remember getting on the plane, the flight home. I don't remember who picked me up from the Ft. Smith Airport and drove me to Fayetteville. I was shell-shocked.

I arrived at the VA Hospital where I learned that my father's cancer was far more severe than had originally anticipated due to a misdiagnosis from Levy. When my father was moved from the ICU to the palliative care unit, it was hard to see my dad, a strong, independent veteran, lying there helplessly in the hospital bed struggling to breathe on his own. He had to wear a BiPAP which prevented him from communicating very well. I stayed in the hospital as often as I could, only returning to Ft. Smith every few days to clean up and visit with my son and my husband, or my fiance at the time.

After a few days in the palliative care unit, I overheard my dad communicating with family members and nurses regarding my upcoming wedding that was planned for November of 2014. He had said things like, "I just have to make it to November." I knew that my father couldn't make it that long with the severe stage of cancer that he was now in. It meant everything to me to have him at my wedding and be able to give me away. My fiance and I had decided to sacrifice our traditional wedding for an impromptu wedding at the VA. It was not romantic. It was not happy or fun.

This means that I went dress shopping alone. No bridesmaids or groomsmen. No ring bearer, no flower girl, no reception dinner, no wedding showers, no music or father/daughter dance. No meaningful invitations, and limiting guests to only parents and siblings. It was not a hard choice to make though for me because I would have given anything to have my dad witness and take part in my marriage to my best friend. I'm lucky to have a husband that understood how important it was to me to have my father and was willing to sacrifice a traditional wedding too.

When we told my dad that he would be -- that we would be pushing the wedding up to July 23rd and we would be having it in his room, he was excited and happy to be

able to give me away, even under sad circumstances.

The day of the wedding, I got ready in a suite in the palliative care unit alone. Everyone tried their best to be happy and enjoy the day, including myself. It was not an easy task when -- even with such a happy event. It was very hard to feel like a happy bride when I knew that my father was dying beside me. We were married that day in the hospital room next to my father's bed. It was a beautiful day and I was thankful to be able to share that moment with my father, even if it was different than how I had imagined. I went home with my husband that night and returned to the hospital early the next morning to be with my father for a couple of days. He was deteriorating very quickly at this point. I knew my time with my father was quickly coming to an end.

Friends and family started to come to say their goodbyes to him. And I didn't have such a conversation with him because I already knew that he loved me and he was proud of me and what he expected me to do in my life. On July 25th, I drove home from Ft. Smith to see my son and husband for the night before returning to the hospital in the morning. On the morning of the 26th, I was already en route to VA when my aunt called me to tell me that my father was slipping. I drove as quickly as I could, but as I parked the car, my aunt called again to tell me he had

already passed. I had never felt such sadness in my life and it felt like there was more gravity on Earth weighing me down.

I went to his room and said my goodbyes. Now I had to start helping to plan for my father's burial and explain to my son that his papaw was gone. My father received a service and burial with full military honors at the Ft. Smith National Cemetery. I know I wasn't the only one suffering and missing my dad that day, but I still felt very alone. I watched as the guards presented my four-year-old son with a flag that draped his grandfather's coffin. The ceremony was beautiful and exactly what my dad would have wanted, but it still felt as though he had been stolen from me too soon.

As months and years passed, I tried to move on with my life and career as best I could. Just weeks after my father passed, I was hired in my first teaching position, something I know he would have been proud of. A few months later, my husband officially adopted my son, something that my dad had made sure to set up so that it was easy to complete when the time came. I struggled with depression for years following my father's death, which put a strain on my new marriage. The death of my father was a weight that I carried everywhere. The sadness consumed me.

Having my wedding anniversary tied so closely to

my father's death is not easy for me. We did a reception dinner in November of 2014, but I don't think I really enjoyed it. Still we do not celebrate our anniversary in July because of the negativity I have associated with it. I don't even display photos of our wedding in our home because of the overwhelming sadness that it evokes, and I still struggle with it to this day.

In 2018, my husband and I had a second child. Something that should have been happy for my family was tainted. I would often become upset that he would never know his papaw like my oldest did. My oldest son knew this concern and he would often tell me, "I will remember for him." He tells me often how much he misses his papaw. And this makes me even more sad, because a 10-year-old should not feel responsible for keeping memories of his grandfather alive for his siblings.

Again, I had another child in November of 2020 on my own birthday. Once again, what should have been a very happy occasion had a dark shadow cast over it. I just completed my master's degree last year, and I know my dad would have been very proud and probably would stop people on the street to brag about it. However, it doesn't feel like a big accomplishment without him here to celebrate it with me.

It would be nearly six years before I would

realize the atrocity of his misdiagnosis and his mistreatment of my father's cancer that led to his untimely death, and that it was not just an innocent oversight or accident, but a malicious act of negligence and total disregard for human life. My dad was collateral damage.

With this realization, I began to wonder what would have happened if he had received the correct diagnosis and treatment from a sober and caring physician? Would he still be here today to welcome his third grandchild into the world and celebrate my master's degree? Could he have lived three more years, long enough to see that he would have a second grandchild and watch his first grandson grow into an intelligent, funny, talkative child? Maybe he only had a year left. He would have been a part of my first teaching job, walked me down the aisle at a traditional wedding and seen his first grandson start kindergarten.

Maybe he was too late. Maybe he would have had better quality of life these last few months if he had been able to make that decision. Would he have chosen to spend every day with family and friends, going on trips and living life to his fullest? I'll never know. The answers to these questions have been stolen from me. Instead, I get to spend the rest of my life haunted by the ghosts of "what if."

The ways in which my father's death has affected me personally are innumerable, immeasurable, and ongoing. It's truly impossible for me to list all of the ways in which the loss has affected me and my life and my children's lives. And it doesn't end today, either. I don't believe that I'll ever be able to celebrate happy and momentous occasions fully for the rest of my life. I will always feel that I'm missing something because my dad isn't here. I wish that I could say that I believe we would be reunited one day, but I do not believe that is true. For me, all I had were the 25 short years with my father, 25 years with the best man and father, 25 years of being a daddy's girl, 25 years of planning for a future that would never happen.

What happened to my father is a huge injustice and I hope that it is ratified today. However, nothing will give me true closure or lessen the feeling of sadness and loss.

THE COURT: Thank you so much for sharing all of that.

MS. VELOSKY: Thank you.

MS. JENNER: Mr. Doug Kolpek.

THE COURT: Mr. Kolpek, thank you for coming and being here.

MR. KOLPEK: Thank you for having me. I'm

actually here today with my sister to speak on behalf of our dad.

Our dad had a prostate biopsy nine years ago that he was told was benign, but we later learned that it was actually found to be positive for cancer, the result of an incorrect diagnosis by Mr. Levy. This was a cancer that had gone undiagnosed and untreated for over six years while the cancer spread throughout his entire body, eventually taking his life three weeks ago. Our dad wanted to be here to tell his story, to finally see justice carried out, but we are here today to be his voice as best we can.

Our dad was old school. He was a very proud man. He was a very proud father. He was a very proud veteran. My dad served in the U.S. Army during the Korean War. His dad served in the U.S. Army as an ambulance driver during World War II. His grandfather fought in the Spanish-American War, and to this day, he proudly displays that medal. Our dad was proud to be a veteran.

He worked on the railroad his entire life, and even though they provided him with health insurance and the ability to go anywhere he wanted for treatment, he always chose to go to the VA for his medical treatments. He trusted the VA to treat him like the honored veteran that he was. I remember my sister and I drove down to Arkansas to be with him at the VA during his heart bypass surgery.

He would also routinely drive from his Minnesota summer home all the way to Little Rock for his doctor appointments. And when he finally retired and moved back to Iowa, his primary care doctor was over two hours away, but he still insisted on traveling so he could keep receiving care from the VA.

Our dad was almost compulsive in maintaining his annual checkups and his prescriptions. In his final years of life after finding out about the misdiagnosis that left him with terminal cancer and despite pleas from his family to seek treatment elsewhere, he still refused to go anywhere else for treatment but the VA. Our dad was a true supporter of the VA system; a system that he trusted with his life.

Our dad was 81 when he was told about his mis-read biopsy from six years earlier. He was a healthy 81-year-old man whose father had lived to be 98 years old. At the time he was told about his prostate cancer, he was dealing emotionally with the recent news that his youngest brother had also just been diagnosed with Stage 4 prostate cancer. This then prompted the last of the three brothers to get checked, and he found out he also had prostate cancer.

Dad was angry that this could have been easily treated years earlier, but he focused his attention on his

treatment, not on the VA. At the time he found out about his cancer, his wife was in an assisted living home dealing with the effects of Alzheimer's. Before his diagnosis, he would visit her daily for lunch and dinner and spend time visiting with her. But as the cancer medications began to take its toll on his body, he found himself unable to visit her as often, and this was truly heartbreaking for him. He would talk about how guilty he felt for not going to see her. He often spoke about how he would tell her what was happening to him, but by the time he left, she would have forgotten.

One year after his diagnosis, she passed away, leaving a huge hole in his life. If his life wasn't already hard enough, this last year of his life brought even more hardship for him due to the COVID-19 pandemic. Visits with friends become less safe and less frequent. Visits with family became less safe and less frequent. We all tried to do the right thing and keep him safe, but knowing there was a chance that this might be his last of many things, heartbreaking and difficult decisions had to be made; difficult decisions that my sister and I now have to live with for the rest of our lives.

In the end, he spent his last Christmas alone in the hospital, his family unable to visit him. Our dad deserved better. Our dad deserves justice today. I just

want to end this with a story about my daughter, who is in college, and was recently enrolled in a class about death and dying. And she asked if she could interview grandpa and get his thoughts for an assignment she was working on. She asked him a number of questions about his life and his faith and how he wanted his last days to be. And in talking with him after, I could tell it was very therapeutic for him and he enjoyed sharing those feelings with her. She also asked him how he would want to be remembered. And she writes, quote, "Jerry Kolpek wants to be remembered as a person who had a good life. He talks about how he loved his job on the railroad, getting to go overseas to visit my dad when he was living in Spain. How he's been all over the country he once served, and how he always loved the outdoors, fishing, hunting, and the duty of country itself. I'm grateful for this assignment for the chance to learn more about my grandpa, and I will always remember him in the way he wants."

No matter what happens here in this courtroom today, we're not going to let this hearing be the way that we remember him. We're going to remember him as the man that he was, not the victim that he ended up being. Thank you for your time.

THE COURT: Thank you very much for sharing that.

MS. JENNER: Would now be a good time for a

 

break? May I have just five minutes, Your Honor?

THE COURT: Yes. We'll take a five-minute convenience break.

(recess taken from 11:53 a.m. to 12:03 p.m.)

THE COURT: Ms. Jenner?

MS. JENNER: Thank you, Your Honor.

I had a lot of 3553(a) factors prepared to discuss with the Court, but I'm going to dispense with that, Your Honor, and say that everything that the government could have said today and had intended to say in its argument for sentencing, it was far exceeded by what we heard today from Mr. McGuire and Ms. Lynch, Ms. Velosky, Ms. Hill, Ms. Phillips, and Mr. Parks.

This is an astounding case with huge ramifications that affect not only the lives of veterans, but society itself. And the Court has a difficult decision to make. And I'd ask for a 28-year sentence. I know the Court has a lot to consider in reaching such a maximum sentence. And if the Court should decline to impose the maximum, I would ask the Court to impose not less than a 20-year sentence. Thank you, Your Honor.

THE COURT: Thank you, Ms. Jenner.

Mr. Everett?

MR. EVERETT: May it please the Court.

As I said before, Your Honor, these good people

that testified and have given their victim impact statements deserve our sympathy and our prayers, and they will get them, at least from this side.

There are some factors, Your Honor, that I want to mention in connection with your sentencing decision that have not been specifically addressed yet in this courtroom.

As you know, this matter was resolved on a plea and a plea agreement. That plea agreement, as is typical in all plea agreements, the quid pro quo to the defendant is a dismissal of some charges, many charges, and the government's position that it won't object to a reduction for acceptance and also make a motion for another point for acceptance.

However, about two weeks ago, the government told the Court that their recommendation was to give Dr. Levy the statutory maximum and require that he serve them consecutively. It strikes me that that is kind of a violation of the plea agreement. After all, if that happens, there is no benefit to the acceptance of responsibility of three points. So in a civil context, you'd say that the consideration failed. But even if that's -- well, I think that deserves consideration, Your Honor. I'm not accusing the government of bad faith. I would never do that, particularly with Ms. Jenner, who is one of the most capable and honorable and honest people I

know.

I also think, Your Honor, that the fact that Dr. Levy has been an inmate in the Washington County Detention Center for what I think to be 18 months, but it might be 19, or 17 -- perhaps I haven't kept up with them -- is deserving of some consideration. You probably have -- you hopefully have no personal experience with the environment in the Washington County Detention System, but in this time of a COVID-rich environment, it has been nothing short of a nightmare. I guess the point is that 19 months' confinement in the Washington County Detention Center is worth more than 19 months confinement in the Bureau of Prisons. Dr. Levy hasn't been outside for any meaningful period of time. He's been variously quarantined and locked down in a little room over there with people that have been COVID exposed. I think that's deserving of some consideration.

I do know, Your Honor -- and you know too because the evidence is that -- that at least the mail fraud charges would have never been filed or discovered absent Dr. Levy's spontaneous sua sponte effort to contact the investigative authorities as he did, and spontaneously confess to having used 2M2B, or M22B, or whatever it's called. I think he's deserving of some credit for that. I don't know if it was a matter of him simply recognizing the

problems and wanting to get it on the table and confess to it, make it -- get past it or not, or perhaps he was just stupid. But I guess if you asked lawyers, you'd say, "don't do that." But he did, and I think that's a fact that you ought to think about.

You also know from reading the PSR that Dr. Levy is himself a veteran. He was in the Air Force for four or five years. He was discharged as a Major, honorably discharged. You know that during -- prior to his term at the VA hospital in Fayetteville, he stepped up in the AIDS epidemic. He performed autopsies on AIDS patients under circumstances in which many physicians, rightfully, would have declined to do so.

Particularly given the upward departure on the sentencing guidelines, that range now, if I have done it correctly, is nine years to 11 years and three months. And it strikes me that the sentence that's enough, but not too much, which I think is the goalpost here, falls within that range, and that's what I urge you to do.

Thank you for listening to me, Judge.

THE COURT: All right. Thank you, Mr. Everett.

MR. EVERETT: Your Honor, there's a couple of things I'm told to do, and frankly I forgot.

One is to renew our objections made in the pleadings before this hearing, and I do thereby renew them.

Mr. Hampton told me I had to do that. I didn't think I did, but I wanted to make sure. He's smarter than I am.

MR. HAMPTON: That's not true.

MR. EVERETT: The second thing is that if you choose to impose a term of imprisonment, Dr. Levy asks that you recommend that that be done in Texas. That's where his sister, Liz Reichman, lives. And recognizing that the Bureau of Prisons, unlike most of us, don't have to listen to you, but if you would make that recommendation, he would request that you do so.

THE COURT: All right. Thank you, Mr. Everett. There are several BOP facilities in Texas. What city does Ms. Reichman live in?

MR. EVERETT: Your Honor, I'll give you the same answer I gave to the very first question they asked me in law school. I don't know.

MS. JENNER: Your Honor, she wrote to the Court, so I believe she lives in San Antonio.

MR. HAMPTON: That's correct.

THE COURT: I was trying to find that. I have her letter, but I didn't -- yeah, right there in the return address at the very top of the page. All right. Thank you.

I'm not aware of any rule that requires that objections be renewed, but I don't suppose there's any harm

to it, either. Your exceptions were noted, and to the extent that they are viewed as a motion for reconsideration, it's denied.

All right. Mr. Levy, can you unmute?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Would you like to make a statement?

THE DEFENDANT: Yes, Your Honor, please.

THE COURT: You may proceed.

THE DEFENDANT: I regret and take responsibility for the decisions and actions that have led to this point.

In regards to involuntary manslaughter, my diagnostic evaluation of John Ray Gibbs showed wanton disregard for patient well-being, first driven by my arrogance while diagnosing within my subspecialty. And when found wrong, then a compulsion to quickly resolve the case, but again, with inadequate consideration, this time in two additional occasions, resulting in the death of a former airman who might otherwise be 67 years old now.

Concerning mail fraud, I became obsessed with my personal problem of craving that first drink while in recovery so that I lost sight of the greater picture and violated the public trust as a government official, but I also turned my back on my social contract as a physician when I broke my sobriety contract with the government.

To say I'm humiliated, disconsolate, angry with myself, provides no relief to those who have been harmed and just penetrates the surface as I continue to ask questions of how I became this man.

My plan going forward, if sentencing allows, is to continue in the alcohol/rehab community and seek out an addiction specialist to prescribe the best long-term, therapeutic strategy. But for now, I apologize to all families who have been fractured. I will forever grieve my professional misconduct that has impacted you all. And with a painful examination, now I'm going. I will stop my statement here and complete. I'm finished for the time being. Thank you, Your Honor.

THE COURT: Thank you very much, Mr. Levy. I really, really appreciate your statement.

So the guideline range, as calculated for the Court's previous explanation after the upward departure, would recommend to this Court that an appropriate sentence would be 108 to 135 months. There was a comment earlier about formulaic recitations. And the guideline range can be thought of as a formulaic recitation, which is necessary to give some assurance within a certain rubric that there's uniformity. That's the reason that the guidelines were invented in the first place is to bring some measure of uniformity across the courts of the United States.

However, since the *Booker* decision out of the Supreme Court, these guidelines have not been binding on the Court in a reflection that sometimes the guideline range does not get it right in any given case. And the Courts are required now to begin their calculation with the guideline range and then custom-tailor a sentence to the defendant, to the offense, through the so-called 3553(a) factors. And so while the guideline range is our beginning point, it isn't necessarily our ending point, because the Court first must examine and apply all of these other factors in an effort to customize the sentence to the facts and to the defendant.

I think when the Court applies these 3553(a) factors in your case, it views some of them, in fact many of them, in a very aggravating light, while others the Court must and does consider in a more mitigating light. And I will begin with the aggravating and then migrate towards the mitigating.

Before I get into those factors specifically, I would observe that in reading the presentence report and all of the other information that's been presented to the Court, including the extensive briefing, there's been this nagging question about what is and was behind such a great departure from the standard in so many cases. Why were there so many errors? What is the reason? What is the

cause?

Well, obviously, with the evidence about the 2M2B, that explains pretty concretely a certain period of time over which this happened. But it left a lot of question marks about what was going on back in 2014 or before. And the Court has explored those question marks openly in this hearing.

The Court did not have the opportunity to review the letters from your family members, Mr. Levy, until last night. The Court welcomes such letters. It reads every one of them in every case. Sometimes the Court will receive 50 letters that say very few things of importance under the mistaken belief that quantity is better than quality. Other times, the Court receives a few letters that are truly qualitative and useful to the Court. And that is certainly true in your case. The Court has received a lot of letters over the years that are well written, but I would certainly rank the genuineness and the usefulness of the letters that your brother and your sister, of course your dad as well, but your brother and your sister through their letters probably helped the Court to understand what was going on with you in your life more than anything that I read in the presentence report, more than anything that I read in the briefing, and I truly appreciate it.

So there are two offenses here. There's a mail fraud charge, and then we have the involuntary manslaughter charge. Both of these are federal felony offenses. Every federal felony offense is serious, but in the spectrum of relative seriousness, mail fraud charges, context really matters. I mean, a lot of times this a white collar business crime where money is trying to be obtained illegally. And so relative seriousness really is fact specific.

Here, the Court views the surrounding facts as being very serious and therefore the relative seriousness of the mail fraud charge in context is viewed as very serious and aggravating because the whole objective was to conceal the doing of something that in and of itself shocks the Court's conscience. That one, as a physician who took an oath to do no harm, would go to work drunk is just about as serious of an offense as I can imagine. It's not as serious as a child sex crime. I'm not suggesting that. And those crimes are frequently prosecuted in this Court. But it is nevertheless one of the more serious and aggravating offenses that I can imagine. And that would be one thing if that's all we were talking about, but it's not.

After going to work drunk with an apparent history of doing so, if the thoughts and remarks and

observations of your coworkers are credited, you did make, when confronted, the acknowledgment that you were an alcoholic and that you needed help. And frankly, for reasons which I don't entirely understand, the VA gave you a second chance. They worked with you while you were in treatment. Despite what you had done up to that point, you had made a good decision to get help for your addiction. You received help for your addiction. You had a pathway to come back to the practice of medicine. Your job was there. You resumed your duties in I believe the first or middle part of October of that same year, of 2016.

Doing so required this contract of sobriety. You knew what that meant. And within the first month, the first two months, the very first short amount of time, you made a decision that I can now somewhat comprehend, but not really comprehend it fully. You made a decision to throw away that second chance that you had been given and to go back to work drunk. And whether that part is specifically admitted or not is beyond the point. The Court is well persuaded by the evidence and the reasonable inferences that you were doing the same thing by the winter of 2016 and into 2017 that you had been doing a year earlier. And I just can't comprehend that. I find that egregious. So suffice it to say in the context of this case in terms of relative seriousness, it's very serious. I find it to be

very aggravating.

The involuntary manslaughter charge with regard to J.R.G., Mr. Gibbs, very, very difficult to get my mind around. You used a term that I had written in my notes, "arrogance." Despite acknowledging, I guess later acknowledging that you were an alcoholic, but, I mean, by then you knew that you had a problem. Well, let me put it this way. We know that you showed up drunk for work in March of 2016. As it relates to the involuntary manslaughter conviction and the events from February of 2014, the Court is quite convinced that you did not wake up on March 2016 and begin going to work drunk and that was your first time. The Court is well persuaded that you had a drinking problem, that you were an alcoholic long before 2016. And the Court is well persuaded by all of the reasonable inferences that your alcoholism was a significant contributing, if not direct cause, of your professional malpractice, practicing not just below the standard of care, but in reckless disregard -- and you've admitted that, and I appreciate that -- with regard to this patient.

But your treatment here illustrates another just extraordinarily aggravating component here. It's one thing if you're impaired and your impairment causes you or your vision not to see what is clearly in front of you. That's

one thing. But to either not present that conclusion to your colleague as required by the policy, or to present it to your colleague who disagrees and then falsely fail to disclose that, conveying to the clinicians and the surgeons who have to make decisions about this person's course of treatment and indeed their life, giving them the impression that there was confidence in the pathology diagnosis. Even if your impairment was causing you not to see through the microscopic lens clearly, I can't understand why that you would defeat these checks and balances, and why, when those checks and balances told you that you were wrong, you would then go on to lie about that. I just -- arrogance does not fully capture or explain why someone would do that.

You know, if you have an alcohol problem -- and we will talk about this in mitigation in a moment -- but if you drink too much alcohol, whether you are an alcoholic or whether you've been out for a night on the town, we all know, it's well-ingrained in society, that you don't get behind the wheel of a vehicle and drive. Because if you do, you're endangering not only your own life, but the lives of other members of the motoring public. And despite how well-ingrained that is in our society, I would think that it would just be -- it's just incomprehensible to me that one would take that to the next level and practice medicine while drunk.

Which is to say this: Alcoholism is a disease and it's mitigating. But it's one thing to destroy one's own body and not be able to help it. It's quite another when you get behind the wheel drunk, and then in an order of magnitude times 10, when you enter a hospital and provide treatment drunk. And there are just certain times when the guideline range doesn't fully capture the nature and the extent and the totality of the facts and circumstances at play here, and I fear that this is one of those cases.

But the facts here are not limited to March of 2016. They are not limited to the subsequent events in fiscal year, as we've called it, 2017 and '18. They are not just that your alcoholism drove you to find a substance that's not even part of the protocol of the Arkansas Crime Lab to detect. They had to invent a process to detect it. That you would go to that extent to choose satisfying your addiction over patient care, this could not be contemplated as being a case in the heartland of the guideline range. Could not be such a case.

Egregious. Callous. Arrogance. Self-righteous indignation. That you would actually write letters, one to the VA, filled with arrogance and self-righteous indignation of being mistreated because you were being accused of drinking again on the job without evidence. How

dare they? How dare these people say these mean, bad things about the great chief Levy? While at the same time, you're executing a plan to deceive them about your extensive efforts to conceal the very offensive conduct that you were engaging in. Who does that?

I'm not sure that I fully understand the context of why you wrote this hospital in California. But it's evident that there was some explanation that was necessary for your endeavors with them to explain away the mean things that the VA was doing to you and to explain why they just didn't get the facts right and that it was just a misunderstanding at the very time that you knew full well it was just not only false, but intentionally designed to deceive. These letters do not look like they were written in a drunken stupor. Words are well formed. They are typewritten. So even in sobriety, this self-righteous indignation and denial of the obvious just gives this Court great pause for who we're dealing with and the extent that you would go to. Hopefully, you won't do this in the future, but I just have great concern of where your sober mind will lead you and what that might cause you to do upon society.

Your lies were audacious, of sociopathic proportions, one hallmark of which is the inability to have compassion or empathy for harm or injury to others. Sound

familiar? Knowing that you're going to be providing patient care drunk. Knowing that you have made errors that you're willing to falsify medical records to cover up. Not having concern, apparently, for the accuracy of diagnosing tissue specimen, knowing that it will be relied upon by the clinicians. And being so wrong that you're missing or not stating things that a first-year resident would discover, despite your excellent medical education, training, and experience.

The aggravating nature of every aspect of both offenses of conviction, which are obviously interrelated by this impairment, I can't find words to understate them. But as the lookback study revealed, this probably didn't begin in 2014 either. It had probably been going on for some time before that. The Court is not prepared to punish Dr. Levy with causing deaths or massive bad outcomes in 589 people. Those were errors, significant errors, some of which I'm sure fall into the category of reasonable pathologists diligently practicing might differ. Others I'm sure involved errors that had the potential for having significant untoward consequences, but in the big scheme of things, that course may have already been destined.

But if you look at it scientifically, even though there are these outliers and the things that don't truly represent what's going on here, when you have that many

datapoints and you draw a line through the middle of them, this conduct is all related. And whether it results from the cause here, the personal cause, whether you were in this state of perhaps depression that led to the drinking and the depression contributed or acted solely in you just not caring anymore, I don't know. But it's all related in some fashion. And I say all that as being important in that it gives context. If this were an isolated -- you know, if these two cases, these two situations were isolated, if your conduct in these cases were aberrant of your overall career, that would truly be one thing. That would be a situation where we could say that the guideline range is appropriate. But that's not this case. The context here is like an onion with many, many layers. And every single layer is context that's not good. And that makes it very difficult to find mitigating nuance.

Nevertheless, the Court much search the record for any of the applicable sentencing factors that would weigh in a mitigating light so that the Court balances and tempers its judgment and its view as to the aggravating characteristics. And let's start with the most obvious and probably the most compelling here is that, Mr. Levy, you are an alcoholic. And you admitted that. You admitted that in 2016. You've admitted it again here today, and I appreciate that continued acknowledgment. Addiction is a

very powerful thing. Addiction is something that those that do not have an addiction to a harmful substance, it's easy for such people to discount the power of addiction.

Unfortunately, this Court has the opportunity to see and sentence methamphetamine addicts, heroin addicts. It has the opportunity after they have been sentenced, after they have done their time to be brought back before the Court because they have succumbed once again to this cycle of addiction. So I can understand it. Perhaps not completely because I've not experienced it, but I can understand it more than the average person, and I therefore can appreciate the fact that alcohol and your addiction to it is very, very powerful and has been very difficult for you to deal with. And this addiction, while not an excuse, gives context. And the Court must absorb its aggravating findings within this context, and I do.

And better than anything that any of the lawyers provided to the Court were the letters from your family members. And, you know, sometimes the Court receives letters that talk about, oh, just what a great person the defendant is, and they have made a mistake. And, you know, they are really a good person, you just don't know them. The letters from your siblings were rather unvarnished, and they did talk about the good, for sure. They talked about you growing up and about your empathy and about your

compassion. And that that is why your desire to help others, that's why you went to medical school. It's why you served our country. But they noticed, your family as a whole noticed that something changed about you. That your training in San Francisco seems to be a high point when the hard work and the things that you were confronted with made it difficult to be compassionate. The story about Hurricane Katrina and personal losses in your life. But their observation of this transformation to the point where you become disenfranchised from the family, you pushed them out of your life, you withdrew, all looks like depression to me. I'm not a psychologist, but looks like depression to me, and the alcoholism that came with it. But their observation was that you had lost your ability to be compassionate. And, wow, is that a true observation. And the context that they provide really helps me understand that more than anything. And this goes hand-in-hand with the alcoholism. And so, again, it's no excuse. An alcoholic doesn't get a free pass to drive on the interstate drunk. But the Court must endeavor to understand what's going on so that it can temper justice with mercy.

I also find mitigating that you have no prior criminal history. And the Court must recognize that because it sees so many people before it that have

extensive criminal histories. And when it sees those people, it really feels the need to observe a lack of respect for the law is present and to impose a sentence that will deter. So while it's true that you don't have any criminal record in the context that I'm thinking, to be fair, you probably would have had a criminal record if when you were arrested on that DWI, it was known that you had most likely been under the influence of an intoxicant that their test couldn't detect. I don't make a whole lot of that here. That's for some other court.

I would also note that, while you don't have a criminal history, it's not like you haven't been given a second chance. A lot of times the Court puts weight on lack of prior criminal history as pointing to someone who is deserving of a second chance and seeing what they will do with it. Well, two thoughts about this. A), you were given a second chance, for reasons that I can't fully understand, but they did. And it would be one thing if you had done well for two or three years and had some tragic event happen and you fell off the wagon. But it appears on this record that it wasn't just a matter of falling off the wagon. It appears as though you had been planning how you could remain impaired and work at the same time. And perhaps with your medical background and your chemistry understanding, that was an easy thing for you to figure

out. It seems somewhat complex to the layperson that you would be able to figure that out. But, wow. I digress. I'm trying to focus on mitigating.

A lot of the people that come before me, Mr. Levy, have been raised under impoverished circumstances. They have been provided no parental guidance. They've been provided with absolutely no foundation whatsoever to really appreciate right from wrong in a moral sense. And what they make of their lives is kind of preordained. They are destined not to do well in society. And so that's viewed as mitigating sometimes by the Court, this lack of proper parental guidance.

That doesn't fit you. You were raised properly. You had the benefit of lots of things that others don't. Had a good loving family. You were able to achieve an incredible education. So it's not mitigating that you weren't raised right, but it is mitigating that you do have a good family support structure. I take it you've been somewhat estranged from some of your family, but they are still there for you. It took them a lot of time to compose their letters. They are still here to support you, and you're going to need that support. And I think that that is mitigating, family support.

You're a veteran yourself; five years of service in the Air Force. You were honorably discharged. Thank

you for your service. The Court makes a point of saying that every time it sentences a veteran honorably discharged. Of course, the context here is that you were doing what you did upon your fellow veterans, so I don't give you a whole lot of mitigating credit for being a veteran, although I do appreciate your service during a period of better times in your life.

I do give you credit for accepting responsibility. And the first step in accepting responsibility is to admit what you did. And you took that step when you called the investigating agent and you said, "I have some more things to say." And you got back together with them and you began to peel back some of the secrets. Of course, that was after you hadn't been fully forthcoming with them the Friday before that, and so I don't know if not being forthcoming before weighed on your conscience. I don't know whether it was a realization that you had done your patients wrong that weighed on your conscience, but you did begin to start opening up. You gave a foothold to the investigation that they might not otherwise ever have uncovered. That's what Agent Raper testified, that they might not have ever uncovered that. And so I'm going to give you mitigating credit to weigh against the aggravating circumstances here for accepting responsibility. And the first step was that phone call and

those interviews where you started to come clean.

That said, to suggest that you earn a merit badge simply because you confessed to crimes that you had committed is not the proper way to view this. A confession by a criminal occurs much more often than when the police saw the "who done it" all by theirselves. So don't get too bent out of shape patting yourself on the back for confessing. You're a felon. You admitted to committing felonies. What you did was wrong, and you should have confessed. And you don't get a whole lot of extra credit for doing the right thing. What you get credit for is acceptance of responsibility, and that was the first step. And viewed in that context, you're very deserving of acceptance of responsibility.

The next major step that you took in accepting responsibility was to come into this Court, admit to the factual basis and to plead guilty to these two offenses. You saved the government an enormous amount of time and resources to prove these things. I don't even want to think about what the motion practice would have looked like in a case like that. But at least potentially, we could have been reconstructing this lookback during the course of a trial. And there has to be significant weight afforded to you for your acceptance in that second step of agreeing to plead to these two offenses.

The next significant step that you took in accepting responsibility was to make the statement that you made today. I find your allocution to be genuine. I find it to be remorseful. I find it to be in contradiction to the arrogance and narcissistic tones that some of your letters and your earlier conduct would exhibit. And that's a good step too. It's a good step for you to turn away from that. It's a good step for you not to try to say to this Court, "Well, you know, a lot of doctors make mistakes." So I appreciate that tone. I appreciate that self-recognition, and it's worthy of mitigation weight before this Court.

You are 54 years old, if I am correct, maybe 55. Generally speaking, age in and of itself is not a factor that the Court should consider in sentencing. But as a practical matter, one can't help but consider one's spectrum on the scale of age in comparison to what that means with respect to where one will be when one completes the sentence imposed. And sometimes a 10-year sentence puts defendants that have come before this Court beyond their anticipated life expectancy. So it can come into play. And the argument has been made about the effect of a 28-year sentence and how old you would be. And, again, at the end of the day, that's not a factor that the Court should be fixated on, but nonetheless, they have a point.

And so to a certain extent the Court appreciates the significance of what it is doing when it sentences a 54-year-old defendant to a very lengthy prison sentence, and I have taken that into account.

One of the purposes of sentencing is deterrence. On the one hand, you have no prior criminal history. It's not like you've been a revolving door of the criminal justice system like many defendants that the Court sees. So in some respects, I don't know that deterrence and the need for deterrence weighs heavily here on a personal level. I would like to think that this has been a ginormous wake-up call and that you don't need to be sentenced simply to deter you from committing additional crimes. That said, you are the person who, after being given a second chance, after being given your white jacket back, abused all that it stands for. And so I would be remiss if I didn't say that I did have some concern about what it's going to take to get through to you and that there be some measure of deterrence that plays a role in the Court's sentence.

Secondly, deterrence isn't just needed for specific deterrence. Deterrence is needed to send a message to others that there are consequences for conduct. For a doctor to violate their oath is one thing. For a doctor to violate their oath the way that you did is quite

something else. And if other doctors, others members of your profession who obviously must be familiar with your case because of the attention that it has drawn, certainly within the VA circles, if others were to see that it's okay to do this and you're just going to get -- I hesitate to use the word "minor" -- but a lesser sentence, it would be the wrong message to send.

This Court routinely, unfortunately, sentences middle-of-the-road and upper-end meth distributors to jail for 10, 15, 20, not too long ago sent one away for 25 years. Being a drug dealer and being a healer are two different things, so it's hard to make this comparison. But being someone who is cloaked as a healer that would do such harm, I can't see why you should receive a sentence that is considerably less than what a methamphetamine dealer or a heroin dealer of a significant scale would receive. It's different. I'm not saying it's a one-on-one comparison. But just looking at the big picture, it would seem odd to say that because you have been given such privilege of profession, that you're automatically entitled to a sentence less than those that don't enjoy all of the privileges that you enjoyed, receive, for doing something that may harm society. But it -- I take that back. Sometimes heroin does have actual victims, but it's not like it's pointed like your harms were. So deterrence,

388

both specific and general, is a concern. I don't know that I put a whole lot of concern on specific deterrence though.

The same for public safety. I would like to think that you will never be licensed as a physician ever again. You know, the term "doctor," medical doctors are always referred to in public as "doctor." It's honorific. An honorific is to show respect for accomplishment and for the worthiness of a profession. And while no one can ever take away your medical degree, we can take away the honor by calling you doctor, because you're not worthy of it.

My tie-in to public safety here is that if there were a chance that you were going to be practicing again, I would be very concerned that you would return to your old ways. But I don't think that you will be given an opportunity to practice medicine again. I do have concern that if you don't address your alcoholism, that you will get behind the wheel of a car if allowed to do so, and in that respect, the Court has concern for public safety.

The Court must also, as I explained earlier, take into account the need to avoid unwarranted differences in sentencing. That presupposes that the Court has a comparator to avoid an unwarranted difference from, and I don't know that this Court has a true comparator. I've certainly never had anything personally. Some of the case law that the Court has discussed and reviewed in ruling on

objections, there's been large-scale frauds, large-scale audits, investigations that had to take place. But nothing like this. So I've thought about it. I've looked at and am aware of the Court's sentencing in fraud cases, taken those into consideration. I've taken the need to avoid unwarranted disparity into consideration.

Mr. Levy, I take from your comments today, I take from the comments of your very-able counsel who have done a very good job of representing you in this case. They have postured this case in a very good manner for you. And while I have that thought, I would be remiss if I did not remark on the record, Mr. Everett, that I disagree that there's been any violation of a plea agreement here. There has not. 11(c)1(C), if you were wanting to bind the Court to a sentence, there's a procedure for doing that. The plea agreement says that this Court is not bound to a guideline range sentence. The Court advised Mr. Levy of that. He pled guilty understanding that. This Court specifically and expressly explained that by pleading guilty, he understands that he could be sentenced up to the statutory maximums of these two offenses. What you thought and whether it's a violation of an agreement are two different things.

Mr. Levy, I appreciate your acceptance. I appreciate all of the three steps of acceptance that I have

remarked upon today. There have been times where you've done the right thing. Your alcoholism explains the context. The Court does believe that it should temper its findings of the aggravating nature here as a consequence of that. But before there can be mercy, there has to be justice. And in this case, a significant upward variance from the guideline range is going to be required.

Mr. Levy, it is the judgment of this Court that you are to be sentenced to the custody of the United States Bureau of Prisons for a period of 240 months on Count 13 of the indictment. And that you are to be sentenced to a period of eight years on Count 29 of the indictment, with those two terms to be run concurrently for a total of 240 months of incarceration.

The Court will recommend that you be designated to a facility nearest San Antonio, Texas, that is within your classification level as determined by the Bureau of Prisons. The Court will recommend that you be allowed to participate in its residential drug abuse treatment program. Upon completion of your sentence of incarceration, you will serve a period of three years of supervised release.

Upon release from incarceration, you shall report to the probation office in the district to which you are released within 72 hours. While on supervised release, the

defendant shall not commit any federal, state or local crimes. He shall be prohibited from possessing a firearm or other dangerous device. He shall not possess a controlled substance and he shall comply with the mandatory drug testing provisions and the mandatory DNA collection provisions found at Title 18 United States Code Section 3583(d).

The defendant shall comply with all of the standard conditions of supervised release. Those were set out in your plea agreement. They will be restated in your judgment and commitment paperwork. The Court will impose the following special conditions:

Number one; the defendant shall submit to inpatient or outpatient substance abuse evaluation, counseling, testing and/or treatment as may be deemed necessary and as directed by the United States Probation Office.

Number two; Mr. Levy, you shall abstain from alcohol and any other related intoxicating substances, obviously, for example, but not limited to 2M2B during your term of supervised release.

Number three; the defendant shall not purchase, possess, use, distribute or administer marijuana, or obtain or possess a medical marijuana card or prescription, regardless of whether the consumption of marijuana might be

legal in the state in which you are serving your term of supervised release.

Number four; until the financial penalties to be imposed are paid in full, the defendant shall not incur any new debt nor establish any new bank or credit accounts unless receiving the prior approval from his probation officer. And in that regard, he must make known to his probation officer any and all information concerning his financial status upon request.

Number five; and in furtherance of number four, the defendant shall allow and give consent to the probation officer to make contact with any of his financial institutions to confirm that the defendant is complying with the previously ordered special condition.

Number six; the defendant shall submit his person, residence, place of employment and vehicle to a search to be conducted by the United States Probation Office at a reasonable time and in a reasonable manner based upon any reasonable suspicion that there might be evidence of any violation of the conditions of supervised release thereby disclosed.

With regard to restitution, for the reasons explained and identified and in the amounts set forth in the presentence report, it is ordered that the defendant pay to the victim restitution in the amount of -- to the VA

victim, restitution in the amount of $497,745.70. Interest will be waived.

In recognition of the length of sentence and the enormous amount of restitution, the Court will not impose a fine. The Court is required and will impose the special assessment of $100 per count, for a total of $200.
Mr. Levy, these amounts are technically due and payable immediately. To the extent that you may not have the ability to pay that entire amount upfront, then you will be required to make payments over time on the following schedule:

Any unpaid portion of the financial penalties shall be paid by the defendant during his term of imprisonment at a rate of up to 50 percent of the defendant's available funds in accordance with the Bureau of Prisons Inmate Financial Responsibility Program. During any period of residential reentry placement, the payments will become equal to 10 percent of the defendant's gross monthly income. The payment of any remaining balance shall become a condition of supervised release and shall be paid in monthly installments of $750, or 15 percent of the defendant's net monthly household income, whichever is greater, with the entire balance to be paid in full not later than one month prior to the end of the period of supervised release.

Mr. Everett, this is the Court's intended sentence. Are you aware of any legal reason why it should not be imposed?

MR. EVERETT: Do not know of any good ones.

THE COURT: Excuse me?

MR. EVERETT: If you were addressing that to me, and I assume -- I don't hear well. I know of no legal reason why that should not be imposed.

THE COURT: Thank you, Mr. Everett.

Ms. Jenner?

MS. JENNER: No reason, Your Honor.

THE COURT: The sentence will be imposed as stated.

Ms. Jenner, what about the remaining counts of the indictment and the superseding indictment?

MS. JENNER: The government moves to have those counts dismissed as per the terms of the plea agreement.

THE COURT: That motion is granted, and all of the remaining counts of the superseding indictment are dismissed.

Mr. Levy, you do have the right to appeal. And that includes the right to appeal the sentence that has just been imposed. In this regard, you should understand that you have a limited time within which to exercise your right to appeal by filing a notice of intent to appeal.

Your notice must be filed within 14 days of the day that the Court files its judgment. If you cannot afford to pay the filing fee that goes along with the filing of the notice of appeal, the Court would waive it.

You have the right to be represented by an attorney on appeal. If you cannot afford to retain an attorney privately for that purpose, the Court will appoint an attorney to represent you on appeal.

Mr. Levy, do you understand your rights on appeal?

THE DEFENDANT: Yes, Your Honor.

THE COURT: All right. Thank you.

Upon conclusion of our hearing today, Mr. Levy will be remanded to the custody of the United States Marshals Service pending designation and transfer to the Bureau of Prisons.

I'd like to thank counsel for their extraordinary work in presenting this case to the Court and the professionalism which you have shown throughout that process.

Ms. Jenner, is there anything else from the government today?

MS. JENNER: No, Your Honor.

THE COURT: Mr. Everett?

MR. EVERETT: Nothing from the defense, Your

Honor.

THE COURT: We're adjourned.

(proceedings concluded at 2:18 p.m.)

C E R T I F I C A T E

I, Paula K. Barden, CCR, RPR, RMR, Federal Official Court Reporter, in and for the United States District Court for the Western District of Arkansas, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this 1st day of February 2021.




_________________________________
PAULA K. BARDEN, CCR, RPR, RMR #700
Federal Official Court Reporter
Western District of Arkansas